UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                              )
DODORA UNIFIED COMMUNICATIONS,    )
INC.,                                                        )
        Plaintiff,                               )
                                                              )        Civil Action No.
        v.                                               )        05-10016-NMG
                                                              )
DIRECT INFORMATION PVT. LTD.,              )
LOGICBOXES, WEBHOSTING. INFO.,         )
TRANSECUTE (I) PVT. LTD.,                       )
RESELLERSRS, INC., AND                          )
ANSWERABLE, INC., COLLECTIVELY        )
d/b/a "DIRECTI.COM"                                  )
        Defendants.                             )
_____)

**MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR A PRELIMINARY INJUNCTION**

        The plaintiff, Dodora Unified Communications, Inc. ("Dodora"), defaulted in a state court case in Texas. Dodora then apparently sat by idly while a $100,000 default judgment was entered against it, the Texas court appointed a receiver, and that receiver began taking steps to turn Dodora's assets into cash to satisfy the default judgment. That receiver in that action contacted the defendant, Direct Information Pvt. Ltd. ("Directi"), like Dodora a "registrar" of domain names, to assist the receiver in collecting assets to satisfy the default judgment. The receiver entered into two agreements with Directi (which the Texas court's order appointing him authorized), and Directi did what it was required to do under those agreements.

        Eighteen months after it was defaulted and almost a year after it indisputably knew of the default judgment against it, Dodora entered into a settlement with the plaintiff in the Texas case. The settlement – to which Directi was not a party -- resulted in the dissolution of the

receivership, the approval of all actions the receiver took, and the discharge of any further responsibilities by Directi under the agreements. Promptly upon hearing that Dodora and the plaintiff in the Texas case were beginning settlement discussions, Directi tried to contact Dodora, both directly and through the receiver, to discuss how to migrate to Dodora the information that Directi had obtained in connection with assisting the receiver in collecting assets to satisfy the judgment. Instead of assisting in that regard, Dodora made baseless threats of litigation and falsely accused Directi of stealing its customers, domain names, and revenues.

The preliminary injunction should be denied because the plaintiff has failed to show a reasonable likelihood of success on the merits of its claims, Dodora would not be irreparably injured, and the paltry amount of money at issue neither raises issues allowing equitable relief nor even provides this Court with subject matter jurisdiction. Directi acted under contract to a duly appointed receiver, all of whose actions were expressly approved by the Texas court in the judgment to which Dodora agreed (and no doubt, helped draft). Directi promptly ceased its activities when the receivership ended, repeatedly offered to provide the information that Directi demands, never had access to more than about 18,000 domain names of Dodora, and received only about $12,000 as payment for the services that it indisputably provided to the receiver.

## Facts

Directi is an Indian company based in Mumbai (Bombay), India.[1] (Complaint ¶10.) Both Directi and Dodora are what are called "registrars" of domain names. (Turakhia Aff. ¶4.)

---

[1] The only proper defendant in this case could be Directi. The so-called defendants LogicBoxes and Webhosting.info are, in fact, tradenames of Directi. (Affidavit of Bhavin Turakhia ("Turakhia Aff.") ¶39.) The defendant Answerable, Inc. is a company that has no affiliation with any of the defendants, is not owned by the principals of any of the defendants, and has no connection to this case whatsoever. (Id.) The attorneys for Directi do not represent Answerable, Inc. The defendants Transecute(I) Pvt. Ltd., and ResellerSRS, Inc. are owned by Mr. Turakhia. However, there is no jurisdiction over them as they have no operations in Massachusetts, have had no contact with it, and had no communications with Dodora. (Id.) They will file a motion to dismiss on those grounds if the plaintiff does not voluntarily dismiss them.

In brief, a registrar acts as an interface between a customer that wants to use a domain name and the "registry" that registers who has rights to that domain name. (Id. ¶4-5.) The largest registries are for the ".com" and ".net" top-level domains. VeriSign, Inc. maintains these "TLDs". (Id. ¶4.)

A registrar, such as Directi or Dodora, charges a customer that wants to lease a domain name for a one year period a sum of, for Directi, $6.49 per domain name per year and, for Dodora, $6.69 per domain name per year. $6.00 of that amount is paid to VeriSign and $.18 of that amount is paid to an organization called the Internet Corporation for Assigned Names ("ICANN"), which maintains a record of all domain name registrations. (Turakhia Aff. ¶30, 37-38.) Customers are free to transfer their registration of the domain names from businesses such as Dodora and Directi to the many other registrars that compete for this business. (E.g., id. ¶33.)

