UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
DODORA UNIFIED COMMUNICATIONS, )
INC., )
      Plaintiff, )
) Civil Action No.
v. ) 05-10016-NMG
)
DIRECT INFORMATION PVT. LTD., )
LOGICBOXES, WEBHOSTING. INFO., )
TRANSECUTE (I) PVT. LTD., )
RESELLERSRS, INC., AND )
ANSWERABLE, INC., COLLECTIVELY )
d/b/a "DIRECTI.COM" )
      Defendants. )
_____)

## AFFIDAVIT OF BHAVIN TURAKHIA

1. I am employed by the defendant Direct Information Pvt., Ltd. ("Directi") as its CEO. I make the following statements of my own knowledge, except as to those statements made based on my belief or understanding. With respect to the latter, I believe them to be true.

2. I have attached, as Exhibit A, a true and correct copy of an order, dated January 29, 2004, appointing Mr. Michael Bernstein as receiver in the matter of *Compana v. Dodora,* with respect to a default judgment of $100,000 entered against Dodora in a state court in Texas. Directi has no relationship with Compana and had no involvement in its case against Dodora until, as explained below, Mr. Bernstein requested Directi's assistance in performing his duties as the court-appointed receiver.

3. I understand that between being appointed as receiver and June 2004, Mr. Bernstein attempted to obtain access to assets of Dodora United Communications, Inc. ("Dodora") to be able to satisfy this judgment.

4. Dodora (and Directi) are "registrars" of domain names. Every registrar registers domain names by connecting to a "registry" for different "Top Level Domains" (TLDs). There are different TLDs for different domain names. The largest TLDs are ".com" and ".net". Verisign, Inc. manages the .com and .net registries.

5. Registrars, such as Dodora (and Directi), connect to a registry using passwords. I understand that Mr. Bernstein obtained a court order requiring Verisign to change and turn over to him the password that Dodora used as a registrar, which logically would have caused Dodora's business to come to a standstill. It is my understanding that Mr. Bernstein hoped, from this, to obtain cooperation from Mr. Ron Garraud, the owner of Dodora, in collecting assets to pay the judgment in favor of the plaintiff in the Texas case.

6. Based on my communications with Mr. Bernstein, Directi's experience managing Dodora's domain registrar business on behalf of Mr. Bernstein, and my experience in this industry, I am confident that customers of Dodora were highly inconvenienced during this process and could not manage or renew their domain names or add any new domain names through Dodora. Dodora's domain name business had to have been experiencing great difficulties well before Directi entered into its agreements with Mr. Bernstein.

7. Mr. Bernstein, whom I understand is a local lawyer in Texas, did not himself have the ability to manage Dodora's registrar operations. Mr. Bernstein therefore approached me, sometime before the beginning of June 2004, to see if Directi could provide software for

2

managing the registrar operations of Dodora. Directi has an unincorporated division, called LogicBoxes, which provides software for completely automating the operations of a registrar. LogicBoxes software currently powers around 20 ICANN-accredited registrars. Mr. Bernstein asked us to provide this software to him in his capacity as a receiver so that he could manage the Dodora registrar operations.

8. I received and reviewed the court order appointing Mr. Bernstein as a receiver. Directi's lawyers in India did as well. (Exhibit A is a facsimile transmission from Mr. Bernstein enclosing an additional copy of the order.) Directi's lawyers and I were convinced that Mr. Bernstein had the requisite power to hire Directi's services and to contract with Directi. We also were convinced, both by Mr. Bernstein and upon conducting our review, that while Mr. Bernstein's activities were always subject to court approval, he did not need any prior court approval to enter into any contract with Directi. I would not have had Directi enter into any agreement with Mr. Bernstein if I and my lawyers were not so convinced.

9. Directi therefore contracted with Mr. Bernstein (as receiver for Dodora) on June 15, 2004, to assist him in managing the registrar operations of Dodora. Directi entered into two contracts with Mr. Bernstein – namely the "Batch Pool Agreement" and the "Management Agreement." Each was signed by Directi and by Mr. Bernstein, as receiver for Dodora. I have attached, as Exhibit B, true and correct copies of the two contracts with Mr. Bernstein.

10. The Management Agreement listed Directi's general responsibilities, through its division LogicBoxes, to assist Mr. Bernstein in managing the registrar operations of Dodora. The work involved customizing our standard LogicBoxes software to allow it to perform the

services contemplated under the contract and deploying and managing the same for Mr. Bernstein, as well as providing support to all Dodora customers during the duration of the contract. However, LogicBoxes simply provides business process automation software to registrars. All of the actual billing and payment collection responsibilities are left to the registrar. LogicBoxes has similar arrangements with over 20 other registrars it serves. LogicBoxes' business process software does not allow LogicBoxes to bill or collect payments on behalf of the registrar. Directi agreed not to receive any compensation directly for these services. The Batch Pool Agreement, as explained below, was necessary to provide a means to generate revenues from Dodora's domain registrar operations, so that Mr. Bernstein would have funds to pay the plaintiff in Texas and so that Directi could be compensated for its services.

