UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

DODORA UNIFIED COMMUNICATIONS, INC.

Plaintiff,

v.

DIRECT INFORMATION PVT. LTD., LOGICBOXES,
WEBHOSTING.INFO, TRANSECUTE (I) PVT LTD.,
RESELLERSRS, INC., AND ANSWERABLE, INC.,
COLLECTIVELY d/b/a "DIRECTI.COM"

Defendants.

Civil Action
No. 05-10016-NMG

Affidavit of Ron Garraud

Ron Garraud, on oath, hereby deposes and states as follows:

1.      I am the founder and Chief Executive Officer of Dodora Unified
Communications, Inc. ("Dodora"). Dodora is an internet domain name registrar
accredited by the Internet Corporation for Assigned Names and Numbers ("ICANN").

2.      I founded the business in 2000 and built it slowly and steadily by
providing quality service and low prices to my customers.

3.      In 2003, an internet competitor, Compana, filed fraudulent claims against
Dodora in Texas state court, alleging that Dodora had breached a contract with Compana
that Dodora never entered. The false contract contained a $100,000 liquidated damages
provision. Service was not properly effected, and Compana obtained a default judgment
against Dodora. Compana then had a Texas attorney, Michael Bernstein, appointed
receiver of Dodora in January 2004.

4.     Dodora challenged the default judgment in Texas and succeeded in getting the Texas court to vacate the judgment and to dismiss the case against Dodora, but not before Directi and its president, Bhavin Turakhia, working in conjunction with the receiver, wrongfully interfered with Dodora's business, converting thousands of its customers, massively disrupting their ability to maintain their websites, and decimating Dodora's goodwill with them.

5.     The receiver had no experience or ability to manage Dodora's domain name registration and management business. Directi, on information and belief, was aware of the fact that Dodora was in receivership and saw an opportunity to take over Dodora's business and customers.

6.     On information and belief, Directi and the receiver entered into communications about how Directi could effectively take over Dodora's business.

7.     On information and belief, Directi sought to buy Dodora's accreditation from the receiver. As an accredited registrar, Directi knew or should have known that the receiver was not permitted to sell or assign Dodora's accreditation, pursuant to Section 5.9 of the standard Registrar Accreditation Agreement that ICANN enters with all registrars. A copy of the Registrar Accreditation Agreement is attached hereto at Exhibit A. Indeed, on March 29, 2004, the receiver indicated that it was seeking to transfer all of Dodora's domain names to "the buyer of Dodora's credentials," and ICANN responded that it is not possible to sell Dodora's registrar accreditation (also known as its "credentials"). A true and accurate copy of their e-mail correspondence is attached at Exhibit B. As a result, Dodora's accreditation was not sold to Directi.

2

8.    However, without authority from the Texas court or ICANN (which oversees the domain name registration business), Directi achieved effectively the same result by getting the receiver to give control of Dodora's credentials to Directi. This effectively constituted an assignment of Dodora's credentials without permission from ICANN, in violation of the Registrar Accreditation Agreement.

9.    With control of Dodora's credentials, Directi then took steps to systematically convert Dodora's customers.

10.    On or about June 15, 2004, Directi and LogicBoxes entered into purported agreements with the receiver. These agreements, titled the Directi-Dodora Batch Pool Agreement and the Directi-Dodora Management Agreement, were both expressly "subject to Court Approval." True and accurate copies of these agreements are attached hereto respectively at <u>Exhibits C</u> and <u>D</u>. But neither the receiver nor Directi brought these purported agreements to the Texas Court's attention until two months later when the receiver applied to have the contracts approved. A copy of the receiver's Application to Approve Contracts is attached hereto at <u>Exhibit E</u>. They delayed so that they could implement their wrongful plan to have Directi takeover Dodora's business without having to give Dodora notice and an opportunity to object to the plan.

11.    When the receiver did petition the Texas court for approval of their contracts in August 2004, Dodora received notice and objected. Dodora simultaneously moved to vacate the default judgment and to dismiss the case. The Texas court then took a closer look at what was being done to Dodora's business, raised serious doubts about it, and recommended that the parties try to settle the matter before the court ruled on

3

Dodora's motion. In the end, the parties reached a settlement agreement and the Court dissolved the receivership and dismissed the case against Dodora. In its Order, the Texas court expressly did not approve the contracts between Directi and the receiver. A copy of the Court's Order, dated December 13, 2004, is attached hereto at Exhibit F. That rejection of the contracts was important to Dodora, because it intended to seek redress from Directi which had so severely harmed Dodora's business.

12.    In or about June 2004, without the Texas Court's approval, Directi took control of Dodora and transferred Dodora customer domain names to Directi. Directi admitted this transfer of Dodora customer domain names in a letter to Dodora customers that it posted on Dodora's website in or about June 2004. A true and accurate copy of the text of this letter is attached hereto at Exhibit G. In the "Frequently Asked Questions" section of the letter, Directi told Dodora customers that "your domain names ... will be automatically and seamlessly transferred to Directi the moment you or your Customer renews a Domain Name." See Exhibit G. In this manner, Directi converted thousands of Dodora customer accounts without approval from Dodora or its customers.

13.    As the letter to Dodora customers makes clear, Directi transferred Dodora customer domain names unilaterally and without prior customer assent. Some customers have complained and confirmed to me that their domain names were switched to Directi without their approval. I have obtained an affidavit from one former Dodora customer, Ryan Brown of The Burgh Live, which I have attached hereto as Exhibit H. Mr. Brown confirms that his accounts were transferred to Directi without his approval. Another former customer, Sherry Crabtree has confirmed the same in an affidavit that is attached hereto at Exhibit I.

4

14.    Contrary to Directi's assurances to Dodora's customers that the transfer to Directi would be "seamless," Dodora's customers experienced enormous disruption to their business and, in turn, to their own customers' web-based businesses. This is reflected in the affidavits of Mr. Brown and Ms. Crabtree. See Exhibits H and I. It is also reflected in an email communication from one of Dodora's larger customers, RegCA, which is attached hereto at Exhibit J.

15.    The confusion resulted in widespread difficulties for Dodora's customers, which hurt their hard-earned goodwill with their own customers who could not access their websites and, in turn, hurt Dodora's goodwill. It also required Dodora's customers to pay extra fees to Directi. See Exhibit J.

16.    The cost to Dodora in lost business has been very significant. By way of example only, Bravenet is a reseller of domain names and was Dodora's second largest customer. Bravenet paid average monthly fees to Dodora of approximately $7,000. Bravenet has informed me that it experienced significant disruption to its accounts in June 2004 as Directi transferred Dodora's accounts to Directi. As a result of this disruption and residual problems that continue at Dodora as it tries to regain full control of its accounts, Bravenet has recently decided that it will not presently return its accounts to Dodora. This is an annual loss of revenues of approximately $84,000. As a result of Directi's actions, Dodora has lost other business and valuable assets.

17.    Some of the valuable assets that were converted by Directi are domain names that Dodora owned and had under management, such as "wlsauction.com" and "big1s.com". Dodora had many others. These domain names have substantial value and

5

are routinely auctioned to companies and individuals in the market for domain names. Some domain names can be sold for hundreds of thousands of dollars, if not more. The domain names that Dodora owned, such as "wlsauction.com" and "big1s.com", could have been sold for $10,000 to $20,000 each. Directi has not returned these domain name assets.

18.    Expired domain names that once belonged to a registrar's customer can also be auctioned by the registrar. Contrary to Mr. Turakhia's statement that expired domain names return to the registry and are available for others to register (see par. 32 of his affidavit), it is known in the industry that his own company sells expired domain names before they are returned to the registry. In fact, Directi has a partnership with Snapnames.com, a popular auction venue for expired doman names, in which expired domain names under Directi's management may be sent to Snapnames.com and auctioned for value. This partnership was recently reported on the internet at http://www.dnjournal.com/lowdown.htm.. As a result of Directi's actions, Dodora was deprived of the opportunity to auction the domain names that were transferred to Directi and then expired, which according to Mr. Turakhia totaled approximately 1850 domain names.

19.    Upon the dissolution of the receivership, the receiver wrote a letter to Bhavin Turakhia of Directi, dated December 14, 2004, informing him that the receivership is closed and that "[c]ontrol should be returned to Dodora." He also stated: "Any money remaining due to Dodora under the contracts should be paid to Dodora." A copy of this letter is attached to the Verified Complaint at Exhibit E. Based on the dissolution of the receivership and this letter from the receiver to Directi, all assets and

money belonging to Dodora should have been returned promptly. Directi, however, still has not returned Dodora's assets, including, without limitation, all of its domain names, all of its database information concerning its customers, and all email from its customers (some of which contains important customer information necessary to manage the domain names). Directi also has not returned any of the money earned by Dodora. Dodora needs all of these assets and money to manage our customers' domain names and to try to restore our registrar business.

Signed under the pains and penalties of perjury this 21 day of January, 2005.


Ron Garraud
CEO, Dodora Unified Communications, Inc.

# Exhibit A



# Registrar Accreditation Agreement

(17 May 2001)
(Additional appendices posted on 25 November 2002, 23
January 2003, and 3 April 2003)

## Index

Section 1. Definitions

Section 2. ICANN Obligations

Section 3. Registrar Obligations

Section 4. Procedures for Establishment or Revision of Specifications and Policies

Section 5. Miscellaneous Provisions

**Appendices**:

.aero Appendix

.biz Appendix

.com Appendix

.coop Appendix

.info Appendix

.museum Appendix

.name Appendix

.net Appendix

.org Appendix

.pro Appendix

Logo License Appendix

# Registrar Accreditation Agreement

This REGISTRAR ACCREDITATION AGREEMENT ("Agreement") is by and between the Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation, and [Registrar Name], a [Organization type and jurisdiction] ("Registrar"), and shall be deemed made on _____, at Los Angeles, California, USA.

**1. DEFINITIONS.** For purposes of this Agreement, the following definitions shall apply:

1.1 "Accredit" means to identify and set minimum standards for the performance of registration functions, to recognize persons or entities meeting those standards, and to enter into an accreditation agreement that sets forth the rules and procedures applicable to the provision of Registrar Services.

1.2 "DNS" refers to the Internet domain-name system.

1.3 The "Effective Date" is _____.

1.4 The "Expiration Date" is _____.

1.5 "ICANN" refers to the Internet Corporation for Assigned Names and Numbers, a party to this Agreement.

1.6 "Personal Data" refers to data about any identified or identifiable natural person.

1.7 "Registered Name" refers to a domain name within the domain of a TLD that is the subject of an appendix to this Agreement, whether consisting of two or more (e.g., john.smith.name) levels, about which a TLD Registry Operator (or an affiliate engaged in providing Registry Services) maintains data in a Registry Database, arranges for such maintenance, or derives revenue from such maintenance. A name in a Registry Database may be a Registered Name even though it does not appear in a zone file (e.g., a registered but inactive name).

1.8 "Registered Name Holder" means the holder of a Registered Name.

1.9 The word "Registrar," when appearing with an initial capital letter, refers to [Registrar Name], a party to this Agreement.

1.10 The word "registrar," when appearing without an initial capital letter, refers to a person or entity that contracts with Registered Name Holders and with a Registry Operator and collects registration data about the Registered Name Holders and submits registration information for entry in the Registry Database.

1.11 "Registrar Services" means services provided by a registrar in connection with a TLD as to which it has an agreement with the TLD's Registry Operator, and includes contracting with Registered Name Holders, collecting registration data about the Registered Name Holders, and submitting registration information for entry in the Registry Database.

1.12 "Registry Data" means all Registry Database data maintained in electronic form, and shall include TLD Zone-File Data, all data used to provide Registry Services and submitted by registrars in electronic form, and all other data used to provide Registry Services concerning particular domain name registrations or nameservers maintained in electronic form in a Registry Database.

1.13 "Registry Database" means a database comprised of data about one or more DNS domain names within the domain of a registry that is used to generate either DNS resource records that are published authoritatively or responses to domain-name availability lookup requests or Whois queries, for some or all of those names.

1.14 A "Registry Operator" is the person or entity then responsible, in accordance with an agreement between ICANN (or its assignee) and that person or entity (those persons or entities) or, if that agreement is terminated or expires, in accordance with an agreement between the US Government and that person or entity (those persons or entities), for providing Registry Services for a specific TLD.

1.15 "Registry Services," with respect to a particular TLD, shall have the meaning

defined in the agreement between ICANN and the Registry Operator for that TLD.

1.16 A Registered Name is "sponsored" by the registrar that placed the record associated with that registration into the registry. Sponsorship of a registration may be changed at the express direction of the Registered Name Holder or, in the event a registrar loses accreditation, in accordance with then-current ICANN specifications and policies.

1.17 "Term of this Agreement" begins on the Effective Date and continues to the earlier of (a) the Expiration Date, or (b) termination of this Agreement.

1.18 A "TLD" is a top-level domain of the DNS.

1.19 "TLD Zone-File Data" means all data contained in a DNS zone file for the registry, or for any subdomain for which Registry Services are provided and that contains Registered Names, as provided to nameservers on the Internet.

## 2. ICANN OBLIGATIONS.

2.1 Accreditation. During the Term of this Agreement, Registrar is hereby accredited by ICANN to act as a registrar (including to insert and renew registration of Registered Names in the Registry Database) for the TLD(s) that are the subject of appendices to this Agreement according to Subsection 5.5.