### 1.   The Texas case.

For reasons that it chose not to explain in its filings with this Court, Dodora defaulted in a Texas state court action and allowed a $100,000 default judgment to enter against it there. The default judgment was entered on June 6, 2003. (Complaint ¶20.)[2] The plaintiff in the Texas action, which has no connection to Directi, caused the Texas state court to appoint a receiver. (Complaint, ¶21; Turakhia Aff. ¶2 and Exh. A thereto.) As Dodora admits in its complaint,

> "the *receiver* seized Dodora's license to use its Internet registration systems, held with both VeriSign and ICANN, in an effort to generate revenues to satisfy the Texas judgment. The receiver, Michael S. Bernstein, P.C. (a Garland, Texas attorney), then exercised control of certain assets and contractual rights of Dodora, specifically its login credentials under Dodora's registrar accreditation agreement with ICANN and VeriSign. ***With these login credentials, the receiver gained control of Dodora's entire Internet business, the revenues from Dodora's residual income, and access to Dodora's customer/registrant data base.***"

---

[2] Dodora has not even alleged that it had any valid defenses other than, purportedly, improper service. (*See* Complaint ¶¶19-20.)

3

(Complaint ¶¶21-22, emphasis added.)

Accordingly, by no later than January 2004, Dodora was well aware that a default judgment had been entered against it, that a receiver had been appointed to collect on Dodora's assets sufficient to satisfy the default judgment, and that the receiver was taking very aggressive steps to do so. All these actions occurred wholly without any involvement of Directi. What Dodora does not mention in its complaint, but which obviously is the case, is that once the receiver took those actions, Dodora's domain name registrar business was effectively shut down and subject to the complete control of the receiver. Rather than coming to terms with the receiver and trying to resurrect its business, Dodora apparently refused to cooperate with him or to settle with the plaintiff until December 2004. (Complaint ¶24 and Exh. D thereto; Turakhia Aff. ¶¶22-25.)[3] Instead of recognizing its own responsibility for its business difficulties, or extracting from the plaintiff in Texas or the receiver in Texas compensation for what it claims are its losses, Dodora apparently settled the case with the plaintiff and the receiver, no doubt releasing any claims against them. It then decided to file this strike suit against Directi.

  **2.** **<u>Directi's contracts with the receiver.</u>**

Directi's involvement in the Texas action was limited to services it provided under two contracts entered into with the receiver, Mr. Bernstein, on June 15, 2004. (Turakhia Aff. ¶¶2, 7-9.) Those two contracts, the "Management Agreement" and the "Batch Pool Agreement", are perfectly valid agreements which were vetted by Directi's principal and its Indian lawyers as well as, of course, by Mr. Bernstein, a lawyer in Texas. (Id. and Exh. B thereto.) Directi performed services under those agreements for six months, during which the receiver had the full authority of the Texas court to continue the relationship with Directi. Dodora apparently did

nothing, during that time, to help maintain its business or to assist the receiver or Directi in avoiding the damages it claims here.

### 3. The Texas receiver's appointment and the agreed dissolution of the receivership.

Dodora attacks the agreements that Directi entered into with the receiver as somehow being invalid. Indeed, its whole case rests on that erroneous assertion. However, the contracts, on their face, are valid, and Directi provided the services it agreed to provide under them. (Turakhian Aff. ¶35.) Moreover, the January 9, 2004 "order appointing receiver, corporate defendant," expressly provided the receiver "with the power and the authority to take possession of all non-exempt property, real and personal, of [Dodora], including, but not limited to: . . . (6) all cash, . . . . (9) contract rights, whether present or future; and (10) accounts receivable . . . ." (Turakhia Aff. Exh. A.) He was authorized, in addition, "to collect all accounts receivable of [Dodora]" and "to hire any person or company necessary to accomplish any right or power under this Order." (Id.)

Dodora also alleges that it "successfully challenged the appointment of the receiver in Texas, and the services performed by the receiver were never approved by the Texas court." (Complaint ¶24.) That allegation is simply and absolutely false. Dodora and the plaintiff in the Texas case voluntarily settled their litigation. Their "agreed order of dismissal" required the Texas court to dismiss, with prejudice, all claims and to vacate the default judgment. (Turakhian Aff. Exh. G.) However, Dodora, the plaintiff, and the receiver prepared, signed and filed, and the Texas judge then signed, an order that states as follows:[3]

---

[3] Directi has requested that Dodora provide a copy of all of the settlement agreement with the plaintiff and the receiver. Dodora has not done so.

5

"IT IS ORDERED that this receivership be and the same hereby is terminated; and that the receiver be, and he is released and discharged from all obligations under his bond and under this receivership;

ORDERED that the Receiver's Motion to Approve Contracts is hereby denied *as moot;*

***ORDERED that all actions taken by the receiver during the pendency of the receivership are APPROVED in all respects;***

ORDERED that all funds on deposit with the receiver as of 11/30/04 ($21,710.12) shall be distributed to the Receiver as additional approved receiver's fees and to Mark Blendin [the plaintiff's lawyer] as per their agreement; . . . .