11. Each domain name registered or renewed by a registrar incurs a $6.00 fee from the relevant registry, such as Verisign. Therefore, if any customer of Dodora wanted to buy a new domain name, Mr. Bernstein would need to deposit $6.00 with the registry, in advance, to be able to perform the transaction. In addition, Mr. Bernstein would need to pay to the relevant registry (again, in advance) $6.00 for every customer that wanted to renew a domain name or to add new domain names. Mr. Bernstein therefore would have needed both to pre-fund these transactions and to employ manpower and infrastructure to collect this amount for hundreds of transactions from Dodora customers each month. As mentioned above, LogicBoxes' software assists a registrar in business process automation, but the registrar would itself be responsible for the actual payment collection. LogicBoxes cannot and would not agree to collect money on behalf of Mr. Bernstein (or any other registrar), not least because of the credit risk involved. He would have had to

manage invoicing and collections independently, using the software provided by LogicBoxes.

12. Since the receivership did not have any money and Mr. Bernstein did not want to be responsible for collecting these payments from the customers of Dodora, Mr. Bernstein decided that he would not forward money to the registry and that no customer of Dodora would be allowed to renew a domain name or to add a new domain name. If any customer wished to buy new domain names or renew their existing domain names, the customer would need to move its business to another provider. Therefore, the Management Agreement explicitly prohibited LogicBoxes (i.e., Directi) from allowing renewal of domain names and from adding new domain names under Dodora. This is something that Mr. Bernstein requested, not a feature of the agreement that Directi imposed on him.

13. Customers of Dodora were informed that no such transactions could be performed by them under the Dodora account. They were informed they had the option of choosing a new provider on their own. In other words, before the domain name of any customer expired, the customer could move their domain name to any other registrar or provider of their choice. In this industry, the customers always have that choice anyway.

14. Mr. Bernstein did not have money from the receivership to pay Directi for all its services. As I understand it, Mr. Bernstein was advised by Compana (the Texas plaintiff) that the only realistic way the receivership could generate revenues to satisfy the judgment (and to pay Directi for its services) was through what is called monetizing the batch pool of Dodora.

15. Every registrar has what is known as a batch pool, which is provided by the Verisign registry. This batch pool is the only method that can be used to register valuable secondary market domain names which have expired. Specialized software must be employed to use this batch pool to register these domain names. Almost 90% of the registrars worldwide lease out their batch pool connections to specialized providers, who then use these batch pool connections to register a small set of valuable domain names (around 100-300 every month per registrar) and then auction these names to generate revenue. These providers then share a portion of such revenue with the registrar whose connections they lease. The monthly revenue that a registrar can earn through leasing its connection to the batch pool varies from $5,000 to $15,000; however, this amount has been dropping as more and more registrars begin leasing their batch pool connections out each month.

16. The dominant player in this market, to which most registrars lease their connections, is Pool.com. In fact, I understand that before Mr. Bernstein took control of Dodora's registry password, Dodora was already leasing its batch pool connections to Pool.com.

17. Mr. Bernstein decided to monetize the batch pool of Dodora and for this purpose entered into the second contract with Directi, namely the Batch Pool Agreement. Under this contract, Directi would manage Dodora's batch pool connections with Pool.com. Mr. Bernstein would retain 75% of the income generated by this arrangement and 25% of the income would be paid to Directi for services being rendered by Directi under the Management Agreement. The contract also stated that Directi would pay Mr. Bernstein $6.00 for every domain name registered, which Mr. Bernstein would then send to Verisign in order to allow Pool.com to register domain names using Dodora's

connections. Verisign, however, requires payment in advance, and it was therefore subsequently decided that Directi would advance money to the Verisign registry to cover the cost for any domain names registered by Pool.com using the batch pool of Dodora. Pool.com then would reimburse this money to Directi.

18. For the periods between June 15, 2004 and December 1, 2004, Pool.com transferred $4,924.03 to Mr. Bernstein and $43,517.33 to Directi. Directi received, very recently, an additional $3,115.64 from Pool.com, against payments for the period between December 1 and December 13, for a total of $51,557.00. However, $3,036 of this amount represented amounts (due to Mr. Bernstein under the Batch Pool Agreement) reimbursement for 506 domain names that Pool.com registered during this period, at the rate of $6.00 per domain name. The remaining $48,521 therefore was the amount subject to the 75% commission to be paid to Mr. Bernstein under the Batch Pool Agreement.