2.2 Registrar Use of ICANN Name and Website. ICANN hereby grants to Registrar a non-exclusive, worldwide, royalty-free license during the Term of this Agreement (a) to state that it is accredited by ICANN as a registrar for each TLD that is the subject of an appendix to this Agreement and (b) to link to pages and documents within the ICANN web site. No other use of ICANN's name or website is licensed hereby. This license may not be assigned or sublicensed by Registrar.

2.3 General Obligations of ICANN. With respect to all matters that impact the rights, obligations, or role of Registrar, ICANN shall during the Term of this Agreement:

2.3.1 exercise its responsibilities in an open and transparent manner;

2.3.2 not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition;

2.3.3 not apply standards, policies, procedures or practices arbitrarily, unjustifiably, or inequitably and not single out Registrar for disparate treatment unless justified by substantial and reasonable cause; and

2.3.4 ensure, through its reconsideration and independent review policies, adequate appeal procedures for Registrar, to the extent it is adversely affected by ICANN standards, policies, procedures or practices.

## 3. REGISTRAR OBLIGATIONS.

3.1 Obligations to Provide Registrar Services. During the Term of this Agreement, Registrar agrees that it will operate as a registrar for each TLD for which it is

accredited by ICANN in accordance with this Agreement.

3.2 <u>Submission of Registered Name Holder Data to Registry.</u> During the Term of this Agreement:

> 3.2.1 As part of its registration of Registered Names in a TLD as to which it is accredited, Registrar shall submit to, or shall place in the Registry Database operated by, the Registry Operator for the TLD the following data elements:

>> 3.2.1.1 The name of the Registered Name being registered;

>> 3.2.1.2 The IP addresses of the primary nameserver and secondary nameserver(s) for the Registered Name;

>> 3.2.1.3 The corresponding names of those nameservers;

>> 3.2.1.4 Unless automatically generated by the registry system, the identity of the Registrar;

>> 3.2.1.5 Unless automatically generated by the registry system, the expiration date of the registration; and

>> 3.2.1.6 Any other data the Registry Operator requires be submitted to it.

> The appendix to this Agreement for a particular TLD may state substitute language for Subsections 3.2.1.1 through 3.2.1.6 as applicable to that TLD; in that event the substitute language shall replace and supersede Subsections 3.2.1.1 through 3.2.1.6 stated above for all purposes under this Agreement but only with respect to that particular TLD.

> 3.2.2 Within five (5) business days after receiving any updates from the Registered Name Holder to the data elements listed in Subsections 3.2.1.2, 3.1.2.3, and 3.2.1.6 for any Registered Name Registrar sponsors, Registrar shall submit the updated data elements to, or shall place those elements in the Registry Database operated by the Registry Operator.

> 3.2.3 In order to allow reconstitution of the Registry Database in the event of an otherwise unrecoverable technical failure or a change in the designated Registry Operator, within ten days of any such request by ICANN, Registrar shall submit an electronic database containing the data elements listed in Subsections 3.2.1.1 through 3.2.1.6 for all active records in the registry sponsored by Registrar, in a format specified by ICANN, to the Registry Operator for the appropriate TLD.

3.3 <u>Public Access to Data on Registered Names.</u> During the Term of this Agreement:

> 3.3.1 At its expense, Registrar shall provide an interactive web page and a port 43 Whois service providing free public query-based access

to up-to-date (i.e., updated at least daily) data concerning all active Registered Names sponsored by Registrar for each TLD in which it is accredited. The data accessible shall consist of elements that are designated from time to time according to an ICANN adopted specification or policy. Until ICANN otherwise specifies by means of an ICANN adopted specification or policy, this data shall consist of the following elements as contained in Registrar's database:

> 3.3.1.1 The name of the Registered Name;

> 3.3.1.2 The names of the primary nameserver and secondary nameserver(s) for the Registered Name;

> 3.3.1.3 The identity of Registrar (which may be provided through Registrar's website);

> 3.3.1.4 The original creation date of the registration;

> 3.3.1.5 The expiration date of the registration;

> 3.3.1.6 The name and postal address of the Registered Name Holder;

> 3.3.1.7 The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the technical contact for the Registered Name; and

> 3.3.1.8 The name, postal address, e-mail address, voice telephone number, and (where available) fax number of the administrative contact for the Registered Name.

The appendix to this Agreement for a particular TLD may state substitute language for Subsections 3.3.1.1 through 3.3.1.8 as applicable to that TLD; in that event the substitute language shall replace and supersede Subsections 3.3.1.1 through 3.3.1.8 stated above for all purposes under this Agreement but only with respect to that particular TLD.

3.3.2 Upon receiving any updates to the data elements listed in Subsections 3.3.1.2, 3.3.1.3, and 3.3.1.5 through 3.3.1.8 from the Registered Name Holder, Registrar shall promptly update its database used to provide the public access described in Subsection 3.3.1.

3.3.3 Registrar may subcontract its obligation to provide the public access described in Subsection 3.3.1 and the updating described in Subsection 3.3.2, provided that Registrar shall remain fully responsible for the proper provision of the access and updating.

3.3.4 Registrar shall abide by any ICANN specification or policy established as a Consensus Policy according to Section 4 that requires registrars to cooperatively implement a distributed capability that provides query-based Whois search functionality across all registrars. If the Whois service implemented by registrars does not in a reasonable

time provide reasonably robust, reliable, and convenient access to accurate and up-to-date data, the Registrar shall abide by any ICANN specification or policy established as a Consensus Policy according to Section 4 requiring Registrar, if reasonably determined by ICANN to be necessary (considering such possibilities as remedial action by specific registrars), to supply data from Registrar's database to facilitate the development of a centralized Whois database for the purpose of providing comprehensive Registrar Whois search capability.

3.3.5 In providing query-based public access to registration data as required by Subsections 3.3.1 and 3.3.4, Registrar shall not impose terms and conditions on use of the data provided, except as permitted by policy established by ICANN. Unless and until ICANN establishes a different policy according to Section 4, Registrar shall permit use of data it provides in response to queries for any lawful purposes except to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass, unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of any Registry Operator or ICANN-Accredited registrar, except as reasonably necessary to register domain names or modify existing registrations.

3.3.6 In addition, Registrar shall provide third-party bulk access to the data subject to public access under Subsection 3.3.1 under the following terms and conditions:

>3.3.6.1 Registrar shall make a complete electronic copy of the data available at least one time per week for download by third parties who have entered into a bulk access agreement with Registrar.
>
>3.3.6.2 Registrar may charge an annual fee, not to exceed US$10,000, for such bulk access to the data.
>
>3.3.6.3 Registrar's access agreement shall require the third party to agree not to use the data to allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass, unsolicited, commercial advertising or solicitations to entities other than such third party's own existing customers.
>
>3.3.6.4 Registrar's access agreement shall require the third party to agree not to use the data to enable high-volume, automated, electronic processes that send queries or data to the systems of any Registry Operator or ICANN-Accredited registrar, except as reasonably necessary to register domain names or modify existing registrations.
>
>3.3.6.5 Registrar's access agreement may require the third party to agree not to sell or redistribute the data except insofar as it has been incorporated by the third party into a

value-added product or service that does not permit the extraction of a substantial portion of the bulk data from the value-added product or service for use by other parties.

3.3.6.6 Registrar may enable Registered Name Holders who are individuals to elect not to have Personal Data concerning their registrations available for bulk access for marketing purposes based on Registrar's "Opt-Out" policy, and if Registrar has such a policy, Registrar shall require the third party to abide by the terms of that Opt-Out policy; provided, however, that Registrar may not use such data subject to opt-out for marketing purposes in its own value-added product or service.

3.3.7 Registrar's obligations under Subsection 3.3.6 shall remain in effect until the earlier of (a) replacement of this policy with a different ICANN policy, established according to Section 4, governing bulk access to the data subject to public access under Subsection 3.3.1, or (b) demonstration, to the satisfaction of the United States Department of Commerce, that no individual or entity is able to exercise market power with respect to registrations or with respect to registration data used for development of value-added products and services by third parties.

3.3.8 To comply with applicable statutes and regulations and for other reasons, ICANN may from time to time adopt policies and specifications establishing limits (a) on the Personal Data concerning Registered Names that Registrar may make available to the public through a public-access service described in this Subsection 3.3 and (b) on the manner in which Registrar may make such data available. In the event ICANN adopts any such policy, Registrar shall abide by it.

3.4 <u>Retention of Registered Name Holder and Registration Data</u>.

3.4.1 During the Term of this Agreement, Registrar shall maintain its own electronic database, as updated from time to time, containing data for each active Registered Name sponsored by it within each TLD for which it is accredited. The data for each such registration shall include the elements listed in Subsections 3.3.1.1 through 3.3.1.8; the name and (where available) postal address, e-mail address, voice telephone number, and fax number of the billing contact; and any other Registry Data that Registrar has submitted to the Registry Operator or placed in the Registry Database under Subsection 3.2.

3.4.2 During the Term of this Agreement and for three years thereafter, Registrar (itself or by its agent(s)) shall maintain the following records relating to its dealings with the Registry Operator(s) and Registered Name Holders:

3.4.2.1 In electronic form, the submission date and time, and the content, of all registration data (including updates) submitted in electronic form to the Registry Operator(s);

3.4.2.2 In electronic, paper, or microfilm form, all written communications constituting registration applications, confirmations, modifications, or terminations and related correspondence with Registered Name Holders, including registration contracts; and

3.4.2.3 In electronic form, records of the accounts of all Registered Name Holders with Registrar, including dates and amounts of all payments and refunds.

3.4.3 During the Term of this Agreement and for three years thereafter, Registrar shall make these records available for inspection and copying by ICANN upon reasonable notice. ICANN shall not disclose the content of such records except as expressly permitted by an ICANN specification or policy.

3.5 <u>Rights in Data</u>. Registrar disclaims all rights to exclusive ownership or use of the data elements listed in Subsections 3.2.1.1 through 3.2.1.3 for all Registered Names submitted by Registrar to the Registry Database for, or sponsored by Registrar in, each TLD for which it is accredited. Registrar does not disclaim rights in the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and Subsections 3.3.1.3 through 3.3.1.8 concerning active Registered Names sponsored by it in each TLD for which it is accredited, and agrees to grant non-exclusive, irrevocable, royalty-free licenses to make use of and disclose the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and 3.3.1.3 through 3.3.1.8 for the purpose of providing a service or services (such as a Whois service under Subsection 3.3.4) providing interactive, query-based public access. Upon a change in sponsorship from Registrar of any Registered Name in a TLD for which it is accredited, Registrar acknowledges that the registrar gaining sponsorship shall have the rights of an owner to the data elements listed in Subsections 3.2.1.4 through 3.2.1.6 and 3.3.1.3 through 3.3.1.8 concerning that Registered Name, with Registrar also retaining the rights of an owner in that data. Nothing in this Subsection prohibits Registrar from (1) restricting bulk public access to data elements in a manner consistent with this Agreement and any ICANN specifications or policies or (2) transferring rights it claims in data elements subject to the provisions of this Subsection.

3.6 <u>Data Escrow</u>. During the Term of this Agreement, on a schedule, under the terms, and in the format specified by ICANN, Registrar shall submit an electronic copy of the database described in Subsection 3.4.1 to ICANN or, at Registrar's election and at its expense, to a reputable escrow agent mutually approved by Registrar and ICANN, such approval also not to be unreasonably withheld by either party. The data shall be held under an agreement among Registrar, ICANN, and the escrow agent (if any) providing that (1) the data shall be received and held in escrow, with no use other than verification that the deposited data is complete, consistent, and in proper format, until released to ICANN; (2) the data shall be released from escrow upon expiration without renewal or termination of this Agreement; and (3) ICANN's rights under the escrow agreement shall be assigned with any assignment of this Agreement. The escrow shall provide that in the event the escrow is released under this Subsection, ICANN (or its assignee) shall have a non-exclusive, irrevocable, royalty-free license to exercise (only for transitional purposes) or have exercised all rights necessary to provide Registrar Services.

3.7 <u>Business Dealings, Including with Registered Name Holders</u>.

3.7.1 In the event ICANN adopts a specification or policy, supported by a consensus of ICANN-Accredited registrars, establishing or approving a Code of Conduct for ICANN-Accredited registrars, Registrar shall abide by that Code.

3.7.2 Registrar shall abide by applicable laws and governmental regulations.

3.7.3 Registrar shall not represent to any actual or potential Registered Name Holder that Registrar enjoys access to a registry for which Registrar is Accredited that is superior to that of any other registrar Accredited for that registry.

3.7.4 Registrar shall not activate any Registered Name unless and until it is satisfied that it has received a reasonable assurance of payment of its registration fee. For this purpose, a charge to a credit card, general commercial terms extended to creditworthy customers, or other mechanism providing a similar level of assurance of payment shall be sufficient, provided that the obligation to pay becomes final and non-revocable by the Registered Name Holder upon activation of the registration.