(Turakhia Aff. Exh. G, emphasis added.)

Accordingly, Dodora's argument that the line in the two contracts about potential subsequent court approval means that all of the actions of Directi under those agreements were without any authority, is irrelevant as well as wrong.[4] Dodora manufactured a settlement in Texas that prohibited the receiver from seeking that approval and which required the court to deny his pending motion. However, the motion was denied *as moot,* not because of a "finding" that the receiver had no authority to enter into those agreements. ***In fact, the Texas court specifically "approved" all of the actions the receiver took.*** (Turakhia Aff. Exh. G.) The most significant action the receiver took, at least with respect to this case, was entering into the agreements with Directi. Dodora's allegations that the Texas court somehow "invalidated" these contracts therefore is simply absurd and is belied by the very order to which it agreed.

  **4.  The payments Directi actually received and the domain names Dodora actually had.**

Dodora also contends that Directi misappropriated its domain names, the number of which Dodora claims exceeded 60,000, and at least $120,000 in customer fees that Dodora claims were paid during the six months Directi managed the domain business on behalf of the

receiver. Those statements also are utterly and demonstrably false. First, Directi received, through the Batch Pool Agreement, $51,557 from the third party (Pool.com) that actually generated the revenues. Pool.com paid $4,924.03 directly to Mr. Bernstein, and Directi paid him an additional $28,160.06 of what it received from Pool.com under the Batch Pool Agreement. Directi transferred a further total of $8,700 of that amount to VeriSign ($3,700 of which was wired to Mr. Bernstein, who then sent it on to VeriSign). (Turakhia Aff. ¶¶ 18-20.) Accordingly, Directi transferred, to Mr. Bernstein and VeriSign, $36,860.33 of the $51,557 that Pool.com paid as a result of the Batch Pool Arrangement.

Including a payment of $3,115.64, which Directi received only last week from Pool.com for revenues received with respect to the last two weeks of the receivership, Directi has received a total of only $14,696.67 from these collections. (Turakhia Aff. ¶21.) Prior to that payment, it had received $11,581.03 against agreed fees of $12,130.25. (Id.) After this payment, there appears to be an excess of $2,566.42, which Directi is prepared to pay to Mr. Bernstein, the plaintiff in the Texas case, or Dodora as the settlement agreement among them would require. Directi received no other funds for any of the work it performed on behalf of Mr. Bernstein. (Turakhia Aff. ¶20.)

Dodora also claims that it had 60,000 domain names. That again is demonstrably false. Based on publicly available information, at the time Directi signed the agreement with Mr. Bernstein, Dodora managed only about 18,000 domain names. (Turakhia Aff. ¶30 & Exh. I thereto.) That is consistent with the approximately 18,250 domain names that Directi managed under contract to the receiver. (Turakhia Aff. ¶31.) If, in fact, Dodora had the number of domain names it alleges – which is certainly not the case -- then those names must have

---

[4] The only evidence from the parties to those agreements is that those lines in the contracts were added, in essence,

7

disappeared during the months between January and June 2004, when the receiver was trying to force Dodora to pay the judgment and Dodora was ignoring the receiver and watching its business fritter away. Directi does not have information about any names other than those 18,250 it dealt with under authority of the receiver, never had access to or control over any of those "missing" domain names, and has no information about them today. (Turakhian Aff. ¶¶29-35.)

### 5. What Directi is (or, rather, is not) doing now.

Directi is simply not utilizing, wrongly or otherwise, any confidential information of Dodora. As detailed in Mr. Turakhia's affidavit, once Directi learned from Mr. Bernstein that settlement discussions were ongoing between Dodora and the plaintiff in Texas, Directi tried to make contact with Dodora to discuss how best to migrate to Dodora the information that Directi had obtained in connection with the receivership. Directi's principal followed up on that request to Mr. Bernstein by contacting Dodora directly. (Turakhia Aff. ¶¶22-26 & 28 & Exhs. E & F.) Dodora's response was, in essence, that it would sue Directi. Dodora's principal refused to discuss how to transfer the very information it now complains of. (Turakhian Aff. ¶¶26 & 28.) Directi remains willing to transfer that information to Dodora, in whatever format it desires, and to delete it from Directi's systems. (Id. ¶36.) The only exception is information about the 1786 domain names with respect to which customers concluded, for independent business reasons, to renew through Directi and any information needed for tax, accounting, legal and other similar business needs.

As set forth in the Turakhia affidavit, promptly upon dissolution of the receivership, Dodora changed its login and password information with Verisign and other registries and took

---

to provide additional protection for Directi. (E.g., Turakhia Aff. ¶8.)