19. Between June 15, 2004 and December 13, 2004, Directi transferred $23,236.03 of the amount received from Pool.com to Mr. Bernstein. I have attached as Exhibit C, true and correct copies of wire transfer documents reflecting these payments. Therefore, Mr. Bernstein received a total of $28,160.06 during this period (including the $4,924.03 that Pool.com transferred to him directly).

20. Between June 15, 2004 and December 13, 2004, Directi transferred a further total of $8,700 of the amount received from Pool.com to Verisign Inc. $3,700 of this was wired to Mr. Bernstein, who then sent it to Verisign. The remaining amount was directly sent to Verisign. I have attached as Exhibit D wire transfer documents reflecting these payments. Accordingly, of the $51,557 that Pool.com paid as a result of the batch pool arrangement, Directi transferred $36,860.33 to Mr. Bernstein and Verisign.

ID # 418853v01/14386-2/ 01.20.2005

21. Directi's fees under the Batch Pool Agreement should actually have been $12,130.25 (25% of $48,521). Prior to the Pool.com's very recent payment of $3,115.64, Directi had received only $11,581.03. As Directi has now received a total of $14,696.67 from those collections, there appears to be an excess of $2,566.42.

22. On December 1, 2004, Mr. Bernstein informed me that settlement talks were going on between Compana and Dodora. Mr. Bernstein mentioned, in this communication, that once the settlement was finalized, the receivership would be closed and the services of Directi would no longer be required. Directi was simply asked to wait for a further communication from Mr. Bernstein. Directi was not asked to participate in the settlement process or to provide any feedback to the court or the parties about what, if anything, the settlement should entail with regards to Directi's contracts with Mr. Bernstein, the receivables thereunder, the process to be followed to return the remaining domain names to Dodora, or anything else.

23. Upon receiving this email from Mr. Bernstein, I asked for contact information for Ron Garraud of Dodora. I also asked Mr. Bernstein to notify Mr. Garraud to get in touch with me in order to discuss how to migrate customer information to Dodora. (I have attached as Exhibit E a true and correct copy of that e-mail.)

24. On December 7, having not heard from Mr. Garraud or Mr. Bernstein about the settlement progress, I sent an e-mail to Mr. Garraud congratulating him on the settlement and asking him to get in touch with me to discuss the process to follow the settlement. (I have attached as Exhibit F a true and correct copy of that e-mail.)

ID # 418853v01/14386-2/ 01.20.2005

25. On December 13, 2004, after Compana and Dodora arrived at a settlement, the Texas court dissolved the receivership. (I have attached, as Exhibit G, true and correct copies of documents I received from Mr. Bernstein concerning the dissolution of the receivership.)

26. I called Mr. Garraud sometime in the second week of December, after he failed to respond to my e-mail. I asked him several times, in that conversation, the format in which he would want the customer data delivered so he could start his registrar operations on his system. Mr. Garraud did not seem to want to discuss what I assumed would be an important aspect in restarting his business and instead stated that his legal team would be contacting me.

27. I understand that around that time, Mr. Garraud contacted Verisign and obtained Dodora's password back. I understand that he also informed Verisign not to accept any requests from Directi with regards to Dodora's registrar. Mr. Garraud therefore was in full control of the Dodora registrar activities. Directi physically could no longer access the Verisign registry on behalf of the receivership or manage Dodora domain names from that point onwards. (Please refer to Exhibit H, a true and correct copy of an e-mail from Verisign.) Directi was also not authorized from that date to request Verisign to change any settings in the registry. Mr. Garraud and Dodora would be exclusively responsible for making any changes in the registry including, but not limited to, the certificate common name that Dodora would use to connect to the Registry. While Directi had no interest in performing any of these functions with respect to the Dodora domain names and has not done so since its work under agreement with Mr. Bernstein ended, I did want the Court to understand it would have been impossible for Directi to do so anyway.

ID # 418853v01/14386-2/ 01.20.2005

28. In the meantime, Directi's sales staff received calls from the Dodora legal team, in the middle of the night in India.  The next day, Mr. Garraud and another colleague from Dodora called me up. In this conversation, I once again reiterated my offer of giving them the entire customer database, past and current, in the format they desired.  However, they were unwilling to discuss the migration process and instead chose to continuously insist that all contracts entered into by Directi with Mr. Bernstein were invalid and that all actions performed by Directi under those contracts were illegal and that they would sue Directi.

29. I understand that Dodora claims that it had 60,000 domain names as of June 2004 and that Directi supposedly "converted" 47,000 domain names or customers and $120,000 in customer fees.  As discussed above, the total amount that Directi received as a result of the batch pool arrangement with respect to any Dodora domain names or customers was $51,577, most of which was transferred to Mr. Bernstein and Verisign.  Dodora's statement about the number of domain names it managed also is entirely inaccurate, based both on the domain names Directi actually managed under the agreements with Mr. Bernstein and on publicly-available information.