3.7.5 Registrar shall register Registered Names to Registered Name Holders only for fixed periods. At the conclusion of the registration period, failure by or on behalf of the Registered Name Holder to pay a renewal fee within the time specified in a second notice or reminder shall, in the absence of extenuating circumstances, result in cancellation of the registration. In the event that ICANN adopts a specification or policy concerning expiration procedures for handling expiration of registrations, Registrar shall abide by that specification or policy.

3.7.6 Registrar shall not insert or renew any Registered Name in any registry for which Registrar is accredited by ICANN in a manner contrary to an ICANN policy stating a list or specification of excluded Registered Names that is in effect at the time of insertion or renewal.

3.7.7 Registrar shall require all Registered Name Holders to enter into an electronic or paper registration agreement with Registrar including at least the following provisions:

3.7.7.1 The Registered Name Holder shall provide to Registrar accurate and reliable contact details and promptly correct and update them during the term of the Registered Name registration, including: the full name, postal address, e-mail address, voice telephone number, and fax number if available of the Registered Name Holder; name of authorized person for contact purposes in the case of an Registered Name Holder that is an organization, association, or corporation; and the data elements listed in Subsections 3.3.1.2, 3.3.1.7 and 3.3.1.8.

3.7.7.2 A Registered Name Holder's willful provision of inaccurate or unreliable information, its willful failure promptly to update information provided to Registrar, or its failure to respond for over fifteen calendar days to inquiries by Registrar concerning the accuracy of contact details associated with the Registered Name Holder's registration shall constitute a material breach of the Registered Name Holder-registrar contract and be a basis for cancellation of the Registered Name registration.

3.7.7.3 Any Registered Name Holder that intends to license use of a domain name to a third party is nonetheless the Registered Name Holder of record and is responsible for providing its own full contact information and for providing and updating accurate technical and administrative contact information adequate to facilitate timely resolution of any problems that arise in connection with the Registered Name. A Registered Name Holder licensing use of a Registered Name according to this provision shall accept liability for harm caused by wrongful use of the Registered Name, unless it promptly discloses the identity of the licensee to a party providing the Registered Name Holder reasonable evidence of actionable harm.

3.7.7.4 Registrar shall provide notice to each new or renewed Registered Name Holder stating:

> 3.7.7.4.1 The purposes for which any Personal Data collected from the applicant are intended;

> 3.7.7.4.2 The intended recipients or categories of recipients of the data (including the Registry Operator and others who will receive the data from Registry Operator);

> 3.7.7.4.3 Which data are obligatory and which data, if any, are voluntary; and

> 3.7.7.4.4 How the Registered Name Holder or data subject can access and, if necessary, rectify the data held about them.

3.7.7.5 The Registered Name Holder shall consent to the data processing referred to in Subsection 3.7.7.4.

3.7.7.6 The Registered Name Holder shall represent that notice has been provided equivalent to that described in Subsection 3.7.7.4 to any third-party individuals whose Personal Data are supplied to Registrar by the Registered Name Holder, and that the Registered Name Holder has obtained consent equivalent to that referred to in Subsection 3.7.7.5 of any such third-party individuals.

3.7.7.7 Registrar shall agree that it will not process the Personal Data collected from the Registered Name Holder in a way incompatible with the purposes and other limitations about which it has provided notice to the Registered Name Holder in accordance with Subsection 3.7.7.4 above.

3.7.7.8 Registrar shall agree that it will take reasonable precautions to protect Personal Data from loss, misuse, unauthorized access or disclosure, alteration, or destruction.

3.7.7.9 The Registered Name Holder shall represent that, to the best of the Registered Name Holder's knowledge and belief, neither the registration of the Registered Name nor the manner in which it is directly or indirectly used infringes the legal rights of any third party.

3.7.7.10 For the adjudication of disputes concerning or arising from use of the Registered Name, the Registered Name Holder shall submit, without prejudice to other potentially applicable jurisdictions, to the jurisdiction of the courts (1) of the Registered Name Holder's domicile and (2) where Registrar is located.

3.7.7.11 The Registered Name Holder shall agree that its registration of the Registered Name shall be subject to suspension, cancellation, or transfer pursuant to any ICANN adopted specification or policy, or pursuant to any registrar or registry procedure not inconsistent with an ICANN adopted specification or policy, (1) to correct mistakes by Registrar or the Registry Operator in registering the name or (2) for the resolution of disputes concerning the Registered Name.

3.7.7.12 The Registered Name Holder shall indemnify and hold harmless the Registry Operator and its directors, officers, employees, and agents from and against any and all claims, damages, liabilities, costs, and expenses (including reasonable legal fees and expenses) arising out of or related to the Registered Name Holder's domain name registration.

3.7.8 Registrar shall abide by any specifications or policies established according to Section 4 requiring reasonable and commercially practicable (a) verification, at the time of registration, of contact information associated with a Registered Name sponsored by Registrar or (b) periodic re-verification of such information. Registrar shall, upon notification by any person of an inaccuracy in the contact information associated with a Registered Name sponsored by Registrar, take reasonable steps to investigate that claimed inaccuracy. In the event Registrar learns of inaccurate contact information associated with a Registered Name it sponsors, it shall take reasonable steps to correct

that inaccuracy.

3.7.9 Registrar shall abide by any ICANN adopted specifications or policies prohibiting or restricting warehousing of or speculation in domain names by registrars.

3.7.10 Nothing in this Agreement prescribes or limits the amount Registrar may charge Registered Name Holders for registration of Registered Names.

3.8 Domain-Name Dispute Resolution. During the Term of this Agreement, Registrar shall have in place a policy and procedures for resolution of disputes concerning Registered Names. Until different policies and procedures are established by ICANN under Section 4, Registrar shall comply with the Uniform Domain Name Dispute Resolution Policy identified on ICANN's website (www.icann.org/general/consensus-policies.htm).

3.9 Accreditation Fees. As a condition of accreditation, Registrar shall pay accreditation fees to ICANN. These fees consist of yearly and variable fees.

3.9.1 Yearly Accreditation Fee. Registrar shall pay ICANN a yearly accreditation fee in an amount established by the ICANN Board of Directors, in conformity with ICANN's bylaws and articles of incorporation. This yearly accreditation fee shall not exceed US$4,000 for the first TLD for which Registrar is Accredited plus US$500 for each additional TLD for which Registrar is Accredited at any time during the year. Payment of the yearly fee shall be due within thirty days after invoice from ICANN.

3.9.2 Variable Accreditation Fee. Registrar shall pay the variable accreditation fees established by the ICANN Board of Directors, in conformity with ICANN's bylaws and articles of incorporation, provided that in each case such fees are reasonably allocated among all registrars that contract with ICANN and that any such fees must be expressly approved by registrars accounting, in the aggregate, for payment of two-thirds of all registrar-level fees. Registrar shall pay such fees in a timely manner for so long as all material terms of this Agreement remain in full force and effect, and notwithstanding the pendency of any dispute between Registrar and ICANN.

3.9.3 On reasonable notice given by ICANN to Registrar, accountings submitted by Registrar shall be subject to verification by an audit of Registrar's books and records by an independent third-party that shall preserve the confidentiality of such books and records (other than its findings as to the accuracy of, and any necessary corrections to, the accountings).

3.10 Insurance. Registrar shall maintain in force commercial general liability insurance with policy limits of at least US$500,000 covering liabilities arising from Registrar's registrar business during the term of this Agreement.

## 4. PROCEDURES FOR ESTABLISHMENT OR REVISION OF SPECIFICATIONS AND

## POLICIES.

4.1 <u>Registrar's Ongoing Obligation to Comply With New or Revised Specifications and Policies</u>. During the Term of this Agreement, Registrar shall comply with the terms of this Agreement on the schedule set forth in Subsection 4.4, with

4.1.1 new or revised specifications (including forms of agreement to which Registrar is a party) and policies established by ICANN as Consensus Policies in the manner described in Subsection 4.3,

4.1.2 in cases where:

4.1.2.1 this Agreement expressly provides for compliance with revised specifications or policies established in the manner set forth in one or more subsections of this Section 4; or

4.1.2.2 the specification or policy concerns one or more topics described in Subsection 4.2.

4.2 <u>Topics for New and Revised Specifications and Policies</u>. New and revised specifications and policies may be established on the following topics:

4.2.1 issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability, and/or operational stability of Registrar Services, Registry Services, the DNS, or the Internet;

4.2.2 registrar policies reasonably necessary to implement ICANN policies or specifications relating to a DNS registry or to Registry Services;

4.2.3 resolution of disputes concerning the registration of Registered Names (as opposed to the use of such domain names), including where the policies take into account use of the domain names;

4.2.4 principles for allocation of Registered Names (e.g., first-come/first-served, timely renewal, holding period after expiration);

4.2.5 prohibitions on warehousing of or speculation in domain names by registries or registrars;

4.2.6 maintenance of and access to accurate and up-to-date contact information regarding Registered Names and nameservers;

4.2.7 reservation of Registered Names that may not be registered initially or that may not be renewed due to reasons reasonably related to (a) avoidance of confusion among or misleading of users, (b) intellectual property, or (c) the technical management of the DNS or the Internet (e.g., "example.com" and names with single-letter/digit labels);

4.2.8 procedures to avoid disruptions of registration due to suspension or termination of operations by a registry operator or a registrar,

including allocation of responsibility among continuing registrars of the Registered Names sponsored in a TLD by a registrar losing accreditation; and

4.2.9 the transfer of registration data upon a change in registrar sponsoring one or more Registered Names.

Nothing in this Subsection 4.2 shall limit Registrar's obligations as set forth elsewhere in this Agreement.

4.3 <u>Manner of Establishment of New and Revised Specifications and Policies</u>.

4.3.1 "Consensus Policies" are those specifications or policies established based on a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by (a) action of the ICANN Board of Directors establishing the specification or policy, (b) a recommendation, adopted by at least a two-thirds vote of the council of the ICANN Supporting Organization to which the matter is delegated, that the specification or policy should be established, and (c) a written report and supporting materials (which must include all substantive submissions to the Supporting Organization relating to the proposal) that (i) documents the extent of agreement and disagreement among impacted groups, (ii) documents the outreach process used to seek to achieve adequate representation of the views of groups that are likely to be impacted, and (iii) documents the nature and intensity of reasoned support and opposition to the proposed policy.

4.3.2 In the event that Registrar disputes the presence of such a consensus, it shall seek review of that issue from an Independent Review Panel established under ICANN's bylaws. Such review must be sought within fifteen working days of the publication of the Board's action establishing the policy. The decision of the panel shall be based on the report and supporting materials required by Subsection 4.3.1. In the event that Registrar seeks review and the Independent Review Panel sustains the Board's determination that the policy is based on a consensus among Internet stakeholders represented in the ICANN process, then Registrar must implement such policy unless it promptly seeks and obtains a stay or injunctive relief under Subsection 5.6.

4.3.3 If, following a decision by the Independent Review Panel convened under Subsection 4.3.2, Registrar still disputes the presence of such a consensus, it may seek further review of that issue within fifteen working days of publication of the decision in accordance with the dispute resolution procedures set forth in Subsection 5.6; provided, however, that Registrar must continue to implement the policy unless it has obtained a stay or injunctive relief under Subsection 5.6 or a final decision is rendered in accordance with the provisions of Subsection 5.6 that relieves Registrar of such obligation. The decision in any such further review shall be based on the report and supporting materials required by Subsection 4.3.1.

4.3.4 A specification or policy established by the ICANN Board of

Directors on a temporary basis, without a prior recommendation by the council of an ICANN Supporting Organization, shall also be considered to be a Consensus Policy if adopted by the ICANN Board of Directors by a vote of at least two-thirds of its members, so long as the Board reasonably determines that immediate temporary establishment of a specification or policy on the subject is necessary to maintain the operational stability of Registrar Services, Registry Services, the DNS, or the Internet, and that the proposed specification or policy is as narrowly tailored as feasible to achieve those objectives. In establishing any specification or policy under this provision, the ICANN Board of Directors shall state the period of time for which the specification or policy is temporarily adopted and shall immediately refer the matter to the appropriate Supporting Organization for its evaluation and review with a detailed explanation of its reasons for establishing the temporary specification or policy and why the Board believes the policy should receive the consensus support of Internet stakeholders. If the period of time for which the specification or policy is adopted exceeds ninety days, the Board shall reaffirm its temporary establishment every ninety days for a total period not to exceed one year, in order to maintain such specification or policy in effect until such time as it meets the standard set forth in Subsection 4.3.1. If the standard set forth in Subsection 4.3.1 is not met within the temporary period set by the Board, or the council of the Supporting Organization to which it has been referred votes to reject the temporary specification or policy, it will no longer be a "Consensus Policy."

4.3.5 For all purposes under this Agreement, the policies specifically identified by ICANN on its website (www.icann.org/general/consensus-policies.htm) at the date of this Agreement as having been adopted by the ICANN Board of Directors before the date of this Agreement shall be treated in the same manner and have the same effect as "Consensus Policies" and accordingly shall not be subject to review under Subsection 4.3.2.

4.3.6 In the event that, at the time the ICANN Board of Directors establishes a specification or policy under Subsection 4.3.1 during the Term of this Agreement, ICANN does not have in place an Independent Review Panel established under ICANN's bylaws, the fifteen-working-day period allowed under Subsection 4.3.2 to seek review shall be extended until fifteen working days after ICANN does have such an Independent Review Panel in place and Registrar shall not be obligated to comply with the specification or policy in the interim.