ID # 419078v01/14386-2/ 01.20.2005

other steps that precluded Directi from continuing to utilize the information about which Dodora complains, even if, which is not the case, Directi had any interest in doing so.  (Turakhia Aff. ¶27 & Exh. H.)  Dodora reacquired, in December 2004, all contacts with customers for management of over 11,746 of the approximately 18,250 domain names that Directi received information about.  (Id. ¶31.)  An additional 1,850 domain names expired because, for example, the customers no longer were interested in utilizing them.  (Id. ¶32.)  An additional 2,906 domain names were transferred to registrars other than Directi, which is permitted in this industry and which happens quite regularly.  (Id. ¶33.)  Therefore, even after all of the difficulties caused by Dodora's failure to deal with the Texas state court proceeding and the receiver, Dodora has retained the great majority of the domain names that Directi first began managing, six months after the receiver started taking actions that inevitably would have caused customers of Dodora to lose interest in doing business with it.

## ARGUMENT

### I.    DODORA HAS FAILED TO SHOW A REASONABLE LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

Dodora seeks a declaratory judgment with respect to purported ownership of the domain name "assets", damages for conversion, money had and received/unjust enrichment, interference with advantageous business relations, Chapter 93A and injunctive relief.[5]  The short answer to all these claims is that Dodora acted, in good faith, consistent with rights provided to it in two agreements that it entered into with a receiver who had been duly authorized to enter into just those kinds of agreements by a Texas court.  There is not a shred of evidence that Directi did anything other than to conduct the activities that the receiver authorized and instructed it to

ID # 419078v01/14386-2/ 01.20.2005

conduct. Had Directi not conducted the work that it did, Dodora's business quite probably would have disappeared entirely, due to Dodora's refusal to cooperate with the receiver and its utter failure to resolve the Texas state court litigation until eighteen months after a default judgment was entered and one year (or more) after it knew the receiver had been appointed.

Dodora may then have tried to manufacture an argument against Directi in the way in which it orchestrated the settlement, to which Directi was not a party. However, the orders dismissing the case and dissolving the receivership -- to which Dodora at least agreed -- demonstrate unequivocally that the Texas court *approved* all the actions that the receiver had taken and did not, in fact, "invalidate" the contracts that he entered into with Directi.

Moreover, with the possible exception of 1786 domain names with respect to which customers made the independent business decision – which they are always free to do – to register those names through Directi and not Dodora or some other registar, Directi has repeatedly offered to transmit to Dodora the information it obtained in connection with the receivership.[6] Directi has made no use of those names and has generated no income from them other than as allowed under the agreements with the receiver.

Whether evaluated based on the doctrine of derived judicial immunity or simple tort concepts, Directi did nothing of which Dodora could complain. Accordingly, it has failed to show a reasonable likelihood of success on the merits of its claims.

---

[5] There obviously is no basis for Chapter 93A liability with respect to actions taken by an Indian company, under contracts (requiring the application of Indian law) between it and a Texas attorney appointed by a Texas state court to act as a receiver in Texas with respect to a default judgment entered in Texas.

[6] Directi must keep information about these existing customers.

## II.   DODORA WOULD NOT BE IRREPARABLY INJURED IF AN INJUNCTION DOES NOT ENTER AND THE BALANCE OF THE EQUITIES DECISIVELY TIPS IN FAVOR OF DIRECTI.

As set forth above, Directi holds nothing that it was not entitled to have in the first place, has always been prepared to transmit the historical customer and domain name information to Dodora, and has not made nor will it make any use of the information it obtained.  Moreover, the total profits that Directi has earned from the 1786 domain names that are now registered with it is about $160.  (Turakhia Aff. ¶37.)  Dodora would have earned no more than about $500 from those domain names.  (Id. ¶38.)  Dodora cannot possibly claim it is being irreparably injured by the loss of those domain names, especially when they generate so little income.  Combined with Directi's repeated attempts to transmit to Dodora the historical information it has, it is clear that Dodora neither has been, nor will be irreparably injured and that the balance of the equities favors Directi.

## CONCLUSION

For the reasons set forth above, Directi respectfully requests that the Court deny the motion of the plaintiff for a preliminary injunction.

DIRECT INFORMATION PVT. LTD.,

By its attorneys,

s/Dustin F. Hecker

_____
Dustin F. Hecker, Esq., BBO# 549171
POSTERNAK BLANKSTEIN & LUND LLP
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617-973-6100)

Dated:  January 20, 2005

**CERTIFICATE OF SERVICE**

      I, Dustin F. Hecker, hereby certify that on this 20th day of January, 2005, I caused a copy of the foregoing to be served by hand, to: Nicholas Carter, Esq., Todd & Weld, 28 State Street, Boston, Massachusetts 02109.

                                       s/Dustin F. Hecker

                                       Dustin F. Hecker, Esq.

ID # 419078v01/14386-2/ 01.20.2005