30. According to publicly-available information, Dodora actually had around 18,000 domain names under management when Directi entered into the agreements with Mr. Bernstein. (Exhibit I is a true and correct copy of an email from the Chief Registrar Liaison of the Internet Corporation for Assigned Names ("ICANN"),  Mr. Tim Cole, validating this fact.)  The same fact can also be validated by referring to reports published by ICANN at http://www.icann.org/tlds/monthly-reports/, which show the sum total of domain names under management of a registrar at any given time.  I have attached, as Exhibit J, some

background information about ICANN. The most important fact about ICANN, for this case, is that a registrar like Dodora must provide information that enables ICANN to calculate the number of domain names it has under management.

31. I am fully familiar with Directi's activities in connection with managing Dodora's domain names. Between June 15, 2004 and December 13, 2004, Directi never had information about or access to more than approximately 18,250 domain names registered to Dodora. Dodora reacquired, in December 2004, all contacts with the customers for and management of over 11,746 of those domain names.

32. Customers allowed approximately 1850 domain names to expire. When a domain name expires, it returns back to the relevant registry (i.e., Verisign) and is available for anyone else to register within a certain period of time. Every year, between 10 to 30% of the customers of any registrar choose not to renew their domain names upon the expiry of their term because they change their mind about that particular domain name or for other reasons.

33. Customers transferred approximately 2906 domain names to registrars other than Directi. Upon expiry of a domain name, each year, any customer has a free choice to transfer their domain name to any other registrar. If a customer chooses to take their business elsewhere at anytime, a registrar is legally prevented from obstructing them in any fashion.

34. Between June 15, 2004 and December 13, 2004, customers for 1786 domain names transferred them to Directi. Directi did not actively attempt to transfer these customers over. As per the contracts entered into between Directi and Mr. Bernstein, these customers had to move their business somewhere when their domain name registrations

11

expired. Customers of 1786 domain names therefore chose to move their domain names to Directi because they perceived it to be an appropriate business decision.

35. During this period, therefore, about 35% of Dodora's domain names expired or were transferred by customers to other registrars, meaning Dodora retained at least 65% of the domain names.  For reference, the average annual renewal rate for registrars is about 60%.  All these customers moved their domain names or let them expire out of their own free will; Directi did not encourage them to do so.  Directi actually ensured that Dodora's customers had a way to manage their domain names while Dodora was under receivership.  Without that all of Dodora's customers would have moved away to other providers.  I can confirm that during this period, Directi did not force customers of Dodora to let their domain names expire, or force their choice as to where they must move their business.  Directi did not sell, auction or transfer any of Dodora's domain names.  Directi simply followed instructions under contract with Mr. Bernstein and served Dodora's customers in the best manner possible.

36. On behalf of Directi, I offered, in December 2004, to send to Dodora a copy of all information we had about the customers and domain names Directi had managed under contract with Mr. Bernstein.  Directi is still prepared to do so and has no interest in keeping even a copy of any information about any of those customers or domain names, excepting those 1786 domain names that asre now registered through Directi and any information Directi may need for tax, accounting and other similar business needs.

37. Directi charges $6.49 per year for each domain name to its customers. The cost per domain name that Directi bears is approximately $6.40 ($6.00 to the registry, $.18 to ICANN, and the rest as support, infrastructure and software costs over the one year).

ID # 418853v01/14386-2/ 01.20.2005

Therefore, Directi has made perhaps $.09 per domain name, or a total of about $160 from the 1786 customers that switched to Directi.

38. Dodora charges approximately $6.69 per domain name. The 1786 domain names that customers decided to transfer to Directi therefore would have represented at most about $500 of income to Dodora.

39. With regards to the other defendants named in the complaint, LogicBoxes and WebHosting.info are not companies, they are simply tradenames of Directi. Answerable, Inc. is an unrelated company that is not owned by Directi or any of its shareholders. A Malaysian client of Directi owns Answerable, Inc., and it has nothing to do with this matter. Transecute(I) Pvt Ltd is another company, the stock of which I own. However, it too has nothing to do with this matter and has no connection to Massachusetts, has done no business here and, to the best of my knowledge, has not communicated with Dodora or anyone else here. Finally, I own the stock of ResellerSRS. While it maintains a bank account in the U.S., that account is not located in Massachusetts, ResellerSRS also does no business in Massachusetts, and it has not communicated with Dodora or anyone here, to the best of my knowledge.

  Sworn to under the pains and penalties of perjury, this 20th day of January 2005.

                s/Bhavin Turakhia
                _____
                Bhavin Turakhia

ID # 418853v01/14386-2/ 01.20.2005