4.4 <u>Time Allowed for Compliance</u>. Registrar shall be afforded a reasonable period of time after receiving notice of the establishment of a specification or policy under Subsection 4.3 in which to comply with that specification or policy, taking into account any urgency involved.

## 5. MISCELLANEOUS PROVISIONS.

5.1 <u>Specific Performance</u>. While this Agreement is in effect, either party may seek specific performance of any provision of this Agreement in the manner provided in

Section 5.6 below, provided the party seeking such performance is not in material breach of its obligations.

5.2 <u>Termination of Agreement by Registrar</u>. This Agreement may be terminated before its expiration by Registrar by giving ICANN thirty days written notice. Upon such termination by Registrar, Registrar shall not be entitled to any refund of fees paid to ICANN pursuant to this Agreement.

5.3 <u>Termination of Agreement by ICANN</u>. This Agreement may be terminated before its expiration by ICANN in any of the following circumstances:

> 5.3.1 There was a material misrepresentation, material inaccuracy, or materially misleading statement in Registrar's application for accreditation or any material accompanying the application.

> 5.3.2 Registrar:

>> 5.3.2.1 is convicted by a court of competent jurisdiction of a felony or other serious offense related to financial activities, or is judged by a court of competent jurisdiction to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN reasonably deems as the substantive equivalent of those offenses; or

>> 5.3.2.2 is disciplined by the government of its domicile for conduct involving dishonesty or misuse of funds of others.

> 5.3.3 Any officer or director of Registrar is convicted of a felony or of a misdemeanor related to financial activities, or is judged by a court to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that ICANN deems as the substantive equivalent of any of these; provided, such officer or director is not removed in such circumstances.

> 5.3.4 Registrar fails to cure any breach of this Agreement (other than a failure to comply with a policy adopted by ICANN during the term of this Agreement as to which Registrar is seeking, or still has time to seek, review under Subsection 4.3.2 of whether a consensus is present) within fifteen working days after ICANN gives Registrar notice of the breach.

> 5.3.5 Registrar fails to comply with a ruling granting specific performance under Subsections 5.1 and 5.6.

> 5.3.6 Registrar continues acting in a manner that ICANN has reasonably determined endangers the stability or operational integrity of the Internet after receiving three days notice of that determination.

> 5.3.7 Registrar becomes bankrupt or insolvent.

This Agreement may be terminated in circumstances described in Subsections 5.3.1 - 5.3.6 above only upon fifteen days written notice to Registrar (in the case of Subsection 5.3.4 occurring after Registrar's failure to cure), with Registrar being

given an opportunity during that time to initiate arbitration under Subsection 5.6 to determine the appropriateness of termination under this Agreement. In the event Registrar initiates litigation or arbitration concerning the appropriateness of termination by ICANN, the termination shall be stayed an additional thirty days to allow Registrar to obtain a stay of termination under Subsection 5.6 below. If Registrar acts in a manner that ICANN reasonably determines endangers the stability or operational integrity of the Internet and upon notice does not immediately cure, ICANN may suspend this Agreement for five working days pending ICANN's application for more extended specific performance or injunctive relief under Subsection 5.6. This Agreement may be terminated immediately upon notice to Registrar in circumstance described in Subsection 5.3.7 above.

5.4 <u>Term of Agreement; Renewal; Right to Substitute Updated Agreement</u>. This Agreement shall be effective on the Effective Date and shall have an initial term running until the Expiration Date, unless sooner terminated. Thereafter, if Registrar seeks to continue its accreditation, it may apply for renewed accreditation, and shall be entitled to renewal provided it meets the ICANN-adopted specification or policy on accreditation criteria then in effect, is in compliance with its obligations under this Agreement, as it may be amended, and agrees to be bound by terms and conditions of the then-current Registrar accreditation agreement (which may differ from those of this Agreement) that ICANN adopts in accordance with Subsection 2.3 and Subsection 4.3. In connection with renewed accreditation, Registrar shall confirm its assent to the terms and conditions of the then-current Registrar accreditation agreement by signing that accreditation agreement. In the event that, during the Term of this Agreement, ICANN posts on its web site an updated form of registrar accreditation agreement applicable to Accredited registrars, Registrar (provided it has not received (1) a notice of breach that it has not cured or (2) a notice of termination of this Agreement under Subsection 5.3 above) may elect, by giving ICANN written notice, to enter an agreement in the updated form in place of this Agreement. In the event of such election, Registrar and ICANN shall promptly sign a new accreditation agreement that contains the provisions of the updated form posted on the web site, with the length of the term of the substituted agreement as stated in the updated form posted on the web site, calculated as if it commenced on the date this Agreement was made, and this Agreement will be deemed terminated.

5.5 <u>Addition or Deletion of TLDs for Which Registrar Accredited</u>. On the Effective Date, Registrar shall be accredited according to Subsection 2.1 for each TLD as to which an appendix executed by both parties is attached to this Agreement. During the Term of this Agreement, Registrar may request accreditation for any additional TLD(s) by signing an additional appendix for each additional TLD in the form prescribed by ICANN and submitting the appendix to ICANN. In the event ICANN agrees to the request, ICANN will sign the additional appendix and return a copy of it to Registrar. The mutually signed appendix shall thereafter be an appendix to this Agreement. During the Term of this Agreement, Registrar may abandon its accreditation for any TLD under this Agreement (provided that Registrar will thereafter remain accredited for at least one TLD under this Agreement) by giving ICANN written notice specifying the TLD as to which accreditation is being abandoned. The abandonment shall be effective thirty days after the notice is given.

5.6 <u>Resolution of Disputes Under this Agreement</u>. Disputes arising under or in connection with this Agreement, including (1) disputes arising from ICANN's failure to renew Registrar's accreditation and (2) requests for specific performance, shall be resolved in a court of competent jurisdiction or, at the election of either party, by an arbitration conducted as provided in this Subsection 5.6 pursuant to the International Arbitration Rules of the American Arbitration Association ("AAA"). The arbitration shall be conducted in English and shall occur in Los Angeles County, California, USA. There shall be three arbitrators: each party shall choose one arbitrator and, if those two arbitrators do not agree on a third arbitrator, the third shall be chosen by the AAA. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrators to reallocate the costs in their award as provided in the AAA rules. The parties shall bear their own attorneys' fees in connection with the arbitration, and the arbitrators may not reallocate the attorneys' fees in conjunction with their award. The arbitrators shall render their decision within ninety days of the conclusion of the arbitration hearing. In the event Registrar initiates arbitration to contest the appropriateness of termination of this Agreement by ICANN, Registrar may at the same time request that the arbitration panel stay the termination until the arbitration decision is rendered, and that request shall have the effect of staying the termination until the arbitration panel has granted an ICANN request for specific performance and Registrar has failed to comply with such ruling. In the event Registrar initiates arbitration to contest an Independent Review Panel's decision under Subsection 4.3.3 sustaining the Board's determination that a specification or policy is supported by consensus, Registrar may at the same time request that the arbitration panel stay the requirement that it comply with the policy until the arbitration decision is rendered, and that request shall have the effect of staying the requirement until the decision or until the arbitration panel has granted an ICANN request for lifting of the stay. In all litigation involving ICANN concerning this Agreement (whether in a case where arbitration has not been elected or to enforce an arbitration award), jurisdiction and exclusive venue for such litigation shall be in a court located in Los Angeles, California, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of the parties during the pendency of an arbitration, the parties shall have the right to seek temporary or preliminary injunctive relief from the arbitration panel or in a court located in Los Angeles, California, USA, which shall not be a waiver of this arbitration agreement.

5.7 <u>Limitations on Monetary Remedies for Violations of this Agreement</u>. ICANN's aggregate monetary liability for violations of this Agreement shall not exceed the amount of accreditation fees paid by Registrar to ICANN under Subsection 3.9 of this Agreement. Registrar's monetary liability to ICANN for violations of this Agreement shall be limited to accreditation fees owing to ICANN under this Agreement. In no event shall either party be liable for special, indirect, incidental, punitive, exemplary, or consequential damages for any violation of this Agreement.

5.8 <u>Handling by ICANN of Registrar-Supplied Data</u>. Before receiving any Personal Data from Registrar, ICANN shall specify to Registrar in writing the purposes for and conditions under which ICANN intends to use the Personal Data. ICANN may from time to time provide Registrar with a revised specification of such purposes and conditions, which specification shall become effective no fewer than thirty days after it is provided to Registrar. ICANN shall not use Personal Data provided by

Registrar for a purpose or under conditions inconsistent with the specification in effect when the Personal Data was provided. ICANN shall take reasonable steps to avoid uses of the Personal Data by third parties inconsistent with the specification.

5.9 Assignment. Either party may assign or transfer this Agreement only with the prior written consent of the other party, which shall not be unreasonably withheld, except that ICANN may, with the written approval of the United States Department of Commerce, assign this agreement by giving Registrar written notice of the assignment. In the event of assignment by ICANN, the assignee may, with the approval of the United States Department of Commerce, revise the definition of "Consensus Policy" to the extent necessary to meet the organizational circumstances of the assignee, provided the revised definition requires that Consensus Policies be based on a demonstrated consensus of Internet stakeholders.

5.10 No Third-Party Beneficiaries. This Agreement shall not be construed to create any obligation by either ICANN or Registrar to any non-party to this Agreement, including any Registered Name Holder.

5.11 Notices, Designations, and Specifications. All notices to be given under this Agreement shall be given in writing at the address of the appropriate party as set forth below, unless that party has given a notice of change of address in writing. Any notice required by this Agreement shall be deemed to have been properly given when delivered in person, when sent by electronic facsimile with receipt of confirmation of delivery, or when scheduled for delivery by internationally recognized courier service. Designations and specifications by ICANN under this Agreement shall be effective when written notice of them is deemed given to Registrar.

If to ICANN, addressed to:

Internet Corporation for Assigned Names and Numbers
Registrar Accreditation
4676 Admiralty Way, Suite 330
Marina del Rey, California 90292 USA
Attention: General Counsel
Telephone: 1/310/823-9358
Facsimile: 1/310/823-8649

If to Registrar, addressed to:

[Registrar Name]
a [organization type and jurisdiction]
[Courier Address]
[Mailing Address]
Attention: [contact person]
Registrar Website URL: [URL]
Telephone: [telephone number]
Facsimile: [fax number]
e-mail: [e-mail address]

5.12 Dates and Times. All dates and times relevant to this Agreement or its

performance shall be computed based on the date and time observed in Los Angeles, California, USA.

5.13 <u>Language</u>. All notices, designations, and specifications made under this Agreement shall be in the English language.

5.14 <u>Amendments and Waivers</u>. No amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties. No waiver of any provision of this Agreement shall be binding unless evidenced by a writing signed by the party waiving compliance with such provision. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

5.15 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.16 <u>Entire Agreement</u>. Except to the extent (a) expressly provided in a written agreement executed by both parties concurrently herewith or (b) of written assurances provided by Registrar to ICANN in connection with its Accreditation, this Agreement (including the appendices, which form part of it) constitutes the entire agreement of the parties pertaining to the accreditation of Registrar and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties on that subject.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed in duplicate by their duly authorized representatives.

INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS


By:_____
Paul Twomey
President and CEO


[Registrar Name]


By:_____
Name: _____
Title:_____


.AERO APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction]

("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".aero Appendix") is a part.

Registrar wishes to be accredited in the .aero TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .aero TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .aero TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .aero TLD.

4. Need for Agreement with Sponsor. Registrar's obligation under Subsection 3.1 to operate as a registrar for the .aero TLD is conditioned upon the .aero Sponsor (designated as such by a TLD Sponsorship Agreement with ICANN) selecting Registrar as one authorized to act as an .aero registrar and upon an Authorizing Agreement between Registrar and the .aero Sponsor.

5. Sponsored TLD/Sponsor's Delegated Authority. Registrar acknowledges that the .aero TLD is a sponsored TLD, over which the .aero Sponsor has delegated policy-formulation authority under its TLD Sponsorship Agreement with ICANN. The scope of delegation is currently stated at <http://www.icann.org/tlds/agreements/aero/sponsorship-agmt-att2-20nov01.htm> and includes topics that will affect the manner in which Registrar conducts its business of registering domain names in the .aero TLD. (The delegation includes, for example, "Practices and performance of ICANN-Accredited Registrars selected by Sponsor with respect to Registered Names and their registration.") Registrar agrees to comply with the requirements established by the .aero Sponsor within its delegated scope of policy-formulation authority.

6. Deviations from Obligations of this Agreement Due to Delegation. The .aero Sponsor may develop and implement a policy within the scope of its authority granted by its TLD Sponsorship Agreement with ICANN that requires Registrar to deviate from one or more obligations of this Registrar Accreditation Agreement. In that event, the .aero Sponsor will notify ICANN in writing of the policy and the manner in which the .aero Sponsor believes that Registrar's obligation(s) under this Registrar Accreditation Agreement should be modified. Within thirty days after this notification, ICANN will either:

> (a) notify Registrar and the .aero Sponsor in writing of the modification(s) to Registrar's obligations under this Registrar Accreditation Agreement that in ICANN's opinion is (are) appropriate to allow Registrar to comply with the .aero Sponsor policy. In case of this notification by ICANN, Registrar may act in conformity with the modified obligation(s) stated in the ICANN notification.

> (b) notify Registrar and the .aero Sponsor in writing that in ICANN's opinion no modification of Registrar's obligations is appropriate. In case of this notification by ICANN, Registrar will continue to comply with its obligations without any modification until it is notified in writing by ICANN that a resolution of any difference between the opinions of

ICANN and the .aero Sponsor is resolved.

IN WITNESS WHEREOF, the parties hereto have caused this .aero Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
                                         Name:
By: _____              Title:
Paul Twomey
President and CEO                        Dated: _____, 200__


.BIZ APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".biz Appendix") is a part.

Registrar wishes to be accredited in the .biz TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .biz TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .biz TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .biz TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .biz Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
                                         Name:
By: _____              Title:
Paul Twomey
President and CEO                        Dated: _____, 200__


.COM APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public

benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".com Appendix") is a part.

Registrar wishes to be accredited in the .com TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .com TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .com TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .com TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .com Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
By: _____      Name:
Paul Twomey                              Title:
President and CEO
                                         Dated: _____, 200__

## .COOP APPENDIX

ICANN and [Registrar] have entered into a Registrar Accreditation Agreement ("RAA"), of which this .coop Appendix ("Appendix") is a part. Pursuant to and subject to the RAA, Registrar and ICANN hereby agree as follows:

1. Definitions. As used in the RAA (including this appendix) with respect to the .coop TLD:

　　1.1 "Sponsor" refers to the entity designated as the Sponsoring Organization for the .coop TLD by a Sponsorship Agreement with ICANN, so long as that Sponsorship Agreement is in effect.

　　1.2 "Registry Operator" is the entity responsible, in accordance with an agreement between the Sponsor (or its assignee) and that person or entity, for providing Registry Services for the .coop TLD.

　　1.3 "Registry Services," with respect to the .coop TLD, shall have the meaning defined in the Sponsorship Agreement in effect between ICANN and the Sponsor.

　　1.4 "Authorizing Agreement" refers to the Sponsor's standard written agreement with registrars under which they are authorized to receive from Registry Operator Registry Services for the .coop TLD.

1.5 "Registered Name" refers to a domain name within the domain of the .coop TLD, whether at the second or a lower level, about which Registry Operator (or an affiliate engaged in providing Registry Services) maintains data in a Registry Database, arranges for such maintenance, or derives revenue from such maintenance. A name in a Registry Database may be a Registered Name even though it does not appear in a zone file (e.g., a registered but inactive name).

All initially capitalized terms not otherwise defined in this Appendix shall have the definitions assigned to such terms in the RAA.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registrar Services in the .coop TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registrar Services in the .coop TLD.

4. Need for Agreement with Sponsor. Registrar's obligation under RAA Subsection 3.1 to operate as a registrar for the .coop TLD is conditioned upon the .coop Sponsor selecting Registrar as one authorized to act as a .coop registrar, and upon Registrar and the .coop Sponsor having an Authorizing Agreement in effect.

5. Sponsored TLD/Sponsor's Delegated Authority. Registrar acknowledges that the .coop TLD is a sponsored TLD, over which the .coop Sponsor has been delegated policy-formulation authority under its TLD Sponsorship Agreement with ICANN. The scope of delegation is currently stated at <http://www.icann.org/tlds/agreements/coop/sponsorship-agmt-att2-06nov01.htm> and includes topics that will affect the manner in which Registrar conducts its business of registering domain names in the .coop TLD. (The delegation includes, for example, "Practices of ICANN-Accredited Registrars selected by Sponsor with respect to Registered Names and their registration.") Registrar agrees to comply with the requirements established by the .coop Sponsor within its delegated scope of policy-formulation authority.

6. Deviations from Obligations of this Agreement Due to Delegation. The .coop Sponsor may develop and implement a policy within the scope of its authority granted by its TLD Sponsorship Agreement with ICANN that requires Registrar to deviate from one or more obligations of this RAA. In that event, the .coop Sponsor will notify ICANN in writing of the policy and the manner in which the .coop Sponsor believes that Registrar's obligation(s) under this RAA should be modified. Within thirty days after this notification, ICANN will either:

(a) notify Registrar and the .coop Sponsor in writing of the modification(s) to Registrar's obligations under this RAA that in ICANN's opinion is (are) appropriate to allow Registrar to comply with the .coop Sponsor policy. In case of this notification by ICANN, Registrar may act in conformity with the modified obligation(s) stated in the ICANN notification.
(b) notify Registrar and the .coop Sponsor in writing that in ICANN's opinion no modification of Registrar's obligations is appropriate. In case of this notification by ICANN, Registrar will continue to comply with its obligations under the RAA without any modification until it is notified in writing by ICANN that a resolution of any difference between the opinions of ICANN and the .coop Sponsor is resolved.

IN WITNESS WHEREOF, the parties hereto have caused this .coop Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
By: _____             Name:
Paul Twomey                              Title:
President and CEO
                                         Dated: _____, 200__

### .INFO APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".info Appendix") is a part.

Registrar wishes to be accredited in the .info TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .info TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .info TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .info TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .info Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
By: _____             Name:
Paul Twomey                              Title:
President and CEO
                                         Dated: _____, 200__

### .MUSEUM APPENDIX

ICANN and [Registrar Name] have entered into a Registrar Accreditation Agreement ("RAA"), of which this .museum Appendix ("Appendix") is a part. Pursuant to and subject to the RAA, Registrar and ICANN hereby agree as follows:

1. Definitions. As used in the RAA (including this appendix) with respect to the .museum TLD:

   1.1 "Sponsor" refers to the entity designated as the Sponsoring Organization for the .museum TLD by a Sponsorship Agreement with ICANN, so long as that

Sponsorship Agreement is in effect.

1.2 "Registry Operator" is the entity responsible, in accordance with an agreement between the Sponsor (or its assignee) and that person or entity, for providing Registry Services for the .museum TLD.

1.3 "Registry Services," with respect to the .museum TLD, shall have the meaning defined in the Sponsorship Agreement in effect between ICANN and the Sponsor.

1.4 "Authorizing Agreement" refers to the Sponsor's standard written agreement with registrars under which they are authorized to receive from Registry Operator Registry Services for the .museum TLD.

1.5 "Registered Name" refers to a domain name within the domain of the .museum TLD, whether consisting of two or more (e.g., example.art.museum) levels, about which Registry Operator (or an affiliate engaged in providing Registry Services) maintains data in a Registry Database, arranges for such maintenance, or derives revenue from such maintenance. A name in a Registry Database may be a Registered Name even though it does not appear in a zone file (e.g., a registered but inactive name).

All initially capitalized terms not otherwise defined in this Appendix shall have the definitions assigned to such terms in the RAA.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registrar Services in the .museum TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registrar Services in the .museum TLD.

4. Need for Agreement with Sponsor. Registrar's obligation under RAA Subsection 3.1 to operate as a registrar for the .museum TLD is conditioned upon the .museum Sponsor selecting Registrar as one authorized to act as a .museum registrar, and upon Registrar and the .museum Sponsor having an Authorizing Agreement in effect.

5. Sponsored TLD/Sponsor's Delegated Authority. Registrar acknowledges that the .museum TLD is a sponsored TLD, over which the .museum Sponsor has been delegated policy-formulation authority under its TLD Sponsorship Agreement with ICANN. The scope of delegation is currently stated at <http://www.icann.org/tlds/agreements/museum/sponsorship-agmt-att2-20aug01.htm> and includes topics that will affect the manner in which Registrar conducts its business of registering domain names in the .museum TLD. (The delegation includes, for example, "Practices of ICANN-Accredited Registrars selected by Sponsor with respect to Registered Names and their registration.") Registrar agrees to comply with the requirements established by the .museum Sponsor within its delegated scope of policy-formulation authority.

6. Deviations from Obligations of this Agreement Due to Delegation. The .museum Sponsor may develop and implement a policy within the scope of its authority granted by its TLD Sponsorship Agreement with ICANN that requires Registrar to deviate from one or more obligations of this RAA. In that event, the .museum Sponsor will notify ICANN in writing of the policy and the manner in which the .museum Sponsor believes that Registrar's obligation(s) under this RAA should be modified. Within thirty days after this notification, ICANN will either:

(a) notify Registrar and the .museum Sponsor in writing of the modification(s) to Registrar's obligations under this RAA that in ICANN's opinion is (are) appropriate to allow Registrar to comply with the .museum Sponsor policy. In case of this notification by ICANN, Registrar may act in conformity with the modified obligation(s) stated in the ICANN notification.

(b) notify Registrar and the .museum Sponsor in writing that in ICANN's opinion no modification of Registrar's obligations is appropriate. In case of this notification by ICANN, Registrar will continue to comply with its obligations under the RAA without any modification until it is notified in writing by ICANN that a resolution of any difference between the opinions of ICANN and the .museum Sponsor is resolved.

IN WITNESS WHEREOF, the parties hereto have caused this .museum Appendix to be executed by their duly authorized representatives.

ICANN                                          [Registrar Name]

                                               By: _____
                                               Name:
By: _____            Title:
Paul Twomey
President and CEO                              Dated: _____, 200___

## .NAME APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".name Appendix") is a part.

Registrar wishes to be accredited in the .name TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .name TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .name TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .name TLD.

4. Data Submission. Pursuant to Subsection 3.2.1, as part of its registration for SLD E-mail forwarding, the NameWatch Service, and Defensive Registrations, Registrar shall submit to, or shall place in the Registry Database operated by, the Registry Operator for the TLD that Registry Operator, consistent with Appendix C to its Registry Agreement with ICANN, data elements Registry Operator requires be submitted to it.

IN WITNESS WHEREOF, the parties hereto have caused this .name Appendix to be executed

by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
By: _____      Name:
Paul Twomey                              Title:
President and CEO
                                         Dated: _____, 200___

## .NET APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".net Appendix") is a part.

Registrar wishes to be accredited in the .net TLD pursuant to and subject to the Registrar Accreditation Agreement and ICANN wishes to accredit Registrar in the .net TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .net TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .net TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .net Appendix to be executed by their duly authorized representatives.

ICANN                                    [Registrar Name]

                                         By: _____
By: _____      Name:
Paul Twomey                              Title:
President and CEO
                                         Dated: _____, 200___

## .ORG APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix (".org Appendix") is a part.

Registrar wishes to be accredited in the .org TLD pursuant to and subject to the Registrar

Accreditation Agreement and ICANN wishes to accredit Registrar in the .org TLD. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

1. Definitions. All initially capitalized terms not otherwise defined herein shall have the definitions assigned to such terms in the Registrar Accreditation Agreement.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registration Services in the .org TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registration Services in the .org TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .org Appendix to be executed by their duly authorized representatives.

ICANN                                  [Registrar Name]

                                       By: _____
By: _____    Name:
Paul Twomey                            Title:
President and CEO
                                       Dated: _____, 200__


.PRO APPENDIX

ICANN and [Registrar] have entered into a Registrar Accreditation Agreement ("RAA"), of which this .pro Appendix ("Appendix") is a part. Pursuant to and subject to the RAA, Registrar and ICANN hereby agree as follows:

1. Definitions. As used in the RAA (including this appendix) with respect to the .pro TLD, all initially capitalized terms not otherwise defined in this Appendix shall have the definitions assigned to such terms in the RAA.

2. Registrar Election. Registrar hereby elects and agrees to become accredited by ICANN to provide Registrar Services in the .pro TLD.

3. ICANN's Acceptance. ICANN hereby accepts Registrar's election to become accredited by ICANN to provide Registrar Services in the .pro TLD.

IN WITNESS WHEREOF, the parties hereto have caused this .pro Appendix to be executed by their duly authorized representatives.

ICANN                                  [Registrar Name]

                                       By: _____
By: _____    Name:
Paul Twomey                            Title:
President and CEO
                                       Dated: _____, 200__

LOGO LICENSE APPENDIX

The Internet Corporation for Assigned Names and Numbers, a California non-profit, public benefit corporation ("ICANN"), and [Registrar Name], a [organization type and jurisdiction] ("Registrar") have entered into a Registrar Accreditation Agreement ("Registrar Accreditation Agreement"), of which this appendix ("Logo License Appendix") is a part. Definitions in the Registrar Accreditation Agreement apply in this Logo License Appendix.

Registrar wishes to acquire from ICANN, and ICANN wishes to grant to Registrar, a license to use the trademarks listed below the signature block of this Logo License Appendix ("Trademarks") in connection with Registrar's role as an ICANN-accredited registrar. Pursuant to and subject to the Registrar Accreditation Agreement, Registrar and ICANN hereby agree as follows:

LICENSE

1. Grant of License. ICANN grants to Registrar a non-exclusive, worldwide right and license to use the Trademarks, during the term of this appendix and solely in connection with the provision and marketing of Registrar Services in order to indicate that Registrar is accredited as a registrar of domain names by ICANN. Except as provided in this subsection and Subsection 2.2 of the Registrar Accreditation Agreement, Registrar shall not use the Trademarks, any term, phrase, or design which is confusingly similar to the Trademarks or any portion of the Trademarks in any manner whatsoever.

2. Ownership of Trademarks. Any and all rights in the Trademarks that may be acquired by Registrar shall inure to the benefit of, and are herby assigned to, ICANN. Registrar shall not assert ownership of the Trademarks or any associated goodwill.

3. No Sublicense. Registrar shall not sublicense any of its rights under this appendix to any other person or entity (including any of Registrar's resellers) without the prior written approval of ICANN.

REGISTRATION AND ENFORCEMENT

1. Registration. Registration and any other form of protection for the Trademarks shall only be obtained by ICANN in its name and at its expense.

2. Enforcement. Registrar shall promptly notify ICANN of any actual or suspected infringement of the Trademarks by third parties, including Registrar's resellers or affiliates. ICANN shall have the sole discretion to initiate and maintain any legal proceedings against such third parties; Registrar shall not take any such actions without the prior written approval of ICANN; and ICANN shall retain any and all recoveries from such actions.

3. Further Assurances. Registrar agrees to execute such other documents and to take all such actions as ICANN may request to effect the terms of this appendix, including providing such materials (for

example URLs and samples of any promotional materials bearing the Trademarks), cooperation, and assistance as may be reasonably required to assist ICANN in obtaining, maintaining, and enforcing trademark registration(s) and any other form of protection for the Trademarks.

TERM AND TERMINATION

This Logo License Appendix shall be effective from the date it is signed below by both parties until the Expiration Date, unless this appendix or the Registrar Accreditation Agreement is earlier terminated. Each party shall have the right to terminate this appendix at any time by giving the other party written notice. Upon expiration or termination of this appendix, Registrar shall immediately discontinue all use of the Trademarks.

IN WITNESS WHEREOF, the parties have caused this Logo License Appendix to be executed by their duly authorized representatives.

ICANN                                [Registrar Name]

                                     By: _____
By: _____          Name:
Paul Twomey                          Title:
President and CEO
                                     Dated: _____, 200__

TRADEMARKS:

1. ICANN Accredited Registrar

2.





Comments concerning the layout, construction and functionality of this site
should be sent to webmaster@icann.org.

Page Updated 15-May-2003

©2001, 2002, 2003 The Internet Corporation for Assigned Names and Numbers All rights red.

# Exhibit B

**Carter, Nick**

| | |
|---|---|
| **From:** | Dan Halloran [halloran@icann.org] |
| **Sent:** | Monday, March 29, 2004 9:33 PM |
| **To:** | msbpc@earthlink.net |
| **Cc:** | rgarraud@attbi.com |
| **Subject:** | RE: Dodora Receivership |

Michael,

Thanks for your note.  Sorry for the delay in getting back to you.

You should be aware that it's not exactly possible to "sell" Dodora's registrar accreditation.  Dodora Unified Communications, Inc. will continue to be an ICANN-accredited registrar until its accreditation is terminated or assigned with ICANN's prior written consent.  Please refer to §5 of the RAA <http://www.icann.org/registrars/ra-agreement-17may01.htm> for details. Registrars seeking ICANN approval for the assignment of their accreditation should submit a completed and signed Application for Transfer of Registrar Accreditation <http://www.icann.org/registrars/transfer-application.htm>.

I hope this information is helpful.  Please feel free to contact me if I can be of any other assistance.

Best regards,
Dan Halloran
Deputy General Counsel
ICANN
halloran@icann.org
1-310-301-5822


-----Original Message-----
From: msbpc@earthlink.net [mailto:msbpc@earthlink.net]
Sent: 29 March, 2004 14:16
To: halloran@icann.org
Subject: Dodora Receivership

Dear Mr. Halloran,

So far, there has been no substantive response from ICANN to the Court's order. I think it is in everyone's best interest that we move foward swiftly, especially for the sake of the customers.

I think there is a mechanism in place where the  domain names handled by a registrar are routed to another accredited registrar for servicing, in the event of a problem at the original registrar.  Can't we use this system to route the domain names to the buyer of Dodora's credentials?

I'd appreciate ICANN's guidance on the best way to accomplish this, considering that Dodora is not being cooperative and cannot be expected to turnover their customer database.

I look forward to hearing from you!

Mike Bernstein

-----
Michael S. Bernstein, P.C.
1301 Northwest Hwy, Suite 204
Garland TX 75041
972 / 271-2700  (fax) 972 / 271-1818

# Exhibit C

## DIRECTI - DODORA BATCH POOL AGREEMENT

This agreement is entered into and effective from the 15 day of June, 2004, between DIRECT INFORMATION PRIVATE LIMITED – a Company Registered and Incorporated under the provisions of the Companies Act, 1956 having its Registered Office at 102 Osia Friendship 4th Gaothan Lane Off: J. P. Road Opp. Ram Mandir Andheri (West) Mumbai 400 053 India (hereinafter referred to as "Directi") and Michael S. Bernstein, in his capacity as Receiver for Dodora Unified Communications, Inc. in Cause No. CC-03-3182-E in County Court at Law Number Five, Dallas County; *Compana, LLC v. Dodora Unified Communications, Inc.*

This agreement is subject to Court Approval in cause number CC-03-3182-E in County Court at Law Number Five, Dallas County; *Compana, LLC v. Dodora Unified Communications*. This agreement terminates when the judgment in Cause No. CC-03-3182-E is satisfied or settled.

Dodora is an ICANN accredited domain name Registrar. Directi provides Domain Backorder Services.

The parties desire to form a relationship in which Dodora will allow Directi to exclusively use Dodora's allotted Registry Registrar Protocol (RRP) connections to the Verisign Registry's Shared Registration System Batch Pool ("Batch pool") for assistance in registering deleted domain names.

TERM:

This agreement shall commence on the Effective Date indicated above and will continue for 90 days. Unless terminated by its terms or by the parties, this contract shall renew for additional periods of 90 days.

SERVICES:

Directi will have the exclusive right to the Batch Pool connections of Dodora during the term of this agreement. Directi may partner with Service Providers for using these Batch Pool connections.

Dodora will be notified for each name Registered through Dodora's Batch Pool connections. Dodora acknowledges that it will maintain sufficient balance with the Registry at anytime in order to allow for smooth Domain Registration. Directi will pay Dodora such fees in advance of the due date for the fees.

FEES:

The receiver, on behalf of Dodora, will receive a Commission of 75% of the gross monthly revenue generated by Directi, plus $6 per domain name registered through Dodora's Batch Pool connections, payable by the 10th of each month for the previous month.

Directi – Dodora Partner Agreement, page 1 of 3.

The "WLS" refers to Verisign's proposed Wait List Service. Upon the start of the WLS program, this agreement will terminate with immediate effect. Directi will pay any commissions and registry fees due up to the date of termination.

INTERFACE/PROCESS TO BE USED:

All Dodora Batch Pool RRP connections shall remain open for the sole and exclusive use of Directi during the deletion period of the Registry. Directi will only use Dodora's Batch Pool RRP connections to the Registry, and will not knowingly use non-Batch Pool RRP connections of the Dodora to the Registry, in connection with: 1) adding newly grabbed domains; or 2) deleting newly grabbed domains within five (5) days for non-payment.

Directi shall monitor which RRP connection grabs the domain name to properly assign the domain name to Dodora.

NO WARRANTY:

WITH REGARD TO THE BATCH POOL MONITZATION, DIRECTI MAKES NO WARRANTY, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION WITH RESPECT TO REGISTRATION AND OTHER SERVICES, AND EXPRESSLY DISCLAIMS THE WARRANTIES OR CONDITIONS OF NONINFRINGEMENT, MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE.

FORCE MAJEURE:

Without limiting the foregoing and except for payment obligations, neither party shall have any liability for any failure or delay resulting from any condition beyond the reasonable control of such party, including but not limited to governmental action or acts of terrorism, earthquake or other acts of God, labor conditions, and power failures.

TERMINATION:

Directi and Dodora may terminate this agreement with ninety (90) days notice. This contract may terminate by its terms as set forth elsewhere herein.

NOTICE:

Notice shall be sufficiently given only if in writing and transmitted by facsimile to the party's facsimile number, delivered personally or by a nationally recognized courier service, or mailed by prepaid registered mail addressed to the party for whom it is intended, at the address noted on the first page hereof provided that either party may notify the other in writing of a change in such party's address and/or facsimile number for the purposes hereof.

ASSIGNMENT:

Neither party may assign this agreement, in whole or in part, without written consent from the other party.

JURISDICTION:
This Agreement shall be governed by and interpreted and enforced in accordance with the laws of India applicable therein without reference to rules governing choice of laws. Any action relating to this Agreement must be brought in Mumbai High Court or Court sub-ordinate to it, situated in Mumbai. Directi reserves the right to enforce the law in the Country/State/District where the Registered/Corporate/Branch Office, or Place of Management of Dodora is situated as per the laws of that Country/State/District.

ENTIRE AGREEMENT:
This agreement constitutes the entire agreement between the parties for this purpose.

They are the complete and exclusive agreement between the parties with respect to the subject matter hereof, superseding and replacing any and all prior agreements, communications, and understandings (both written and oral) regarding such subject matter.

SIGNATURES:

Directi                                             Dodora Unified Communications, Inc.

_____              _____ Receiver
Signature                                           Signature

_____              _____
Print Name                                        Michael S. Bernstein, as receiver for Dodora

_____              _____
Date                                                 Date  6/15/04

Directi – Dodora Partner Agreement, page 3 of 3.

... to this agreement, in whole or in part, ... ... ... the
...

LAW ...
This Agreement shall be governed by and interpreted and enforced in ... ... ... the laws
of India applicable therein without reference to rules governing ... ... ... ... tion
relating to this Agreement must be brought in Mumbai High Court ... ... ... ... nate to it,
situated at Mumbai. Direcθ reserves the right to enforce the law in its favour ... ... District
where the Registered Corporate/Branch Office, or Place of Management of ... ... is situated as
per the laws of that Country/State/District

ENTIRE AGREEMENT:
This agreement constitutes the entire agreement between the parties for this ... ... ...

They are the complete and exclusive agreement between the parties with respect to the subject
matter thereof, superseding and replacing any and all prior agreements, communications, and
understandings (both written and oral) regarding such subject matter.

SIGNATURES:

Direcθ                                    Dodona Partners Company sstor s, Inc.

Signature _____               Signature _____
BHASHA TURAKHA                          Michael S. Bernstein, as ... tive for Dodona
Printed Name _____            _____
Date 6/15/04                            Date 6/15/04

Direcθ – Dodona Partner Agreement, page 3 of 3.

# Exhibit D

## Directi-Dodora Management Agreement

This agreement is between Michael S. Bernstein, in his capacity as receiver for Dodora Unified Communications, Inc., in Cause No. CC-03-3182-E in County Court at Law Number Five, Dallas County, Texas, USA; Compana, LLC v. Dodora Unified Communications, Inc. and Direct Information Private Limited (hereinafter referred to as "LogicBoxes"). This agreement contains and incorporates the terms of the Directi – Dodora Partner Agreement entered into by the parties at or about the same date.

This agreement is subject to Court Approval in cause number CC-03-3182-E in County Court at Law Number Five, Dallas County; Compana, LLC v. Dodora Unified Communications. This agreement terminates when the judgment in Cause No. CC-03-3182-E is satisfied or settled.

LogicBoxes is currently powering over 6 ICANN Accredited Registrars - Directi.com, Signdomains.com, NameShare, Name Intelligence, esoftWiz, Name King and many others currently in the pipeline.

In case of Dodora, LogicBoxes will be able to offer a complete platform to allow Dodora to carry out their business as is. Here is a brief outline proposal of the process LogicBoxes will be following for this -

*Dodora's Responsibility*

1. Verisign will provide to LogicBoxes a list of Domain Names which Dodora is maintaining to the extent known to the receiver and with as much information as can be provided by Verisign.

2. Dodora will provide to LogicBoxes as much information of the Customer as is available to them

3. Dodora acknowledges that LogicBoxes will redirect the Dodora website and all communication to Dodora, to an appropriate destination, in order to allow LogicBoxes to provide the services under this contract. Dodora gives all necessary permissions and will cooperate with LogicBoxes to allow LogicBoxes to effectuate all services under this contract. Dodora will also give LogicBoxes required authorization and authentication information to connect to the Registry as well as communicate with the Registry on Dodora's behalf

Management agreement, Page 1 of 3.

## *LogicBoxes Responsibility*

1. LogicBoxes will create code to parse and import this data into their database

2. For all domain names where contact information exists LogicBoxes will send out an email to the Customer explaining that they can make modifications and manage their domains using our URL. LogicBoxes will provide a URL and draft out an explanatory email

3. These Customers will be free to transfer their Domain Names to Directi if they so choose. LogicBoxes understands that numerous customers have been without service for approximately two weeks and will do all they can to expedite the return of service for these customers.

4. For all domains whose contact information is not available LogicBoxes will create dummy contact information

5. LogicBoxes will provide Support contact information for these domain names where these Customers may call up. LogicBoxes will have to train representatives here on the situation and the necessary responses to be given to each Customer.

6. LogicBoxes will work out a process to verify the Customer of a given Domain Name and will accordingly assign usernames and passwords to the appropriate Customer.

7. LogicBoxes will manage Dodora's domains on behalf of Dodora. Renewals and newer Add transactions however will not be performed in Dodora's account

## *Costing Proposal*

This process will require significant developer and Customer support resources on the part of LogicBoxes. In order to recover these costs LogicBoxes will monetise the batch pool connections of Dodora.

1. LogicBoxes will monetize the batch pool connections of Dodora based on the arrangement as laid out in the separate contract entered between Dodora and Direct Information Pvt Ltd for this purpose.

2. LogicBoxes will pay Dodora for Verisign's charges, in advance.

Management agreement, Page 2 of 3.

3. Dodora will bear all fees that it owes to ICANN to maintain its accreditation

4. LogicBoxes will not charge anything for deploying the above solution on behalf of Dodora

*Termination*

Directi and Dodora may terminate this agreement with thirty (30) days notice.

*Jurisdiction*

This Agreement shall be governed by and interpreted and enforced in accordance with the laws of Mumbai, India, applicable therein without reference to rules governing choice of laws. Any action relating to this Agreement must be brought in a court in Mumbai, India.

LogicBoxes reserves the right to enforce the law in the Country/State/District where the Registered/Corporate/Branch Office, or Place of Management of Dodora is situated as per the laws of that Country/State/District.

For LogicBoxes

Bhavin Turakhia
CEO

Dated:      June 2004

For Dodora Unified Communcations, Inc.

, *Receiver*
Michael S. Bernstein, Receiver

June 15, 2004

Management agreement, Page 3 of 3.

... all fees that it owes to Dodora

... shall not charge anything for deployment ... ...lution
... of Dodora

Term Period:

Dodora and Dodora may terminate this agreement with thirty (30) days notice.

## Jurisdiction

This Agreement shall be governed by and interpreted and construed in accordance with the laws of Mumbai, India, applicable therein without reference to rules governing choice of laws. Any action relating to this Agreement must be brought in a court in Mumbai, India

LogicBoxes reserves the right to enforce the law in the Country/State/District where the Registered/Corporate/Branch Office, or Place of Management of Dodora is situated as per the laws of that Country/State/District.

For LogicBoxes                      For Dodora Unified Communications, Inc.

Bhavin Turakhia                     Michael S. Bernstein, Receiver
CEO

Dated:    June 2004                  June 15, 2004

Management agreement, Page 3 of 3.

# Exhibit E

No. CC-03-3182-E

| | |
|---|---|
| Compana, LLC | In The County Court |
| vs. | At Law Number Five Of |
| Dodora Unified Communications | Dallas County, Texas |

## Receiver's Application To Approve Contracts

COMES NOW Michael S. Bernstein, your receiver, and seeks to have two contracts approved, as shown:

1. Background.  The continuing Order Appointing Receiver, Corporate Defendant appointed your receiver to "take possession of and sell the assets of Dodora Unified Communications, Inc." (Order, page 1.)  To that end, the order grants the receiver the defendant's contract rights.  (Order, page 1, item 9.)  It grants the receiver "the right, power and authority to hire any person or company necessary to accomplish any right or power under this Order." (Order, page 2, item 9).  The Court further ordered that "The Receiver is authorized and directed to sell Dodora's property at a private sale, including, without limitation, Dodora's ICANN Accreditation, its customer list and all rights pertaining thereto, and its log-in credentials with VeriSign and ICANN, subject to final approval of this court". (Order Requiring Compliance With Receivership Order, signed March 19, 2004.)

1.1.1.  The value to Dodora is in what is known, in the industry, as the batch pool of expired domain names.  A domain name must be renewed regularly or it will expire.  A domain name can be quite valuable.  Companies compete for the rights to expired domain names.  A registrar, such as Dodora, has connections into the mechanisms of the internet through which the rights to expired domain

names can be acquired.  A registrar, such as Dodora, leases the right to use its connections to a company that wishes to vie for the batch pool of expired domain names.

1.1.2.  The same passwords are used to control the batch pool and to manage the service for registering new domain names.  Control of one allows control of the other, since the passwords are the same. Further, unless ICANN and Verisign could be shown that the existing owners of domain names were being serviced, it was understood that Dodora would lose its ability to do business.  Therefore, although the primary value of Dodora to the receiver is the batch pool connections, the rest of Dodora's business had to be controlled by and managed somehow.  It was not possible to allow Mr. Garraud to manage a different part of Dodora's business while the receiver leased the batch pool, because the internet connections for these different parts of the business are utilized through the same username and password.  Allowing Dodora control of one granted it control over the other. Therefore, it was necessary to hire a company to both manage the registration of domain names and to mange / lease the batch pool connections.

1.1.3.  Your receiver entered into two contracts on behalf of Dodora Unified Communications, Inc. on June 15, 2004.  The contracts, attached and incorporated herein, are the Directi – Dodora Management Agreement and the Directi – Dodora Batch Pool Agreement.  The delay in seeking approval was because we were waiting to be sure the arrangement worked satisfactorily before having it ratified.  Also, it was hoped that the parties might come to an agreement.  It was thought that the logistics of a settlement would be easier prior to ratification of the contracts.

2.  Directi-Dodora Management Agreement:  The contract is attached.  This is a contract with Direct Information Private Limited, known as Directi, doing business as LogicBoxes.  Directi / LogicBoxes is managing the registration of domain names for Dodora in order to keep Dodora viable so that income can be generated from the batch pool stream.  The contract provides that it is subject to this

Court's approval.  Your receiver seeks approval of this contract.  Directi / Logicboxes is not charging Dodora directly for managing the registration of domain names.

2.1.1.  Directi's compensation for the Management Agreement is partly the new business that inures to Directi through providing these services and partly from what Directi expects to make from the Batch Pool Agreement, described below.  When domain names come up for renewal, it is expected that they will either find another company or renew through Directi.  Renewals through Dodora would not be possible, as we do not have Dodora's assistance or cooperation in handling the funds for renewals.  Fees for the renewals have to be paid by the customers and Dodora has to pay associated fees to Verisign and other registries.  This could not be accomplished without Dodora's cooperation.  So, renewals and new registrations must go to either a different company or to Directi.

3.  Directi-Dodora Batch Pool Agreement.  The contract is attached.  This is a contract with Direct Information Private Limited, known as Directi.  With this contract, the receiver allows Directi exclusive use of Dodora's allotted Registry Registrar Protocol (RRP) connections to the Verisign Registry's Shared Registration System Batch Pool.  Directi is leasing access to the batch pool.  The contract gives Directi 25% of what is realized from leasing the batch pool access.  The remaining 75% is to be paid to the receiver on the 10th of the month.  The contract is for 90 days and renews for 90 day terms.  The contract is subject to the Court's approval.

4.  Receivership Funds.  There has been no income on this case so far, although it is expected there will be funds from the Batch Pool Agreement, by the time of the hearing.  There is a funds balance of $4.72, from money advanced by the plaintiff for expenses.

5.  Request For Hearing.  A hearing is requested.

Wherefore, your receiver prays for approval of the attached contracts and for such other and further relieve as may be just.

Respectfully Submitted,

MICHAEL S. BERNSTEIN, P.C.

MICHAEL S. BERNSTEIN  02222500
Receiver
1301 Northwest Highway, Suite 204
Garland TX 75041-5896
972 / 271-2700  (office)
972 / 271-1818 (fax)

## CERTIFICATE OF SERVICE

By my signature below, I certify that a true and complete copy of this application, and the receiver's inventory and accounting has been served upon the parties in compliance with Rule 21a of the Texas Rules of Civil Procedure on August 12, 2004, as shown below.

Michael S. Bernstein

Defendant
Ron Garraud
Dodora Unified Communications, Inc.
14 Nicholson St.
Lynn MA  01905

via certified mail #7004 0750 0000 7257 3740
return receipt requested
and via first class mail

Attorney for Plaintiff
Mark P. Blenden, Esq.,
The Blenden Law Firm
P.O. Box 560326
Dallas TX  75356

via fax to 817 / 267-1992; your file No. 23028

Receiver's Application to Approve Contracts, Page 4 of 4.

# Exhibit F

### No. CC 03-3182-E

| | |
|---|---|
| Compana LLC | In The County Court |
| vs. | At Law Number Five Of |
| Dodora Unified Communications, Inc. | Dallas County, Texas |

### Agreed Order Closing Receivership

IT IS ORDERED that this receivership be and the same hereby is terminated; and that the receiver be, and he is released and discharged from all obligations under his bond and under this receivership;

ORDERED that the Receiver's Motion To Approve Contracts is hereby denied as moot;

ORDERED that all actions taken by the receiver during the pendency of the receivership are APPROVED in all respects;

ORDERED that all funds on deposit with the receiver as of 11/30/04 ($21,710.12) shall be distributed to the Receiver as additional approved receiver's fees and to Mark Blenden as per their agreement;

ORDERED that the Clerk of the Court immediately release and pay the sum of $100.00 which is being held as a cash bond in the registry of this court, to The Blenden Law Firm, P.O. Box 560326, Dallas, Texas 75356. The Clerk may deduct its statutory fee.

This ORDER terminates any levy or attachment not already released by the receiver.

SIGNED ON December 13, 2004

_Mark Greenberg_

_____
Mark Greenberg, Judge Presiding

AGREED:

_____
Randal C. Shaffer, Attorney for
Dodora Unified Communications, Inc,

_____ 12/7/04
Michael S. Bernstein, Receiver

_____
Mark P. Blenden, Attorney for
Compana L.L.C.

# Exhibit G

## Carter, Nick

| | |
|---|---|
| **From:** | Ron Garraud [rgarraud@ieee.org] |
| **Sent:** | Thursday, January 13, 2005 3:37 PM |
| **To:** | Carter, Nick |
| **Subject:** | [Fwd: Old dodora.net, dodora.com webpage] |

-------- Original Message --------
**Subject:** Old dodora.net, dodora.com webpage
   **Date:** Sat, 01 Jan 2005 16:43:51 -0500
 **From:** Ron Garraud <rgarraud@ieee.org>
    **To:** Ausrotas, Raymond P. <rausrotas@toddweld.com>

Hi all,

**The operations of Registrar Dodora have been frozen.**
A Court Receiver, Mr Michael Bernstein, has been appointed in order to fulfill a judgement against Dodora in Cause No. CC-03-3182-E in County Court at Law Number Five, Dallas County, Texas, USA.

Mr Michael Bernstein has had to take over the control of Dodora. He has partnered with Directi and LogicBoxes to enable seamless transition and management of the existing Resellers, Customers and Domain Names of Dodora. **Currently, .COM, .NET, .ORG, .INFO and .BIZ Domains have been transitioned over to our System.**

This migration experience is going to inconvenience many of you. It is not going to be a straightforward process. All of you have been conducting your business and now suddenly you will need to change your business processes due to this transition. We have spent the last 2 weeks in planning and structuring this in a fashion so as to minimise the inconvenience to all of you. **We have pre-created all your accounts and pre-created all your Customers.** However this import process cannot be 100% accurate.

We will have missed out on some domains or some accounts. We will have imported some information that is inaccurate or incorrect. We do not have direct access to be able to obtain this information. We have had to work on clever work arounds. However we do believe we have done our best given the short timeframes and the current situation.

**We have also created a 24/7 support cell to assist you with the migration process to the Directi systems.** Directi and LogicBoxes have always maintained superior support and services to its existing base of over 10,000 Resellers worldwide. Our Reseller Management system has been heralded as the best in the market today.

We will be contacting each one of you and working with you closely to assist you with a complete migration of your business to us.

Thanks

Yours sincereley,



Bhavin Turakhia
Chairman & CEO
Directi/LogicBoxes

FAQ          **I am a Reseller of Dodora. What do I Do?**                    **^ top**

Your Reseller account has already been setup with Directi. You will have received a detailed email explaining how you can customize that account and begin managing your domain names at your Dodora email address.

You can login at http://manage.directi.com/reseller. Your username is your email address. A password has been sent to your email address. If you did not get the email you can click the "Forgot Password" link and obtain the password.

To start with you will need to follow the steps below -

**1.** Login to your Reseller account

**2.** Begin by putting in your profile details - Refer to
http://manage.directi.com/kb/servlet/KBServlet/cat111.html

**3.** Setup your branding of your Storefront and Control Panel - Refer to
http://manage.directi.com/kb/servlet/KBServlet/cat133.html. Make sure you follow every answer in this section and setup all your branding settings.

**4.** Verify your Domains - Click on "Domains->Search" and hit submit leaving all parameters blank.

**5.** Verify that you can manage your domains. Refer to -
http://manage.directi.com/kb/servlet/KBServlet/cat119.html

**6.** You will need to change your Selling Currency and Accounting Currency. This is an important step and has to be done right away. You cannot make any changes to these fields once you begin transacting. Refer to - http://manage.directi.com/kb/servlet/KBServlet/faq602.html

**7.** You will need to change your Selling price for your Customers and Resellers. We have setup a default pricing for you. Please refer to -
http://manage.directi.com/kb/servlet/KBServlet/cat107.html

**8.** You will need to now integrate the purchase process with your website. For that refer to -
http://manage.directi.com/kb/servlet/KBServlet/cat114.html

**9.** If you integrate the purchase process you may also need to integrate a Payment Gateway option. For that refer to - http://manage.directi.com/kb/servlet/KBServlet/cat92.html

**10.** You will need to add funds to your Reseller account. Refer to -
http://manage.directi.com/kb/servlet/KBServlet/faq518.html

**11.** You may also want to provide Offline Payment information. Refer to -
http://manage.directi.com/kb/servlet/KBServlet/faq334.html

**12.** If you wish to do API integration with our Server please refer to -
http://manage.directi.com/kb/servlet/KBServlet/cat106.html

**Important Links:**
Knowledgebase - http://manage.directi.com/kb
Requesting Support - http://support.directi.com
(we have a 24/7 Support Desk)

## * How do I manage .BIZ domain names?   ^ top

To start managing your domain names, please email us the list of all **.BIZ** domains you had
registered with dodora to Ninad Raval (ninad.r @ directi.com), we will then verify this list against
our databases and accordingly move these domain names under your reseller account.

## * How do I manage .INFO domain names?   ^ top

To start managing your domain names, please email us the list of all **.INFO** domains you had
registered with dodora to Ninad Raval (ninad.r @ directi.com), we will then verify this list against
our databases and accordingly move these domain names under your reseller account.

## How do I manage .ORG domain names?   ^ top

To start managing your domain names, please email us the list of all .org domains you had
registered with dodora to Ninad Raval (ninad.r @ directi.com), we will then verify this list against
our databases and accordingly move these domain names under your reseller account.

## How do I manage .BIZ Domains?

You will continue to manage those at Dodora for the time being. We will have more updates on this
shortly

## I do not see some of my domains. What do I do?

Please create a support request at http://support.directi.com and someone from our support team
will get back to you shortly.

## Will my domains be under Dodora Registrar or under Directi Registrar?

Your domain names will be under Dodora for the time being. However, they will be automatically
and seamlessly transferred to Directi the moment you or your Customer renews a Domain Name.
This will ensure that your account remains with a stable Registrar

## What about my funds at Dodora?

If you had any funds at Dodora you need to contact Mr Ron Garraud to get those funds back. We

have no funds transfer from Dodora

## Where can my Customers login?

Your Customer can login to a branded URL that you will provide them. Details of how you can set this are provided in the first answer above and sent to you by email.

## I own a Domain with Dodora. Where do I manage it from?

Please contact the company you purchased the domain name from. Alternatively visit http://support.directi.com and create a support Request and someone from our Support Desk will get back to you.

## Tell us more about Directi's Services

Directi has been a stable Registrar with over 10000 Resellers worldwide, since well over 4 years. We have the most robust Reseller Management system (currently used by several Registrars whom we power) with comprehensive features far surpassing that of Dodora's or for that matter all other Registrars. Take some time to explore our interfaces and control panels. We also offer a comprehensive API, with API kits in PHP, JSP, and .NET. We have true multi-level Reseller capability with complete multi-currency finance and billing automation, payment gateway integration, payment collection, complete branding, comprehensive products and services and much more.

Click here to read more about the Directi Reseller program >>

For any further questions you may contact our Support desk by visiting http://support.directi.com

About Directi                                                                        ^ top



*Directi*

Directi is one of the fastest growing Domain Name Registrar Worldwide with a reseller base of over 10000 resellers. Directi's domain registration strategy focuses on Resellers and Low Prices. Directi's Service Portfolio includes Domain Name Registration, Web Hosting Automation Products, Payment Gateway Services, Colocation, Digital Certificates, Managed DNS Services, Domain Forwarding, Mail Solutions and various other services.

About LogicBoxes                                                                     ^ top

LOGICBOXES

LogicBoxes is a Software Development and Consulting Company with its primary focus on developing, deploying and managing business process automation solutions for the Domain Registration and Web Hosting Industry. LogicBoxes' flagship Product - OrderBox - is a complete online Automation suite for ICANN Accredited Domain Registrars and large Web Hosting Companies.

file:///C:/mike/directi-dodora.htm

# Exhibit H

Affidavit of Ryan Brown

Ryan Brown, on oath, states as follows:

1.    I am the founder of The Burgh Live, LLC ("The Burgh Live"), which handles e-commerce websites for customers, including design of customers' websites and registration of their domain names. The Burgh Live is based in Pittsburgh, Pennsylvania.

2.    In about June 2004, DirectI took control of Dodora Unified Communications ("Dodora"). As a result of that acquisition, the domain names of The Burgh Live and our customers were transferred to DirectI without our approval or request.

3.    The forced transfer of these domain names caused many hardships and difficulties for The Burgh Live and our customers. These included unnecessary financial liabilities, locked domain names, and lost hours of billable service to both The Burgh Live and our customers.

4.    For example, DirectI placed a 3 month account lockout on all the domain names they imported from Dodora. The Burgh Live and our customers were unable to modify our domain names or transfer them from DirectI. The Burgh Live and our customers were forced to leave these locked domain names with DirectI or risk losing our domain names with DirectI at the prices they set to expire and be deleted if they were not renewed. The Burgh Live and our customers never asked nor wanted to be locked in with DirectI. As stated before, had no choice in the matter as our domain names could be lost if we did not comply with DirectI policies.

5.    DirectI failed to accurately import every domain name, resulting in many stressful hours comparing databases, filling out paperwork to import the domains, and finally faxing these documents to DirectI. I spent approximately 100 hours trying to resolve these problems.

6.    As soon as the account locks expired, The Burgh Live and our customers immediately began to transfer our domains to the OpenSRS domain registrar.

7.    The Burgh Live and our customers had been satisfied with Dodora and we would have stayed with Dodora as our registrar if DirectI had not taken over in the disruptive way that it did.

Signed under the pains and penalties of perjury this 18 day of January 2005.

_____
Ryan Brown

## Affidavit of Ryan Brown

Ryan Brown, on oath, states as follows:

1.    I am the founder of The Burgh Live, LLC ("The Burgh Live"), which handles e-commerce websites for customers, including design of customers' websites and registration of their domain names.  The Burgh Live is based in Pittsburgh, Pennsylvania.

2.    In about June 2004, Directi took control of Dodora Unified Communications ("Dodora").  As a result of that acquisition, the domain names of The Burgh Live and our customers were transferred to Directi without our approval or request.

3.    The forced transfer of these domain names produced substantial hardships and difficulties for The Burgh Live and our customers.  These included unnecessary financial liabilities, locked domain names, and lost hours of billable service to both The Burgh Live and our customers.

4.    For example, DirectI placed a 3 month account lock on most of the domain names they imported from Dodora. The Burgh Live and our customers were unable to modify our domain names without interaction from DirectI. The Burgh Live and our customers were unable to transfer away these locked domain names from DirectI and we were forced to renew our domain names with DirectI at the prices they choose, as they would expire and be deleted if they were not renewed. The Burgh Live and our customers never asked nor wanted to be affiliated with DirectI, but as stated before, had no choice in the matter as our domain names would be lost if we did not comply with DirectI policies.

5.    DirectI failed to accurately import every domain name, resulting in many stressful hours comparing databases, filling out paperwork to import the domains, and finally faxing these documents to DirectI. I spent approximately 100 hours trying to resolve these problems.

6.    As soon as the account locks expired, The Burgh Live and our customers immediately began to transfer our domains to the Tucow's OpenSRS domain registrar.

7.    The Burgh Live and our customers had been satisfied with Dodora, and we would have stayed with Dodora as our registrar if Directi had not taken over in the disruptive way that it did.

Signed under the pains and penalties of perjury this ___ day of January 2005.

                                        _____
                                        Ryan Brown

# Exhibit I

## Affidavit of Sherry Crabtree

Sherry Crabtree, on oath, states as follows:

1. I am a real estate agent and own the domain name, visityourhome.com. I have owned this domain name for several years.
2. Without my approval, my domain name was transferred to Directi.com in about June 2004.
3. As a result, my website went down and customers were no longer able to access my site.
4. I contacted Pool.com, which had registered my domain name originally with Dodora. Pool.com said that Directi was taking over registration of the domain name. However, when I called Directi, Directi told me that Dodora.com is responsible for my domain name.
5. All I know is that I am still having difficulties with my domain name and website. I don't know who is responsible anymore.
6. I do know that prior to my domain name being transferred to Directi, I was not having these difficulties.
7. I have lost thousands of dollars in lost business because of these recent problems with my domain name because customers have not been able to access my website.
8. I do not want Directi to manage my domain name.

Signed under the pains and penalties of perjury this 20th day of January 2004.


Sherry Crabtree (by permission
Nicholas (-)
Sherry Crabtree

# Exhibit J

## Carter, Nick

| | |
|---|---|
| **From:** | Helen - Reg.CA [helen@reg.ca] |
| **Sent:** | Wednesday, January 12, 2005 6:18 AM |
| **To:** | Carter, Nick |
| **Subject:** | The Effect of Dodora losing Credentials |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

To Nic Carter:
Hi Nic!
Ron Garraud suggested that I send you a draft "affidavit" regarding the losses and suffering that occurred to us a result or Dodora Unified Communications Inc. losing its credentials to operate as an ICANN registrar for the domain name registration of .coms. .net, .org, .info, .biz etc.
This occurred on or about May 26th 2004.

RegCA Enterprises Inc. has been operating as a Domain registration Web hosting company since Aug 2000.
We register some domains such as .ca directly and other domains such as .coms. .net, .org, .info, .biz through a registrar such as Dodora.
As far as our clients are concerned, this administration happens seamlessly as they do everything through us.
We have been building up good client relations over the years by providing full and high quality support.
We received a great many glowing reports and recommendations from our clients.
This goodwill is hard is a very tangible part of our business.

When Dodora lost its credentials we were suddenly in a position of being unable to provide any support for our client in domains we registered through Dodora.
Suddenly clients found that they could not register new .coms. .net, .org, .info, .biz etc., or renew the Domains or sell them, or update the contacts or change the name servers.
In some many our clients run websites that are essential to their business in providing advertising, information and sales.
Clients that had transferred to us and paid us for hosting could not change their DNS entries and we had to refund them while their business plans were halted. In some cases, clients had paid a massive advertising budget with tv, radio, newpaper adds etc. that advertised their websites. If the domain names could not be set to the right name servers the web site would not come up. They were furious.
Many clients were forced to register their new domains elsewhere and when they discovered that we could not provide services for some of their existing domains they transferred their entire portfolio elsewhere. We had .ca domains that they had had with us since 2000 but how do you explain that these selective domain can be controlled and others not?
Unfortunately, most of our clients have come to us by way of registering .ca domains and then expanded their portfolio as a result of our quality service. These same hard earned clients have left us when we could not, through no fault of our own provide them service.
Our work force has undergone incredible strain and frustration as our clients phone us and emailed us and became very angry in some case and we could not help them.

When Directi took over we did feel that they did their best to provide control of our domains.
The first phase was July 6 for .coms, .net ., July 21 for .orgs, Aug 3rd for .info s, , Aug 27 for .biz etc.
However, Directi only had a partial database for .coms and .nets and none at all for the other domains.
We had to supply this information in a very particular format and wait for this information to be entered in.
We then had further difficulty in that there was API setup with Directi as there was with Dodora that allowed our system to seamlessly interface with Directi and automatically make requests for renewals, contact updates, new registrations, DNS changes etc.
The Dodora system had a very good API that allows us to work very well!
Thus we had to get our programming to manually right programs queue these requests and we would then have to log into the Directi site and make all of these changes individually. This was very inefficient and time consuming.
Our programmers also spend many hours working on a new API with Directi. Programmers are very expensive

and they also had to be take off project that would have been very profitable. Also, new registrations cannot be made that way as it is possible for the domain to be taken elsewhere in the interval.

Our next nightmare was discovering that domains that we had paid to renew with Dodora became expired domains upon transfer to Directi's database and since an interval of time had passed and Directi had a mere 10-15 days to deletion of expired domains compared to Dodora's 42 days we suddenly found our newly entered domains going straight into REDEMPTION phase. This effectively means that the domains do not work and allow operation of websites.  And, that it is a very costly and time consuming process to restore the domains out of REDEMPTION.

Effectively we had paid $6.50 to renew these domains.  Then upon transfer to Directi this renewal was lost and we had to pay $60 to remove them from REDEMPTION.  All this while our clients were angry because they had paid us.  We could not charge them for the REDEMPTION restoral.

In one case a client was so angry while waiting for his domain to be restored that he performed a chargeback on his payment (about $12) and the fees for the charge back and penalty expenses run about $50 to us plus the removal of the $12 payment.  So we have much grief from this client in angry phone calls and lost approximately $120 on this domain plus the client as he immediately transferred his domains away from us.

We made many such payments. Eventually we persuaded Directi to reduce the REDEMPTION to $40.  Nothing could be done about double payments for single renewals.

Our problems are continuing as we do not currently have access to control our Dodora domains.

It is difficult to put an exact figure on our losses during this fiasco.

But it is obvious that DODORA should NEVER have lost its credentials to the .coms. .net, .org, .info, .biz etc registries when so many people depending upon them!

For your further information I have attached an document with the full text of this email and some example emails and payments should never have happened.

I apologise for this document being so rough.  We are again swamped with problems until Dodora is on-line again.


Regards,
Helen
RegCA Enterprises Inc.
http://Reg.CA

1/20/2005