UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| DODORA UNIFIED COMMUNICATIONS, INC., | ) ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | 05-10016-NMG |
| | ) | |
| DIRECT INFORMATION PVT. LTD. and ANSWERABLE, INC., | ) ) | |
| Defendants. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION IN LIMINE
## REGARDING DAMAGES TESTIMONY

The plaintiff in this case, Dodora Unified Communications, Inc. ("Dodora"), claims it suffered damages due to the actions of a receiver that a Texas court appointed to marshal Dodora's assets, after a $100,000 default judgment had entered against Dodora. About five months after he was appointed, the receiver, Michael Bernstein, entered into two contracts with the defendant, Direct Information Pvt. Ltd. ("Directi"), by which Directi provided him with certain services in connection with that effort. In December 2004, Dodora settled with the Texas plaintiff and Mr. Bernstein, releasing all claims against Mr. Bernstein. Directi was not involved in the settlement but was informed of it after it was reached. Directi promptly contacted Dodora to assist it in restarting its business. Instead of doing so, Dodora chose to sue Directi.

Dodora has raised claims for "conversion" (Count II), "money had and received/unjust enrichment" (Count III), and "interference with advantageous business relations" (Count IV).[1]

---

[1] The other counts do not permit damages or, in the case of the Chapter 93A claim, are merely duplicative of the claimed common law damages. The Chapter 93A claim cannot be maintained, inter alia, because the conduct here did not occur "primarily and substantially" in Massachusetts.

The conversion claim alleges that Directi has possession of and should return Dodora's "domain name assets and residual income" earned from Dodora's assets.  (Complaint ¶37.)  The money had and received count alleges essentially the same thing.  (*Id.* ¶42.)  The interference claim alleges similar issues.  (*Id.* ¶¶47-48.)  None of those claims would allow Dodora to recover damages for anything other than amounts that Directi actually retained while under contract to Mr. Bernstein.[2]

Moreover, Dodora has also not submitted any expert report on damages and has admitted that the receiver's actions – taken before Directi was involved – caused the losses it appears to claim.  Directi therefore requests that Dodora be precluded, in limine, from introducing evidence of any damages other than amounts that Directi retained in connection with its interests with Mr. Bernstein.

## Dodora's Damages Theory

The exact damages that Dodora apparently intends to present to the jury are quite unclear, as its principal's testimony demonstrates:

> Q:  What are the financial damages that Dodora has been caused allegedly by any actions of Directi?
>
> A:  Well, the financial damage is clear.  I mean, pretty much all the assets that Dodora were supposed to acquire between June, 2004 to December, 2004 was pretty much redirected to Directi.
>
> Q:  How much money is Dodora claiming in this litigation from Directi?
>
> A:  Well, the book would say we lost pretty much close to a quarter of a million dollars, but other than that, there is more like time that – not even accountable for time we spent to fix things, time we spent because of other issues that we experiment to have the process of bringing the registrar back on.  We never put a number on that, but if you look at the book number, I mean, that's pretty much what we can claim at this point.

---

[2] Directi does not, of course, concede it has any liability to Dodora.

Q.  How do you calculate that $250,000?

A:  Well, we look at basically, you know – without knowing how much money Directi is making between June, 2004 and June – to December of 2004, so we come to some projection, look at the Dodora financial situation before June of 2004 and the financial situation after December of 2004.  So basically, if everything was stable and no interference whatsoever, this is what we expect basically to make at the end of the year, but that wasn't becoming the reality because of the interference by Directi.  So it's still unknown how much money that was generated by Directi between June, 2004 to December of 2004.

Q:  I guess what I'm trying to get at is the $250,000 that you just testified to, is that an amount that you believe Directi actually earned as a result of managing Dodora's assets or is that an amount that you believe Dodora would have earned but for the actions of the receiver and Directi and anybody else?

A.  Yeah, it's goodwill.  Goodwill.

Q.  So which is it?  Is this money that Directi earned or that Dodora would have earned had it been able to operate the business itself?

A.  That's what Dodora probably earned, but again, I don't know how much Directi earned between June of 2004, unless Bhavin is willing to open up his bank account so we can see."  (Garraud Dep. pp. 322-23.)

## ARGUMENT

**I.    NEITHER THE CONVERSION NOR THE MONEY HAD AND RECEIVED COUNT ALLOW FOR THE LOST PROFIT DAMAGES THAT DODORA APPEARS TO CLAIM.**

The plaintiff's conversion and money had and received counts both focus on the domain name information that Directi had obtained as a result of its agreements with Mr. Bernstein (and which Directi offered to return promptly upon learning the receivership had closed) and the "residual income" that Directi supposedly obtained.  (Complaint, ¶¶37 and 42.)  Leaving aside the plaintiff's view of how much residual income Directi received during the receivership, the outline of the evidence on that issue is clear.  Directi managed Dodora's domain name business, under a management agreement with Mr. Bernstein; i.e., Directi stepped in, after months during

3

which Dodora was providing no customer service because Mr. Bernstein had cut off Dodora's ability to run its business, to provide that customer service and to try to keep Dodora's moribund business going.  Directi also made arrangements, under the "BatchPool Agreement" to lease Dodora's "batchpool connections" (which Mr. Bernstein then controlled) to a company called Pool.com.  That would generate some revenue with respect to Pool.com's auctioning off of expired and other domain names.  That was the sole way in which any money was earned by the receiver (or Directi) with respect to the Dodora assets that were managed in connection with the receivership.  (*See generally,* Turakhia Affidavit filed in connection with Dodora's preliminary injunction motion.)

Accordingly, whatever it was Pool.com paid to Mr. Bernstein and Directi is the total amount of revenues that even arguably could have been converted or that is subject to a money had and received claim.  As the evidence will show at trial, Mr. Bernstein, as the receiver, quite logically received the bulk of the approximate $50,000 that was generated through this arrangement.  Directi received only a 25% fee for its services to manage all of Dodora's business for about six months, or about $13,000.  While Directi does not believe, of course, that it has any liability to Dodora for anything, that is the complete amount of money that was supposedly converted or could be subject to a money had and received count.

Dodora appears, by contrast, to be claiming that Directi should be responsible for other, undefined amounts that Dodora apparently argues that it would have, but did not, earn during the period Directi managed its business under contract to Mr. Bernstein, and, apparently, for lost profits for periods after the receivership ended.  It is clear, though, that damages for money had and received are limited to what actually was received.  *See, e.g.,* §17 Mass. Practice, Prima

Facie Case, §5.1-5.3 (1997).[3]  Generally, conversion damages also are limited to the value of what was converted and where (as here) the plaintiff received the assets back, to the diminution in any market value of what was converted.  *United Mobile Networks, L.P. v. Deaton,* 939 S.W. 2d 146, 147-48 (Tex 1997); *see also,* 17 Mass. Practice §30.5.

Therefore, Dodora cannot simply show "lost profits" for these counts.  Dodora's testimony therefore must be tied only to the money that Directi received as a result of its work for the receiver.                    .

## II.    DAMAGES SHOULD NOT BE ALLOWED ON THE INTERFERENCE CLAIM AS WELL.

Arguably, Dodora's interference claim alleges broader damages.  However, Dodora's claim really is, in essence, that Directi entered into two agreements with Mr. Bernstein.  Dodora will not be able to prove that Directi acted with a wrongful motive or by improper means.  Accordingly, it will not be able to prove its claim and ought not to be able to introduce evidence of damages based on it.

Texas appears to follow rules on this tort similar to those in Massachusetts.  *See Boty v. Protech Ins. Agency,* 63 S.W.3d 841, 857-859 (Ct. App. Tex 2002).   In the seminal case of *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811 (1990), the Supreme Judicial Court clarified that more than knowledge of a contract, or even intent to induce a breach of contract, is required.  Instead, the plaintiff must be able to prove that the defendant acted with an improper motive (such as ill will toward or a purpose to injure the plaintiff, rather than to benefit the defendant) or employed an improper means to accomplish the interference (such as through defamation or misrepresentations).  *Id.* at 816-17.  *See also, Dulgarian v. Stone,* 420 Mass. 843,

---

[3] It is unclear whether Texas or Massachusetts law should apply.  However, based on preliminary research, the damages issues seem generally to be the same.

851 n.8 (1995) (interference with advantageous business relations also requires pleading and proof of improper means and motives); *Draghetti v. Chmielewski*, 416 Mass. 808, 818 n.14 (1994) (same).

Indeed, even if under these circumstances Directi is deemed to be acting as a competitor, rather than being cloaked with the immunity of the receiver appointed by a Texas court, it is clear that "a competitor may 'interfere' with another's contractual expectancy by picking the deal off for himself if, in advancing his own interest, he refrains from employing unlawful means." *Doliner v. Brown*, 21 Mass. App. Ct. 692, 695 (1986). *Accord, American Private Line Services, Inc. v. Eastern Microwave, Inc.*, 980 F. 2d 33, 36 (1st Cir. 1992) (no interference where defendant "court[ed] [third party] with low prices and atypical services [and] simply engaged in lawful competition"); *Schwanbeck v. Federal-Mogul Corp.*, 31 Mass. App. Ct. 390, 413 (1991), *aff'd. on other grounds*, 412 Mass. 703 (1992) ("competing for the prize is within the realm of permissible interference"). As the Supreme Judicial Court held in *King v. Driscoll*, 418 Mass. 576 (1994), "the motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper requirement." *Id.* at 587.

There is no and will be no evidence that Directi did anything other than in good faith operate under legitimate contracts it entered into with a duly-appointed receiver in Texas. Once the settlement had occurred and the receivership had ended, Directi promptly contacted Dodora to see about transitioning back to it whatever domain name and customer information it had received. Dodora refused to discuss that and, instead, simply demanded the payment of several hundred thousand dollars. Directi had always been willing to provide the information and did not continue to use it thereafter. Accordingly, Dodora should not be allowed to introduce evidence to the jury that any actions Directi took caused it any loss beyond that available under

6

the conversion and money had and received counts, for the money Directi actually retained under the contracts with Mr. Bernstein.

## III.    MR. GARRAUD SHOULD NOT BE ALLOWED TO PROVIDE AN OPINION ON DAMAGES.

For several other reasons, Dodora should not be allowed to introduce evidence on its alleged damages.  First, Dodora has never identified an expert witness, nor provided an expert report as required by Fed. R. Civ. Pro. 26(a)(2)(B).  Apparently, Dodora intends to try to put its damages case in through the testimony of its principal, Ronald Garraud.  Mr. Garraud will not be able to testify as an expert for the additional reason that, as far as the defendant is aware, he has never conducted any damages analyses or presented testimony on damages before.  Yet, to the extent that Dodora is seeking any damages for lost goodwill, lost profits, lost revenues, or any other amount that depends, even in part, on constructing a hypothetical model of what might have been but for the actions of Directi, it must do so through the testimony of an expert.  *See* F.R.E. 703.  Lacking such an expert, Dodora should not be allowed to introduce evidence, through Mr. Garraud or otherwise, that it has suffered some loss of profits, goodwill or anything else.

Dodora presumably will argue that Directi should be held responsible for all of the profits that Dodora contends it otherwise would have earned between, at least, mid June 2004 (when Dodora first entered into the two contracts with the receiver in Texas) and early December 2004, when the receiver settled with Dodora and Directi's responsibilities ended.  Dodora also apparently will attempt to claim lost profits, continuing for some undefined period after

ID # 432011v01/14386-2/ 05.20.2005

December 2004, based again on some hypothetical of what it otherwise would have earned compared to what it has earned.[4]

All of these require some evidence of the available market, the kind of customers that Dodora would have served, the sort of revenues it would have earned, the costs that it would have incurred, and, with respect to any future profits, estimates of appropriate discount rates to reduce future damages to their net present value. Because these involve to a significant degree specialized knowledge and assumptions based on hypotheticals, this kind of testimony generally requires an expert. Because Dodora has not submitted an expert report in a timely manner, it should be precluded from presenting any damages testimony.

Moreover, Mr. Garraud is not "qualified as an expert by knowledge, skill, experience, training or education" to offer opinions with respect to damages and lost profits or lost goodwill, specifically, as Rule 702 requires. Even if rudimentary, any lost profits analysis requires some financial model that the witness must not only be able to create, but also have the skill and experience to explain to a jury. *See, e.g., Lifewise Master Funding, et al v. Telebank,* 374 F.3d 917, 928-29 (10th Cir. 2004) (affirming trial court's ruling that company's CEO could not testify as an expert concerning lost profits).

Nor should Mr. Garraud be allowed to supply an opinion as to Dodora's hypothetical lost profits as a lay witness under Rule 701. *See Walton v. Nalco Chemical Co.,* 272 F. 3d 13, 25 (1st Cir. 2001) (affirming trial court's refusal to allow lay opinion on lost profits). As Mr. Garraud's deposition testimony demonstrates, his testimony would not be "rationally based on [his] perception." F.R.E. 701. Not only could he not explain what Dodora's damages are or how he

---

[4] Directi does not in any way concede that Dodora would have any facts to support these allegations.

8

would articulate their bases, he even admitted he has no knowledge of what Directi did or earned during the six months it was under contract to Mr. Bernstein.  (Garraud Dep. pp. 322-23.)

Mr. Garraud also admitted that, within "a few days" or "two weeks" after the receivership ended, Dodora received its "log in credentials" to allow it to connect with the businesses that actually register domain names and, therefore, to run Dodora's domain name registration business.  (Garraud pp. 53-58.)  He admitted Directi did nothing to interfere with that process.  (*Id.* pp. 58-59.)

However, Mr. Garraud (the only employee Dodora ever had) did not undertake any effort to restart his business.  Instead, he focused on a separate part of Dodora's business (voice over Internet telephoney) and originating mortgage loans for a friend's mortgage brokerage business.  (*Id.* p. 214-15.)  His activities in the domain name business were limited to providing "consulting services" for a different domain name registration business, WLS Registry, owned by his wife and a friend.  (*Id.* p. 221.)  Dodora's business strategy for its domain name registration business was simply to pursue this lawsuit.  (*Id.* p. 215.)

Accordingly, Mr. Garraud cannot testify, as a lay witness, about any post-December 2004 "lost profits" or "goodwill" damages to Dodora's domain name registrar business, because Dodora has not actually conducted any such business in that period.  Rather, whatever activities he conducted in this field were for a different corporation entirely, WLS Registry.  He therefore has no rational basis for providing any lay opinion about Dodora's damages for any period after June 15, 2004.

## IV. DODORA HAS ADMITTED, IN JUDICIAL PLEADINGS, THAT MR. BERNSTEIN'S PRIOR ACTIONS CAUSED ITS DAMAGES.

ID # 432011v01/14386-2/ 05.20.2005

Mr. Garraud testified in his deposition that by early January 2004, he had learned that a lawsuit had been filed against Dodora, in Texas, that a judgment had entered, and that a receiver had been appointed.  (Garraud p. 153, 157-58.)  Shortly after that, the receiver began taking actions to obtain the "login credentials" that Dodora used to register domain names for its reseller customers.  (*Id.* 164.)  Once the receiver obtained control of the login credentials and changed Dodora's passwords, Dodora was no longer able to provide the sole value that it provided for its customers; that of a middleman or gateway between the user of the domain name and the registry that registers the name in such a way that the user has a right to use it and to preclude others from using it.  Mr. Garraud made clear that the receiver's actions in doing so cut off Dodora's ability to generate revenues through that means.  Accordingly, the receiver's prior actions in fact caused Dodora to lose its ability to generate these revenues.

As Mr. Garraud testified:

"Q.  What I'm focusing on is the effect of Mr. Bernstein's controlling Dodora's login credentials to the VeriSign system, the effect on Dodora.  What that meant was none of the resellers that you had set up to be able to use Dodora's gateway to the VeriSign system would be able to use that system anymore; is that correct?

A.  Well, that's correct.

Q.  And so Dodora – once Mr. Bernstein had acquired control of Dodora's login credentials, Dodora would not be able in the future to earn revenues from its resellers for the use of its gateway to the VeriSign system, correct?

A.  That's correct, if that's what it intends to do, that's correct."  (Garraud Dep. pp. 178-79.)

Mr. Garraud and Dodora also made efforts, in the Texas case, to cut off the receiver's control of Dodora's business.  In early June 2004, before Mr. Bernstein hired Directi, Dodora attempted to enjoin Mr. Bernstein from taking further actions to destroy Dodora's business.  Mr. Garraud filed an affidavit, in which he stated,

"I am now aware that a receiver is attempting to exercise control of certain assets and contractual rights of Dodora's; specifically, the login credentials under Dodora's registrar accreditation agreement with ICANN and VeriSign . . . .

As a result of an order issued by the County Court of Law No. 5 in Dallas, Texas ('the Order'), VeriSign has denied Dodora access to its login credentials . . . .

***Enforcement of the Order has effectively ceased the operations of Dodora and is causing Dodora to lose customers and other business.*** The harm caused by this enforcement is irreparable and unquantifiable in that it is adversely affecting Dodora's relationship and reputation with its customers . . . .

Dodora's customers and third-party resellers are also denied access to their accounts as a result of the receiver's actions and are suffering unquantifiable harm as a result of the Order."

(Exh. A hereto, ¶¶6, 8-10, emphasis added.)[5]

In short, based on Mr. Garraud's own sworn testimony and Dodora's pleadings, both in this case and in the Texas case, Mr. Bernstein's actions caused the disruption in Dodora's business for which it is now seeking damages from Directi. Mr. Bernstein acted before Directi even was under contract to him. Dodora should not be allowed, now, to argue that Directi instead caused these damages. In fact, it is clear that without Directi, Dodora's business would have withered away to nothing as Mr. Bernstein, a lawyer, was not capable of managing the domain name business.

## V.    DODORA HAS NO RIGHTS TO UTILIZE ITS BATCHPOOL CONNECTIONS.

Every registrar, such as Dodora (or Directi), has what is known as a batchpool, which is provided by the VeriSign top level domain registry.[6]  (*See* generally Turakhia Aff. ¶15.)[7]  This batchpool is the only method that can be used to register, on the secondary market, valuable

---

[5] Mr. Garraud repeated those exact same arguments in at least one other affidavit he filed in October 2004, well after Directi entered into its agreements with Mr. Bernstein. Indeed, Dodora's complaint in this case makes the same point. (Complaint ¶22.)
[6] VeriSign is the TLD for the most popular .com and .net domain names.
[7] Filed in connection with Dodora's motion for a preliminary injunction.

11

domain names that have expired (i.e., where a user has not paid the yearly fee).  Specialized

software must be employed to use this batchpool to register these domain names.  Almost all of

the registrars worldwide lease out their batchpool connections to specialized providers, such as

Pool.com, which then use these batchpool connections to register a small amount of valuable

domain names and then auction these names to generate revenue.  The providers then share a

portion of that revenue with the registrar whose connections they lease.  Mr. Bernstein hired

Directi to manage the batchpool connections of Dodora, which had already been leased to

Pool.com.  (*Id.* ¶16.)

For several reasons, Dodora should not be allowed to introduce evidence about purported

losses from its batchpool connections.  First, immediately after Dodora learned about the

receivership in January 2004, it entered into an agreement with a company controlled by Mr.

Garraud's wife, WLS Registry, to assign to that company Dodora's batchpool connection rights.

(Garraud pp. 224, 228-29, 233-35.)  WLS then entered into an agreement with Pool.com by

which it purported to lease to Pool.com Dodora's batchpool connections.  (*Id.*, 123 & 125-27,

132-33.)  The revenues then would flow to WLS, effectively bypassing the receiver and

defeating his efforts to collect on the judgment on behalf of the plaintiff in Texas.  The WLS-

Dodora agreement remains in effect today.  (*Id.* p. 224.)

Leaving aside the patent scheme to avoid the lawful process used in Texas, what this also

means is that for however long that agreement remained in place, Dodora in fact had and has no

batchpool connections that it as a corporate entity could use.  All of those rights have been

conveyed to WLS.  Accordingly, to the extent that Dodora claims any damages relating to any

losses from its batchpool connections or any interference with its batchpool connections, it may

not bring such a claim because it does not have the rights to them.

12

Second, the evidence will be clear that whatever was the status of Dodora's batchpool connections, the receivership was only able to generate approximately $50,000 in revenues with respect to that, the vast bulk of which either were paid to VeriSign for its usual and customary charges or to Mr. Bernstein in connection with the receivership.  (Turakhia Aff. ¶18.)  Directi received only about $13,000 in revenues, which was the fee to which Mr. Bernstein had agreed. (*Id.* ¶¶19 & 20.)  That $13,000 is the only money Directi earned from its activities on behalf of Mr. Bernstein.  There can be no evidence that Dodora was damaged in any way beyond the amount of revenues that Pool.com actually paid, with respect to the batchpool connection, the bulk of which went to Mr. Bernstein, whom Dodora released.

## CONCLUSION

For the reasons set forth above, Directi respectfully requests that the Court preclude the plaintiff, in limine, from introducing evidence concerning any damages or, alternatively, any damages it purportedly suffered beyond the approximate $13,000 that Directi retained as its fee in this matter.

Respectfully submitted,

DIRECT INFORMATION PVT. LTD.,

By its attorneys,

s/Dustin F. Hecker

_____
Dustin F. Hecker, Esq., BBO# 549171
Nancy J. Puleo, Esq., BBO 648457
POSTERNAK BLANKSTEIN & LUND LLP
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617-973-6100)

ID # 432011v01/14386-2/ 05.20.2005

Dated:  May 20, 2005

## <u>CERTIFICATE OF SERVICE</u>

I, Dustin F. Hecker, hereby certify that on this 20th day of May, 2005, I caused a copy of the foregoing to be served by electronic mail, to: David Baker, Esq., 105 Union Wharf, Boston, Massachusetts 02109.

s/Dustin F. Hecker

_____

Dustin F. Hecker

14

Ronald Garraud

Page 50

```
1     Q.  I'm sorry?
2     A.  After.
3     Q.  After the web site was down?
4     A.  Yes, after the web site.
5         We got the web site up and running, so
6  the next thing is to connect our API server, our
7  system application to the registry that enable
8  us to transact to the registry,
9         So at that time we been getting denial
10 of service, and have to do an investigation,
11 testing, and they told us it was Directi that
12 was causing that.
13     Q.  Do you have any documents that reflect
14 this denial of service?
15     A.  Yes, I do, I do, and I think I
16 produced that too.
17     Q.  Do you think you produced all of it?
18     A.  Yes.
19     Q.  Do you have documents that reflect
20 your investigation?
21     A.  Yes.
22     Q.  What did you do in this investigation,
23 and what were the results of it?
24     A.  Well, the investigation, we look at
```

Page 51

```
1  the log on both side.  The registry was heavily
2  involved because it was a concern because
3  ICANN -- all the registry was concern about that
4  because there was a lot of customers was
5  complaining for the fact that Dodora system was
6  down, and they could not get it up and running.
7  So ICANN was concerned about it because of too
8  many complaints.  And the registry also has to
9  get involved with it to find out what was going
10 on.
11        And we test, we look at the log and to
12 a point realize this is what it was, you know,
13 the fact that Directi was using the connection
14 at that point and unable Dodora not to connect
15 to the registry.
16     Q.  And how do you know that Directi was
17 somehow responsible for this?
18     A.  How do I know?  Because every
19 registrar has what you call like -- you have SSL
20 certificate that tell you what organization name
21 you are using.  So based on that you can pretty
22 much trace the organization.  That's where we
23 find out they are using something like API
24 Foundation, and we know that API Foundation is
```

Page 52

```
1  an SSL certificate for Directi, and then the
2  point we know what was causing it.
3     Q.  I apologize for not being particularly
4  knowledgeable about the technology of all this,
5  but what is it that you understood Directi could
6  have done to cause a denial of service?  How was
7  it they could do this?
8     A.  Well, it's very easy, because every
9  registrar has X number of connection.  It's not,
10 like, unlimited registries.  You share the
11 registries, and some of them is dedicated to
12 you.
13        So if I have five dedicated to me, and
14 you come and grab all five, so me, I am not
15 going to be able to use it, I have to wait until
16 one of them available to me.  But if you
17 constantly keep all the five to you --
18     Q.  The five what?
19     A.  The five connection.  I'm just giving
20 an example.
21        So if you constantly keep all this
22 connection to you, so that's means I have to
23 wait all the time until you release them.  So
24 it's a game that's well known some time in the
```

Page 53

```
1  industry.
2        But the purpose for them to do that,
3  really, it was a purpose first to, you know,
4  keep us down to a point, basically ICANN
5  probably call us and take the accreditation from
6  us if we are not able to provide service under
7  the agreement.
8     Q.  When was the first time that you
9  contacted VeriSign to try to restore Dodora's
10 credentials, restore Dodora's ability to log in,
11 I guess it is, to VeriSign?
12     A.  Well, we contact VeriSign right after
13 we got the order from Texas.
14     Q.  Some time in December 2004?
15     A.  Yes.
16     Q.  And what did you attempt to do at that
17 point?
18     A.  At that point we request them to give
19 us our access to our credential.  We give them a
20 copy of the order, and then they validate the
21 order, and then they turn over our credential
22 back to us.
23     Q.  And how long did that process take?
24     A.  That process take a few days.
```

14 (Pages 50 to 53)

Ronald Garraud

Page 54

1    Q.  All right.  But VeriSign did within a
2  few days after your receipt of the order put you
3  in a position where you could actually use the
4  VeriSign system, is that fair to say?
5    A.  Right.
6    Q.  And you received your credentials
7  again?
8    A.  Yes, I received them.  Also, Bernstein
9  did send them the letter too.
10    Q.  And the receiver in Texas,
11  Mr. Bernstein, notified VeriSign that the
12  receivership had closed, and accordingly, your
13  credentials should be turned back over to you so
14  Dodora could start to do business in its own
15  name, correct?
16    A.  That's correct.
17    Q.  And did a similar process occur with
18  respect to ICANN?
19    A.  No, ICANN, no.
20    Q.  It doesn't work that way?
21    A.  No.
22    Q.  Were there any registries similar to
23  VeriSign -- let me put the question a little
24  differently.

Page 55

1        Did Mr. Bernstein notify registries
2  other than --
3    A.  Yeah, affiliates, PIR, all of them.
4    Q.  And did you or someone else on behalf
5  of Dodora insure that once Mr. Bernstein had
6  notified those other registries, that you did
7  receive your credentials as soon as possible?
8    A.  Yeah.  We start the process even
9  before Bernstein started it.
10    Q.  So then within a few days after
11  Mr. Bernstein had notified the registries and
12  after the receivership had closed, Dodora had
13  access to all of the registries again; is that
14  correct?
15    A.  Yeah, we got the credential back.
16    Q.  And then were there certificates or
17  anything like that that had to be registered
18  with the registries in order for Dodora to do
19  business with them?
20    A.  Yes, there's certificate, yes.
21    Q.  And what steps did Dodora take, if
22  any, to try to make sure that the certificates
23  that the registries had appropriately allowed
24  Dodora to do business again with the registries?

Page 56

1    A.  Yeah.  We look at our certificate.
2  Some of them, they are expired, and we have to
3  submit them new certificate.  We outbid IP
4  everything, our IP address on the network, that
5  way we know where we coming, and anything that
6  we know to get connectivity back, that's all we
7  did.
8    Q.  So let me see if I can summarize this.
9  And, again, I apologize if I'm less than perfect
10  in my understanding, first, of the terms and,
11  second of all, of the industry.
12    A.  Yes.
13    Q.  But there were a few different things
14  that occurred immediately after the receivership
15  was closed which were necessary in order for
16  Dodora to be able to have access again to the
17  registries, the VeriSigns and the others in
18  order to continue its business.  Is that fair to
19  say?
20    A.  That's correct.
21    Q.  And those included restoring your
22  credentials with VeriSign and the other
23  registries; is that correct?
24    A.  That's correct.

Page 57

1    Q.  And updating certificates that Dodora
2  had with these registries?
3    A.  Yeah.  In our case it was expired.  We
4  have to give a new one.
5    Q.  Okay.  That's something that you could
6  do, you could update that, you could renew that
7  certificate, correct?
8    A.  That's correct.
9    Q.  And there were some IP addresses that
10  were going to be updated in this process?
11    A.  In the file, yes.
12    Q.  And there were other -- anything else
13  that needed to be done with respect to
14  connectivity?
15    A.  That's all you need to do.
16    Q.  And all of those things Dodora was
17  able to do within a few days after the
18  receivership had closed; is that correct?
19    A.  That was the process, yes, a few days.
20    Q.  Did Directi do anything to --
21    A.  Some take more than a few days.
22    Q.  How long?
23    A.  Probably two weeks.
24    Q.  What takes two weeks?

15 (Pages 54 to 57)

Ronald Garraud

Page 58

1    A.  It takes two weeks to get credential
2  back.
3    Q.  Which registry.
4    A.  .us and biz.
5    Q.  .us and .biz.
6    A.  Right.
7    Q.  So with respect to those two
8  registries, the process took a little bit longer
9  than it did with respect to, say, VeriSign; is
10  that correct?
11    A.  That's correct.
12    Q.  But that updating process and
13  recredentialing process even for those two
14  registries occurred no later than a couple of
15  weeks after the receivership had ended, correct?
16    A.  That's correct.
17    Q.  Did Directi do anything to your
18  knowledge to interfere with Dodora's ability to
19  become recredentialed with any of these
20  registries?
21    A.  No, I don't think they did anything.
22  I don't know.
23    Q.  Was there anything that Directi did
24  which interfered with Dodora's ability to become

Page 59

1  recredentialed or recertified with any of the
2  registries?
3    A.  No.
4    Q.  Was there anything that Directi did
5  which interfered in any way with Dodora's
6  ability to obtain any permissions or
7  capabilities that Dodora needed to continue its
8  business?
9    A.  What period?
10    Q.  After the receivership ended.
11    A.  For VeriSign, yeah, they did denial of
12  service.
13    Q.  Okay.  And I apologize for asking you
14  to repeat it, but exactly what is it you believe
15  Directi did in connection with VeriSign to cause
16  a denial of service for Dodora?
17    A.  They keep a connection.  They continue
18  to use our registrar trade to a point we are not
19  able to --
20      MR. BAKER:  Let me ask the a
21  question, maybe we can clarify it.  When you say
22  "connection," what does it mean?  What does the
23  word connection mean?
24      THE WITNESS:  The connection mean

Page 60

1  it's the pipe that enable the registrar to
2  connect to the registry.
3      MR. BAKER:  Like a physical
4  connection?
5      THE WITNESS:  It's a virtual
6  connection.
7      MR. BAKER:  So it's sort of, like,
8  a telephone line?
9      THE WITNESS:  Telephone line where
10  you get a virtual thing going on.
11      MR. BAKER:  So the analogy would be
12  a correct analogy to say that Directi in a sense
13  kept Dodora's telephone number and wouldn't give
14  back the telephone number?
15      THE WITNESS:  That's correct.
16  BY MR. HECKER:
17    Q.  Well, I appreciate the clarification.
18  I'll see if I can ask the questions.
19      There was some kind of connection link
20  that is used to access the VeriSign registration
21  system; is that correct?
22    A.  That's correct.
23    Q.  And you understood that Directi during
24  the receivership had obtained access to Dodora's

Page 61

1  connection to the VeriSign link; is that right?
2    A.  That's correct.
3    Q.  And after the receivership ended, it's
4  your contention that there was a period of time
5  when Directi was still using that connection
6  link?
7    A.  That's correct.
8    Q.  Did you ever request that Directi
9  cease doing so?
10    A.  Well, I mean, there was an order from
11  Judge Gordon at that time that was out there,
12  you know, and that was enough to tell Directi
13  that.
14    Q.  Let me back up for a second.
15      When was it that you first became
16  aware that Directi was still using this link to
17  VeriSign after the receivership ended?
18    A.  It's when we find out we couldn't
19  connect.  And then the VeriSign technical
20  support start troubleshooting the problem first,
21  and then that's when we discovered from them
22  that was causing the problem.
23    Q.  Did you ever ask VeriSign to change
24  its authorizations such that Directi would not

16 (Pages 58 to 61)

Page 118

1  then that was sent into redemption, and Directi
2  was physically renew them and then transfer them
3  over. So we know they are doing that. And some
4  of the customer, they acknowledge that to us.
5      Q. My question is different. The
6  information that Directi assembled about the
7  domain names that it obtained some information
8  about during the course of the receivership
9  reflects that 1,850 of those domain names wound
10  up just expiring during the course of the
11  receivership. Do you have any information to
12  dispute that figure?
13      A. The one that expire?
14      Q. Yes.
15      A. Yes, I have -- yes, I do have
16  information about particular domain name.
17      Q. How many domain names do you believe
18  of the domain names -- let me rephrase the
19  question.
20          How many of the domain names that --
21          (Interruption at the door)
22  BY MR. HECKER:
23      Q. How many of the domain names that
24  Directi received information about wound up

Page 119

1  expiring during the course of the receivership?
2      A. I don't know.
3      Q. How many of the domain names that
4  Directi received information about in connection
5  with the receivership wound up registering,
6  being registered through Directi?
7      A. I don't know.
8      Q. How many of the domain names that
9  Directi received information about wound up
10  being reregistered through registrars other than
11  Directi or Dodora?
12      A. I don't know.
13      Q. How many of the domain names that
14  Directi received information about in connection
15  with the receivership wound up continuing their
16  registration or reregistering through Dodora?
17      A. I don't know.
18      Q. Do you have access to that
19  information?
20      A. No, I don't.
21      Q. You have no way of telling how many of
22  these domain names registered ultimately wound
23  up continuing their registration through Dodora?
24      A. That's correct, because we never have

Page 120

1  control over the database, so whatever Bhavin
2  tell you, that's what it is.
3      Q. So you have no way of looking through
4  Dodora's own computer information to determine
5  which domain names that originally were
6  registered through Dodora wound up maintaining
7  their registration through Dodora after the
8  receivership is over; is that correct?
9      A. That's correct.
10      Q. What is the business of WLS registry,
11  I believe it is?
12      A. Registrar.
13      Q. Registrar.
14      A. WLS, it's an organization that we was
15  going to become a second registrar for the sole
16  purpose to compete in the secondary market.
17          At the time there was agreement with
18  ICANN and VeriSign that they were going to
19  launch WLS as a new product. And then we
20  believe, you know, by acquire the name pretty
21  much in the market inside the business to help
22  us make a presence that we are the new WLS
23  registrar which is enable customer to come and
24  get the product to us.

Page 121

1          But as you know now, there was some
2  issue of ICANN and VeriSign regarding WLS and
3  then that never make it to the market.
4          However, after the time and money we
5  spend to develop our WLS system and it never
6  happen, so we cut our loss.
7      Q. Was WLS affiliated with Dodora in any
8  way?
9      A. Yes, because of me.
10      Q. You own both?
11      A. No, I don't own WLS.
12      Q. Who owned WLS?
13      A. WLS owned by Maggie, my wife, Yvonne,
14  has some money invested in WLS, and that's it.
15  Me, I just was a consultant, give them my
16  advice.
17      Q. Some of the financial information you
18  provided included bank statements for WLS
19  Registrar, Inc.?
20      A. That's correct.
21      Q. Why did you provide bank statements of
22  WLS Registrar, Inc. in connection with your
23  response to the document request in this case?
24      A. Because some of the money that was

31 (Pages 118 to 121)

Ronald Garraud

Page 122

1  collecting for domain registration, that was
2  also for part of the registrar system, and
3  that's why we gave that to you.
4      Q.  What do you mean?
5      A.  Because some of the payment that was
6  coming to WLS system, that was part of the
7  domain registration.
8      Q.  So domain names that resellers were
9  trying to register through Dodora were actually
10  being registered through WLS?
11     A.  Yeah, because some of -- what was
12  going to basically happen, there was going to be
13  a transition, you know, from Dodora and WLS
14  registrar.  So Dodora was going to continue to
15  do the unified communication, and then all the
16  domain registration, like secondary market
17  expire were going to be conducted under WLS.
18         So at that time we announced that to
19  ICANN about what we doing, and we tell some of
20  the reseller that WLS, that's the registrar
21  that's going to, you know, take over the whole
22  domain registration service.
23     Q.  Did WLS actually do business?
24     A.  Yes, they do business, yes.

Page 123

1      Q.  Let me back up for a second.
2          You identified this morning
3  relationships that Dodora had with snap.com and
4  pool.com, I believe?
5      A.  Yes.
6      Q.  Did Dodora actually have those
7  relationships, or was it WLS that had those
8  relationships?
9      A.  With pool.com, it's WLS.
10     Q.  And did WLS actually conduct
11  transactions with pool.com?
12     A.  Yes.
13     Q.  And what were those transactions?
14     A.  It was to register name to Dodora
15  system.
16     Q.  If you don't mind, explain to me what
17  actually happened.
18     A.  Well, it's a register domain name to
19  Dodora log-in credential adviser.
20     Q.  Okay.  Did WLS act as a reseller for
21  Dodora?
22     A.  In a sense, yes, you can put it that
23  way, yes, reseller.
24     Q.  To put it differently, did WLS go out

Page 124

1  and try to find customers who wanted to use
2  domain names and charge them a fee to register
3  those domain names through Dodora?
4      A.  That's correct.
5      Q.  All right.  And in that case WLS acted
6  similarly to Brave Net, for example?
7      A.  Yes.
8      Q.  Are any of the damages that Dodora is
9  claiming in this case related to activities of
10  WLS?
11     A.  No.
12     Q.  Now, I asked about snap.com and
13  pool.com.  Those are not resellers, correct?
14     A.  They are resellers.
15     Q.  Well, did Dodora have relationships
16  with pool.com by which pool.com would find
17  customers with domain names and try to register
18  those domain names through Dodora?
19     A.  Yeah, that's right.
20     Q.  That's what you did with pool.com?
21     A.  Yes.
22     Q.  Any domain names that you recall
23  registering for them?
24     A.  Well, a lot of them.  I don't know.

Page 125

1      Q.  Wasn't the relationship with pool.com
2  with respect to batch pools?
3      A.  Yeah, mostly, yeah, they're a company
4  in the secondhand market, yeah.
5      Q.  Now, when you talked about WLS being
6  set up to deal with the secondary market, was
7  that to enter into batch pool relationships with
8  pool.com, for example?
9      A.  Yep.  The batch pool, most of WLS
10  product, yes.
11     Q.  Most of what WLS did was the batch
12  pool?
13     A.  Yeah, yes, secondary.
14     Q.  Did Dodora independent of WLS do
15  anything with pool.com with respect to the batch
16  pools secondary market?
17     A.  Yeah, Dodora used to conduct secondary
18  market business with Snap Name.
19     Q.  Did Dodora ever conduct secondary
20  market transactions with pool.com?
21     A.  No.
22     Q.  Did WLS conduct all of the secondary
23  transactions?
24     A.  That's correct.  The contract was with

32 (Pages 122 to 125)

Ronald Garraud

Page 126

1  WLS, yes.
2      Q.   Did Dodora receive any revenue as a
3  result of the secondary transactions --
4  secondary market transactions that WLS
5  conducted?
6      A.   Yes.
7      Q.   How did Dodora receive that money?
8      A.   It's to keeping Dodora operating,
9  going, and also to take some of the Dodora
10 liability.
11     Q.   Let me ask some general questions, if
12 I could.
13         I understand that there's an
14 allegation in the complaint that Directi
15 allegedly took some residual income that Dodora
16 claims it otherwise would have earned.
17     A.   Right.
18     Q.   What is that residual income that you
19 are alleging Directi took?
20     A.   An example of residual income, say
21 example, Dodora registered -- what's your domain
22 name?
23     Q.   pbl.com.
24     A.   -- pbl.com, like April 2004 last year,

Page 127

1  and April 2005 pbl.com is due for renewal and
2  then Dodora could not get access to that renewal
3  fee. April 2005 pbl.com went into redemption,
4  and then you ask them to retrieve it back, and
5  then we charge you, like, $85, that's $85 Dodora
6  is not entitled to. So that's pretty much the
7  residual income you are talking here.
8      Q.   Assuming that had happened, which of
9  WLS or Dodora would have received that residual
10 income?
11     A.   That would be Dodora.
12     Q.   What was it that WLS did to generate
13 income, revenues?
14     A.   WLS lease the batch pool to pool.com.
15     Q.   Leased the batch pool connections to
16 pool.com?
17     A.   Yes.
18     Q.   And it received a certain fee for
19 that?
20     A.   Like a monthly revenue.
21     Q.   How much monthly revenue has WLS
22 received for leasing its batch pool connections?
23     A.   Well, it average, like, 12,000 a
24 month.

Page 128

1      Q.   All right. Is any part of Dodora's
2  damages claim -- let me back up.
3         Does any part of Dodora's damages
4  claim in this case reflect any monies that it
5  did not receive but it believed it should have
6  received for leasing batch pool connections?
7      A.   That's correct.
8      Q.   Is any part of the damages claim that
9  Dodora is claiming in this case a result of
10 batch pool connections that it believed WLS
11 would have been able to lease but was unable to
12 do?
13     A.   That's correct.
14     Q.   All right. So the damages figures
15 that Dodora is claiming in this case depend at
16 least in part on monies that WLS would have
17 actually received; is that correct?
18     A.   Yeah, to Pool, yes.
19     Q.   So the money would -- WLS would have
20 leased batch pool connections to pool.com and
21 received a monthly fee for that, correct?
22     A.   Right. I mean, don't get confused
23 here, I mean, WLS receiving the money, but the
24 asset is the Dodora asset at the registry, so we

Page 129

1  got to make it clear here.
2      Q.   It's Dodora's batch pool connection
3  that ultimately could be leased to pool.com,
4  correct?
5      A.   That's correct.
6      Q.   But WLS and Dodora entered into a
7  contract by which WLS got rights to use Dodora's
8  batch pool connections?
9      A.   Yeah, to market the registrar.
10     Q.   And then WLS under that agreement with
11 Dodora marketed the batch pool connection to
12 pool.com?
13     A.   That's right.
14     Q.   And pool.com paid WLS a fee, correct?
15     A.   That's correct.
16     Q.   How much of that fee that pool.com
17 paid to WLS did Dodora actually receive?
18     A.   Most of it.
19     Q.   How much?
20     A.   I will probably say 80 percent of it.
21     Q.   Is there any contract between WLS and
22 Dodora which reflects how much of the revenue
23 rent generated by the lease of the -- is there
24 any contract that reflects how much of the

33 (Pages 126 to 129)

Ronald Garraud

**Page 130**

1 revenues received from the use of Dodora's batch
2 pool connection WLS was entitled to receive and
3 Dodora was entitled to receive?
4     A.   No, there is no contract.
5     Q.   How was it that Dodora and WLS
6 determined on any -- for any period of time what
7 WLS would be able to keep and Dodora would be
8 able to keep?
9     A.   Yeah, because some of the shoulder of
10 Dodora are the shoulder of WLS.  Basically
11 Dodora was going to split to stay focus on
12 unified communications.  So Maggie and Yvonne,
13 they decided to take the registrar which is
14 another system inside Dodora.  So to me they
15 keep the registrar, Dodora keep the unified
16 communication system, so it was a corporate
17 decision.
18     Q.   I guess I don't understand what the
19 corporate decision was.
20     A.   Well, Dodora was -- initially was two
21 system.
22     Q.   Which of the two systems?
23     A.   One is unified communication, it was a
24 system that was designed to offer an E mail,

**Page 131**

1 voice mail, fax.  Unified communication was
2 design by Dodora to do what I explained to you.
3         And then you have the registrar
4 system, also that was designed by Dodora to do
5 that.  So Dodora at that point was competing in
6 two different market, unified communication --
7     Q.   What do you define as the unified
8 communications market?
9     A.   Well, unified communications market is
10 voice over IP and fax over IP market, so it's a
11 system that we developed in-house to provide
12 that service.
13         Then we develop another system which
14 is the registrar system, the RS to provide
15 domain registration.  So in a sense they were
16 competing.
17     Q.   Two separate businesses?
18     A.   Yes.
19     Q.   One is the voice over Internet
20 protocol business, which is not the same thing
21 as registering domain names?
22     A.   Exactly.
23     Q.   And then you had a business
24 registering domain names?

**Page 132**

1     A.   Right.
2     Q.   However, WLS, if I understand it
3 correctly, was a business that was set up to do
4 business in the domain name registration market,
5 correct?
6     A.   Exactly.
7     Q.   And what I'm trying to get at is how
8 was it the corporate decision was made that WLS
9 would be the entity that actually would be
10 receiving the money in the first instance from
11 pool.com for the lease of the batch pool
12 connections that you say Dodora actually owned?
13     A.   Yes, because Maggie initiated the
14 agreement.  She's the one that start the
15 process.
16     Q.   With pool.com?
17     A.   That's right.  And then since that was
18 the contract, so they are entitled to -- pretty
19 much to it.
20     Q.   And was there a period of time during
21 which WLS actually received money from pool.com
22 for the lease of Dodora's batch pool
23 connections?
24     A.   All the time, yes.

**Page 133**

1     Q.   For how long did that last?
2     A.   Until -- I believe until the receiver
3 took control of it.
4     Q.   And how would we tell how much money
5 was received in that period of time by Dodora as
6 a corporate entity with respect to this
7 relationship and how much was received by WLS as
8 a corporate entity?
9     A.   Well, most of the batch pool from
10 Pool, it's money that was going to WLS.  When
11 Dodora used to do batch pool business, it used
12 to do Snap Name, not pool.com.
13     Q.   Let me try to make this clear.
14     A.   Right.
15     Q.   There are two different businesses
16 with respect to which Dodora had some
17 relationship to perform batch pool -- to lease
18 out its batch pool connections, correct, one is
19 pool.com and one is snap.com?
20     A.   That's correct.
21     Q.   Now, Dodora had a direct relationship
22 with snap.com, correct?
23     A.   That's correct.
24     Q.   However, Dodora did not have a direct

34 (Pages 130 to 133)

Ronald Garraud

Page 150

1  business arrangement?  And this is not the
2  reseller agreement but a different agreement
3  signed.
4       A.  No.
5       Q.  Had an agreement been proposed?
6       A.  No.  Because, like I said, at that
7  time, you know, nobody know what they are doing.
8  All we have was a reseller agreement, and then
9  that's when Compana signed with us, and that's
10  it.
11       Q.  But Compana asked Dodora to begin
12  doing some work to try to enable Compana to
13  pursue a new line of business, correct?
14       A.  Yes, they did.
15       Q.  And Dodora believed that it ought to
16  have been paid for the work that it did; is that
17  correct?
18       A.  Yeah, we feel we are entitled to get
19  paid for that work, and they didn't pay us for
20  it.
21       Q.  Okay.  Did Dodora ever make a demand
22  upon Compana to pay money?
23       A.  Yes, we make a demand.
24       Q.  Do you recall how much it was that --

Page 151

1       A.  The whole system that it was going to
2  cost?
3       Q.  Yes.
4       A.  Based on specification and the initial
5  quote from our developer, it was going to cost,
6  like, about $13,000 just to get the whole
7  system.
8       Q.  Did Compana ever pay money to Dodora
9  in connection with the proposed agreement?
10       A.  No, never.
11       Q.  Did Compana ever have access to
12  Dodora's computer systems to try to facilitate
13  the new business line that Compana was involved
14  in?
15       A.  Not directly to Dodora system but to
16  the system, yes, they do.
17       Q.  And at some point did Dodora take
18  steps to cut off Compana's access to that
19  system?
20       A.  Yes, that's correct.
21       Q.  And after that, Compana filed a
22  lawsuit in Texas?
23       A.  That's correct.
24       Q.  Now, when Dodora cut off access to

Page 152

1  Compana's use of Dodora's computer system, did
2  you inform Compana that that had happened?
3       A.  That's correct.
4       Q.  Did they complain about it in any way?
5       A.  Well, they complain about it, but the
6  fact remain the same, they didn't pay us, so
7  we -- what other option?
8       Q.  Did they ever suggest that they might
9  file litigation against Dodora before actually
10  doing so?
11       A.  Yeah, DN Buy suggest that, that they
12  are going to file some complaint, but I never
13  really pay attention to that because we never
14  really have any contract, like a reseller
15  registrar agreement with Compana.
16       Q.  But at any rate, DN Buy, the broker,
17  did inform you that Compana is contemplating
18  filing a lawsuit against Dodora; is that
19  correct?
20       A.  That's correct.
21       Q.  Did DN Buy ever tell you where that
22  lawsuit was going to be filed?
23       A.  No.
24       Q.  At some point Compana did file a

Page 153

1  lawsuit in Texas, correct?
2       A.  That's correct.
3       Q.  Where is Compana located?
4       A.  I don't know because we are having
5  problem to trace them.  It looks like they are
6  base Nevada corporation, but they don't have any
7  address.
8       Q.  Did anyone at Dodora ever receive at
9  any point before January of 2004 a copy of any
10  of the documents that were filed by Compana in
11  the Texas case?
12       A.  No.
13       Q.  Did a secretary at Dodora ever receive
14  a copy of the complaint or the summons?
15       A.  No.
16       Q.  When was the first time that you
17  received any indication whatsoever that Compana
18  had filed a lawsuit?
19       A.  The first time we ever aware of the
20  situation, it was in -- some time in
21  January 2004 when we trying to access our
22  business account to pay some bills, and we find
23  out that there was a lien on the account.
24       Q.  So you tried to access some sort of

39 (Pages 150 to 153)

Ronald Garraud

Page 154

1  bank account?
2      A.  Right.
3      Q.  And you determined that somebody had
4  put a lien on the account?
5      A.  Right.  And then when we called, they
6  said there was a lien on it by some receiver in
7  Texas.
8      Q.  Now, what bank account was this?  Was
9  it Sovereign Bank?
10     A.  Not Sovereign.  Citizens.
11     Q.  Okay.  But at any rate, at some point
12  in January 2004 you were informed by your bank
13  that a receiver in Texas had put a lien on the
14  bank account?
15     A.  Yes.
16     Q.  What did you do after you found that
17  out?
18     A.  We call our counsel in Massachusetts,
19  and then we told him about that.
20     Q.  And who was the attorney in
21  Massachusetts you dealt with at that point?
22     A.  It was Brian Simone.
23     Q.  Brian Simone, S-I-M-O-N-E?
24     A.  Yes.

Page 155

1      Q.  Had you ever dealt with Mr. Simone
2  before?
3      A.  Yes.
4      Q.  What had he done for Dodora before
5  that?
6      A.  A lot of thing, personal and business
7  matter.
8      Q.  Did he also do work for Lehi Mortgage,
9  to your knowledge?
10     A.  Yes.
11     Q.  And what, if anything, did Mr. Simone
12  do?
13     A.  Well, he give me advice and discuss
14  the strategy on how to go about it, undo that.
15     Q.  And what, if anything, did he do to
16  try to resolve the situation in Texas?
17     A.  Well, I don't know what he did
18  exactly.  All I know, in a few days we got a
19  call from the bank saying, you know, everything
20  all set, our account was reopen again.
21     Q.  Did you ever receive an explanation
22  for why -- back up.
23          I take it you understood from that
24  conversation that whatever lien had been placed

Page 156

1  in the bank account was no longer in force, the
2  lien was no longer attached to your bank
3  account?
4      A.  Yeah, that's right.
5      Q.  Did you ever receive any explanation
6  for how it was the lien had been removed from
7  your bank account?
8      A.  Yeah.  The explanation I got from the
9  bank, it was more like a jurisdiction matter
10  because since the -- I think they said that, you
11  know, this thing, since they are not our bank in
12  Texas, so whatever the receiver was telling
13  them, you know, it has nothing to do with them,
14  so they decided they not going to bother.
15     Q.  Did you know what, at least
16  generally-speaking, receivers in court cases do
17  as of January 2004?
18     A.  As of January 2004, I mean, that's
19  when we start learning what a receiver can do.
20  We learn that they have, you know, permission
21  from the court to repossess whatever.  I don't
22  know.
23     Q.  But you understood as of January 2004
24  that a receiver generally would have the

Page 157

1  authority from a court to take control of assets
2  of a business, correct?
3      A.  Yes.
4      Q.  And that the point was to try, at
5  least with this receiver -- back up for a
6  second.
7          Did you or anybody on your behalf make
8  any inquiries in Texas to find out the status of
9  the litigation against Dodora at that point?
10     A.  Yes.
11     Q.  And in January 2004 you determined
12  that, in fact, the case had been filed by
13  Dodora?
14     A.  Yes.
15     Q.  And that a default judgment had been
16  entered against Dodora?
17     A.  Yes.
18     Q.  And that a receiver had been
19  appointed?
20     A.  Yes.
21     Q.  And I take it you understood as of
22  January 2004 that the receiver had been
23  authorized by the court to try to find assets of
24  Dodora to use to satisfy the judgment Compana

40 (Pages 154 to 157)

Ronald Garraud

Page 158

1    had gotten?
2        A.   That's right.
3        Q.   I take it you didn't want that to
4    happen?
5        A.   Well, nobody want that really.
6        Q.   You believe that the default judgment
7    was improper and should be vacated, correct?
8        A.   That's correct.
9        Q.   What steps did you take in January or
10   authorize others to take on Dodora's behalf to
11   try to remove that default judgment?
12       A.   Well, the strategy was coming from all
13   this lawyer that was involved.  But me, I was
14   making myself available to do whatever.
15           So the first step, you know, they try
16   to do a TRO.  I mean, that was to stop that
17   thing.  And after that, they go and do a bill of
18   review.  And after that, you know, they file a
19   motion to, I don't know, to stop whatever that
20   was going on.  The fact of the matter is we get
21   ourself out of Texas.
22       Q.   I will show you a few different
23   documents here.
24           Well, did you have any -- leaving

Page 159

1    aside the documents that your attorneys in Texas
2    filed in court to deal with the case, did you
3    have any discussions or did your lawyers have
4    any discussions with the receiver beginning in
5    January 2004?
6        A.   I think, yeah, they probably have some
7    conversation.
8        Q.   And when was the first time you
9    actually talked to the receiver?
10       A.   I probably talked to the receiver some
11   time in January.
12       Q.   And do you recall the substance of
13   that conversation?
14       A.   It was more about the bank account
15   issue.
16       Q.   And what did he tell you, and what did
17   you tell him?
18       A.   So basically that's when I call him to
19   find out who he was, you know, because I didn't
20   know who he was.  And then that's when he was
21   telling me about that default judgment in Texas.
22       Q.   So he told you as of January 2004
23   about the default judgment?
24       A.   Yes.

Page 160

1        Q.   Did you authorize your lawyers in
2    January 2004 to try to get that default judgment
3    removed?
4        A.   Yes.
5        Q.   Do you know what, if anything, they
6    did to do that?
7        A.   Well, there was a lot of strategy.
8    The initial strategy was to let them come to
9    Massachusetts to enforce the judgment.  That way
10   we could probably wait for them, and then we can
11   better, you know, address the situation in
12   Massachusetts.  But they never did.
13       Q.   So the initial strategy was let's wait
14   to see if they come to Massachusetts to try to
15   enforce that judgment against assets here, and
16   then we'll try to vacate the default in that
17   way?
18       A.   Exactly.
19       Q.   All right.
20       A.   And then that was, you know, the first
21   thing.
22           And then the second strategy was to go
23   down there to start doing the legwork down
24   there, which is -- you know, that's the

Page 161

1    direction we took.  I eventually had somebody
2    down there to do all the legwork.
3        Q.   Do you recall that there was a period
4    of a number of months between when you found out
5    about the receivership and when anyone actually
6    filed documents in Texas to try to deal with it?
7        A.   Well, there was some lapse on the
8    time, but that doesn't mean we are not doing
9    anything.  Don't think, like, we are not doing
10   anything.  In fact, there was a lot of
11   strategies that was going on behind that.
12           As you know, our lawyer was always
13   busy, so if it was up to me, I would be in Texas
14   probably since January, but, again, I have to
15   wait to see when they can file the motion and
16   when they can do anything, you know.  It wasn't
17   me.  It was the fact that they are doing the
18   work, and I have to be patient.
19       Q.   Okay.
20           MR. HECKER:  I'd like to introduce
21   the next exhibit, a document entitled
22   Defendant's Motion for Temporary Restraining
23   Order produced to us by the plaintiff, and it
24   has a file stamp of June 3, 2004.

41 (Pages 158 to 161)

Ronald Garraud

Page 162

1        (Exhibit 5 marked
2        for identification)
3   BY MR. HECKER:
4        Q.   If you could take a look at Exhibit 5,
5   Mr. Garraud.
6        A.   Yes.
7        Q.   And tell me whether you recognize that
8   document.
9        A.   Yes.
10        Q.   And am I correct that there's an
11   affidavit attached on the back of this that you
12   prepared and signed?
13        A.   Yes.
14        Q.   It indicates, if I read this
15   correctly, on the back page of the affidavit
16   that you signed it June 2, 2004?
17        A.   Yes.
18        Q.   Do you see that there's a fax
19   transmittal stamp, though, that seems to reflect
20   this document was faxed on December 15, 2003?
21   Do you see that?
22        A.   I see that.
23        Q.   Did you receive this document in
24   December 2003 but not sign it until June of

Page 163

1   2004?
2        A.   No.
3        Q.   Do you have any explanation for why
4   that fax transmittal stamp is on your affidavit?
5        A.   I don't know.  The only technical
6   explanation it could be an error on the fax
7   machine, I guess.
8        Q.   Do you have any records which would
9   reflect when you first consulted with counsel in
10   connection with the Compana litigation?
11        A.   Yes.
12        Q.   Do you have billing records that any
13   attorneys sent you with respect to work they
14   performed on behalf of Dodora?
15        A.   Yes.
16        Q.   I'd like to see those time records
17   from any attorney that dealt with Dodora in
18   connection with this case, be it the guys in
19   Texas, somebody in Seattle, I think, who wrote a
20   letter or Massachusetts.
21        A.   Okay.
22        Q.   Do you know whether any lawyer on your
23   behalf filed any documents with the court before
24   June 3, 2004?

Page 164

1        A.   No.
2        Q.   Okay.  Do you believe they did not?
3   This is the first time any documents were filed?
4        A.   That's the first bill of review.
5        Q.   What had happened before early
6   June 2004 which caused Dodora now to decide to
7   address the Texas case in the Texas courts?
8        A.   What was happening?
9        Q.   Yes.
10        A.   Well, there was a series of actions
11   that was taken by the receiver.  One is that
12   they take over Dodora log-in credential, and
13   that pretty much one of the primary reason.
14        Q.   When did that happen, that the
15   receiver took over Dodora's log-in credentials?
16        A.   I think probably some time in probably
17   March, March or April.  I don't know.
18        Q.   March or April of 2004, correct?
19        A.   Right.
20        Q.   How did you find out that that had
21   happened?
22        A.   Because we find out we couldn't access
23   the registry anymore.
24        Q.   Okay.  And how did you find that out?

Page 165

1        A.   Our system cannot communicate.
2        Q.   And did the fact that you could not
3   access the registry have any impact on the
4   business of Dodora?
5        A.   Yes, it does.
6        Q.   What was the impact?
7        A.   Dodora cannot conduct business
8   anymore.
9        Q.   And this is something that happened in
10   or about March 2004?
11        A.   Right.
12        Q.   I think we marked an affidavit from
13   you, I think, as exhibit -- I don't know if we
14   did or not.
15        MR. HECKER:  Did we mark an
16   affidavit for Mr. Garraud as Exhibit 1 or 2?
17        MR. BAKER:  No.
18        MR. HECKER:  If we could mark an
19   affidavit of Mr. Garraud as the next exhibit.
20        (Exhibit 6 marked
21        for identification)
22   BY MR. HECKER:
23        Q.   I'd like to ask you to take a look at
24   Exhibit 6 and tell me whether it's a document

42 (Pages 162 to 165)

Ronald Garraud

Page 178

1    A.  Well, I mean, if you look at the
2  topology of the setup, of how this thing is set
3  up, you got a registry system, you got Dodora
4  system, and then you got the reseller system.
5  You got three system, you know, connected
6  together.
7        So Dodora system, registrar in the
8  middle, connect to the registry to set up log-in
9  credential.  So Dodora system is just like a
10  proxy, a gateway to all the reseller system.  So
11  if you change the log-in credential at the
12  registry, you are not acknowledge the Dodora
13  configuration system about it, Dodora will not
14  be able to log into that system.  As a result,
15  the proxy will not work.  All the register
16  reseller will not be able to send data to that
17  proxy.
18        So that's basically what it is.  Once
19  you change it, it change the whole system.
20    Q.  I think we may be saying the exact
21  same thing, but let me see if I can try to
22  clarify it.
23    A.  All right.
24    Q.  What I'm focusing on is the effect of

Page 179

1  Mr. Bernstein's controlling Dodora's log-in
2  credentials to the VeriSign system, the effect
3  on Dodora.  What that meant was none of the
4  resellers that you had set up to be able to use
5  Dodora's gateway to the VeriSign system would be
6  able to use that system anymore; is that
7  correct?
8    A.  Well, that's correct.
9    Q.  And so Dodora -- once Mr. Bernstein
10  had acquired control of Dodora's log-in
11  credentials, Dodora would not be able in the
12  future to earn revenues from its resellers for
13  the use of its gateway to the VeriSign system,
14  correct?
15    A.  That's correct, if that's what it
16  intends to do, that's correct.
17    Q.  If you could look at the last page of
18  Exhibit 5, which is the defendant's motion for a
19  temporary restraining order, specifically your
20  affidavit that was attached to it.
21    A.  Right.
22    Q.  See paragraph six, it reads, "I am now
23  aware that a receiver is attempting to exercise
24  control of certain assets and contractual rights

Page 180

1  of Dodora; specifically, the log-in credentials
2  under Dodora's registrar accreditation agreement
3  with ICANN and VeriSign."
4        Did I read that correctly?
5    A.  Yes.
6    Q.  And that's something you knew that the
7  receiver was doing as of June are 4, 2004,
8  correct?
9    A.  That's right.
10    Q.  And paragraph eight reads, "As a
11  result of an order issued by the County Court of
12  Law Number 5 in Dallas, Texas ('The Order'),
13  VeriSign has denied Dodora access to its log-in
14  credentials."
15        Did I read that correctly?
16    A.  That's correct.
17    Q.  And was that an accurate statement as
18  of June 4, 2004?
19    A.  It's accurate, yeah.
20    Q.  The next paragraph reads, "Enforcement
21  of the order has effectively ceased the
22  operations of Dodora and is causing Dodora to
23  lose customers and other business.  The harm
24  caused by this enforcement is irreparable and

Page 181

1  unquantifiable in that it is adversely affecting
2  Dodora's relationship and reputation with its
3  customers."
4        Did I read that correctly?
5    A.  That's correct.
6    Q.  And was that statement accurate as of
7  June 2, 2004 when you signed that affidavit?
8    A.  That's correct.
9    Q.  The next paragraph reads, "Dodora's
10  customers and third-party resellers are also
11  denied access to their accounts as a result of
12  the receiver's actions and are suffering
13  unquantifiable harm as a result of the order."
14        Did I read that correctly?
15    A.  That's correct.
16    Q.  And was that statement accurate as of
17  June 2, 2004?
18    A.  Accurate?
19    Q.  Yes.
20    A.  Yes.
21    Q.  The court denied the motion for a
22  temporary restraining order, correct?
23    A.  No.
24    Q.  Do you recall that the court acted on

46 (Pages 178 to 181)

Ronald Garraud

Page 214

1  back from Directi?
2  A. To you, yes.
3  Q. And have you or anybody else on behalf of
4  Dodora done anything to try to manage Dodora's
5  domain name business after receiving the information
6  you did receive?
7  A. Yes. I personally was involved in helping
8  getting the registrar up and running.
9  Q. Is it up and running now?
10  A. Yes.
11  Q. Is it earning revenues?
12  A. No.
13  Q. When was the first time you made any effort
14  to try to manage Dodora's domain name business after
15  the receivership ended?
16  A. Sometime in February.
17  Q. This year?
18  A. Yes.
19  Q. So you did not do anything in December of '04
20  or January of '05?
21  A. Nothing, that's correct.
22  Q. What are you currently doing to try to grow
23  Dodora's business?
24  A. Well, first, we are trying to put new

Page 215

1  strategy, update our system and new marketing
2  strategy currently in progress and also to, you
3  know, finish with that litigation that is under way
4  to clear our name over the inside of the ICANN
5  community, and then we are going to start providing
6  full service to the community.
7  Q. What is the new strategy for Dodora that you
8  are implementing or working on?
9  A. Well, our strategy is very simple. I mean,
10  to do what we are doing now. To finish with the
11  litigation and then put that behind us, and then we
12  go back to business.
13  Q. Is any part of the strategy to conduct a
14  business other than what Dodora had been engaged in
15  before June, 2004?
16  A. Well, yes. We will, but as of right now, I
17  mean, it's -- everything is freezed because we have
18  assets here, assets there and money here, money
19  there, so we have to merge everything together, and
20  once we have done that, we can continue as we used
21  to be.
22  Q. I apologize. My question was a little
23  different. Are you contemplating going into any
24  lines of business different than the lines of

Page 216

1  business Dodora was in as of May or June of 2004?
2  A. No. Dodora will always be a domain
3  registrar, as I said to many people, and Dodora will
4  also be a registrar, and as long as we are alive and
5  we continue to pay our dues, we will always be a
6  registrar on the Internet.
7  Q. Since June of 2004, have you personally,
8  whether through Dodora or any other business or
9  individually, been involved in any registrar
11  Since June of 2004 have you been
12  involved in any way in any registrar business other
13  than Dodora?
14  A. June of 2004?
15  Q. Yes.
16  A. The registrar business other than Dodora?
17  Yes. The WLS registrar. I have been involved
18  in what was the WLS system and also some business
19  development for them, yes. I was involved.
20  Q. This is the business that is owned by your
21  wife?
22  A. That's correct, and Maggie.
23  Q. And WLS is a domain name registrar as Dodora
24  is?

Page 217

1  A. Correct.
2  Q. And have you been involved since December of
3  2004 in the business development activities on
4  behalf of WLS?
5  A. Yes. I always considered doing that.
6  Q. Have you been compensated for your activities
7  to develop business for WLS?
8  A. Yes, I have.
9  Q. How much have you received in compensation
10  from WLS?
11  A. Whatever my wife give me.
12  Q. How much is that?
13  A. Well, it's whatever they allow me to have.
14  Q. Well, how much have you received?
15  MR. BAKER: Well, let me express some
16  reservation about the relevance of this line of
17  questioning.
18  Having expressed that, answer the
19  question as best as you can.
20  A. Well, it's not -- I do get compensation to
21  take care of the registrar.
22  Q. How much have you received?
23  A. I don't know.
24  Q. Is it more than $5,000?

4 (Pages 214 to 217)

Ronald Garraud

1    A. Whatever we got. I probably get most of it.
2  If we get $10,000 for that month, like I said, you
3  know, probably all the $10,000 go to me to take care
4  of Dodora.
5    Q. So the bulk of the money that WLS receives
6  from customers is ultimately paid to you, is that
7  correct?
8    A. Yeah, paid to Dodora, yes.
9    Q. Well, does it get paid to you or to Dodora?
10   A. To Dodora.
11   Q. Okay. Does Dodora compensate -- does WLS pay
12 money to Dodora in consideration of your efforts to
13 develop business and to take other activities on
14 behalf of WLS?
15   A. No. That was -- no. It was personal
16 compensation to do that.
17   Q. Okay. So you personally -- you, Ron
18 Garraud --
19   A. Yes.
20   Q. -- have been helping develop the domain name
21 business for WLS?
22   A. Yes. I consult.
23   Q. You have been doing that for how long?
24   A. Since the day they were --

1    Q. Since the day they were formed?
2    A. Yes.
3    Q. When were they formed; do you know?
4    A. I think it was sometime in 2003.
5    Q. Okay. And after Mr. Bernstein obtained
6  control over assets of Dodora, you continued to do
7  work for WLS, correct?
8    A. Yes.
9    Q. And you were compensated by WLS during that
10 period of time, correct?
11   A. That's correct.
12   Q. And your efforts, I take it, were successful
13 in developing some business for WLS?
14   A. Yes.
15   Q. And WLS provides the same kind of domain name
16 registrar services as Dodora does, is that correct?
17   A. No. It was different. That's not correct.
18   Q. How is it different? What does WLS do with
19 respect to domain name registration services that
20 Dodora did not do?
21   A. What WLS was intending to provide to the
22 community, it was the anticipation of the WLS system
23 that was approved by ICANN, but never really put in
24 production. It was going to be a new line of

1  business of marketing strategy, but we never get
2  there. Management, while Dodora was going through
3  that litigation, it takes us, WLS, you know, to step
4  up and provide support, financial support for
5  Dodora.
6    Q. I guess what I'm trying to get at is, what is
7  the current business of WLS? What does it do?
8    A. Well, currently WLS right now provides
9  management support for Dodora. Pretty much
10 financial support, too. And then there is new line
11 of business development with WLS to get into
12 Internet marketing, mortgage, real estate. This is
13 all this new development, and that's coming up
14 inside WLS.
15   Q. That's what I'm trying to get at. WLS
16 generates revenues from customers, correct?
17   A. Yes.
18   Q. And what are -- what services or products do
19 those customers buy that WLS delivers and for which
20 those customers pay?
21   A. Right now the service is more like customer
22 service. An example, like a domain has a
23 redemption. "Would you help us get it?" That's
24 customer service. You pay a fee. We will do it for

1  you. That's pretty much what they provide at this
2  point.
3    Q. Does WLS interface with any registry to
4  register or to renew domain names?
5    A. No, they do not. They don't.
6    Q. So it's a consulting service of sorts for
7  businesses that have issues with their domain name
8  registration?
9    A. That's correct.
10   Q. Is that a service that Dodora historically
11 had provided on behalf of customers?
12   A. That's correct.
13   Q. At least to that extent, WLS is doing the
14 same thing that Dodora did?
15   A. No. WLS does not do the same thing. Dodora
16 is the registrar. It's the actual ICANN registrar.
17 WLS manages the assets. It just manages the
18 customers of Dodora.
19   Q. But Dodora before June, 2004 used to manage
20 customer relationships?
21   A. That's correct, through VigorSoft.
22   Q. Okay. And now Dodora is managing customer
23 relationships through WLS?
24   A. That's correct.

5 (Pages 218 to 221)

Ronald Garraud

Page 222

1    Q. Okay. And is Dodora receiving revenues from
2  WLS for its work?
3    A. That's correct.
4    Q. Okay. But those revenues are now paid
5  directly to WLS and then they go to Dodora?
6    A. That's correct.
7    Q. Whereas previously, customers would pay
8  revenues to Dodora, and Dodora then would have to
9  pay certain amounts to VigorSoft, correct?
10    A. That's correct.
11    Q. Why have you set it up this way?
12    A. Well, basically, Dodora historically was dead
13  in Texas. There was a lot of issues, and the only
14  way to fix thing is Dodora showed it to step up to
15  this old matter.
16    Q. Was your wife a shareholder of Dodora?
17    A. No.
18    Q. Is there any shareholder of Dodora other than
19  yourself?
20    A. There is more than myself.
21    Q. Who are the other shareholders of Dodora?
22    A. We have Heber, H E B E R, Garraud, my
23  brother; Maggie Wesh, M A G G I E, W E S H; Wilnie
24  Wesh, W I L N I E, W E S H.

Page 223

1    Q. There were four stockholders of Dodora?
2    A. That's correct.
3    Q. Have there always been four stockholders?
4    A. Always been.
5    Q. Those same individuals?
6    A. Yes.
7    Q. And I'm sorry. Has WLS ever had a
8  stockholder other than your wife?
9    A. That's correct.
10    Q. I'm sorry. She has been the only stockholder
11  of WLS?
12    A. That's correct.
13    Q. The other day we started to talk about -- let
14  me just back up for a second. You said that one of
15  the reasons why the customer support services were
16  started to be -- let me rephrase that.
17        I believe you testified that the Texas
18  litigation was a reason why it did not make sense to
19  use Dodora to manage customer relations anymore, is
20  that correct?
21    A. I don't recall I said that, but it seems like
22  it makes sense, yes.
23    Q. So the Texas litigation, the action of the
24  receivership caused you to start running customer

Page 224

1  support services through WLS, is that correct?
2    A. That's correct, because all Dodora's assets
3  was freezed.
4    Q. Okay. Since December of 2004 has Dodora
5  leased its batch pool connections to anyone?
6    A. No.
7    Q. Has WLS utilized Dodora's batch pool
8  connections in any way to generate any revenues?
9    A. Yes. We keep the existing contract we have
10  with Pool.com as it was entered since January of
11  2004.
12    Q. So shortly after the receivership ended, WLS
13  entered into an agreement with Pool.com?
14    A. No. It has always been there before the
15  receiver.
16    Q. WLS had entered into an agreement with
17  Pool.com before December of 2004, is that correct?
18    A. That's correct.
19    Q. Do you recall when?
20    A. It was entered in January 20, 2004.
21    Q. So that's a contract between WLS and
22  Pool.com?
23    A. That's correct.
24    Q. And do you have a copy of that contract with

Page 225

1  you today?
2    A. Yes, I do.
3    Q. Do you have any other documents that you
4  brought today --
5    A. Yes, I no.
6    Q. -- that you are intending to produce to me?
7    A. Yes, I do.
8    Q. May I have copies or do you need to make
9  copies?
10    A. They have already got them. I have these for
11  you.
12        MR. BAKER: The first one we are handing
13  you is the Pool.com registrar partner agreement with
14  WLS. You had asked for a profit and loss statement
15  for the calendar year 2002, which we are handing you
16  for 2002 and for 2003. You asked for some annuals
17  between Dodora and -- who is this? -- reg.ca
18  subsequent to Dodora recovering control, and one is
19  a five-page document. What is the date on that?
20        MR. HECKER: Well, this is an e-mail
21  chain. The top e-mail is dated December 18, 2004.
22        MR. BAKER: Okay.
23        (Off the record.)
24        MR. BAKER: And here is another e-mail

6 (Pages 222 to 225)

Ronald Garraud

Page 226

1  trail of the same day between Dodora and reg.ca.
2       MR. HECKER: I'm sorry?
3       MR. BAKER: It's an e-mail that is a
4  four-page document for the same day.
5       MR. HECKER: Okay.
6       MR. BAKER: And here is an e-mail
7  between reg.ca, and I'm assuming Ninad Raval,
8  N I N A D, R A V A L. This is a two page e-mail
9  chain between Dodora and Directi dated December 16,
10  2004. You also asked for some documentation showing
11  that Directi had redeemed a domain name on behalf
12  of a Dodora customer. Here is one showing a
13  transaction of July 9, 2004 between Directi and
14  Amish, A M I S H, Creations.com. The next document
15  I'm showing you is a VeriSign registry tool signed
16  at Amish Creations onto Dodora.
17       Q. Okay. So you conducted a search to find
18  additional documents that were responsive to the
19  document request, correct?
20       A. That's correct.
21       Q. Are there any other customer e-mails from the
22  beginning of 2003 through the present that you have
23  that you haven't produced?
24       A. I'm not aware of anything at this point.

Page 227

1       Q. Are any customers dealing with Dodora at this
2  point?
3       A. There are some.
4       Q. Have they sent you any e-mails at all?
5       A. Yes. They send e-mail regarding their
6  existing domain at Dodora.
7       Q. Have you produced those e-mails?
8       A. Yes, I do.
9       Q. As far as the financial -- as far as the
10  financial information goes, I take it you have
11  backup for these one-page summary profit and loss
12  statements?
13       A. I do. That's your copy.
14       MR. HECKER: Okay. If we could, let's
15  mark as Exhibit 8 the Pool.com registrar partner
16  agreement. Let me take a break for a second and
17  make a couple of copies of these things real fast.
18       (Off the record.)
19       MR. HECKER: If we can mark as the next
20  exhibit a Pool.com registrar partner agreement that
21  was produced this morning.
22       (Marked, Exhibit 8, Pool.com registrar
23  partner agreement.)
24       Q. Mr. Garraud, I would like you to look at what

Page 228

1  we have marked as Exhibit 8 and tell me what this
2  document is.
3       A. 8 is a registrar partner agreement between
4  Pool.com and the WLS registrar.
5       Q. Is WLS and ICANN an accredited registrar?
6       A. No, they are not.
7       Q. Was it required to be an ICANN-accredited
8  registrar to enter into this kind of agreement with
9  Pool.com?
10       A. No, you don't have to being to be an
11  ICANN-accredited registrar.
12       Q. You signed this document, right?
13       A. Yes, I did.
14       Q. And as of January 20, 2004 when you signed
15  this, you were not an employee of WLS, is that
16  correct --
17       A. I was.
18       Q. -- were you?
19       A. I was a consultant.
20       Q. Were you an employee or a consultant?
21       A. I was a consultant.
22       Q. As of January of 2004, you were aware that
23  the Texas litigation existed, correct?
24       A. I was aware of that.

Page 229

1       Q. And after you became aware of that, you
2  entered into this agreement with -- you caused WLS
3  to enter into this agreement with Pool.com, correct?
4       A. That's correct.
5       Q. And was there some agreement that Dodora
6  entered into with WLS as of the same time?
7       A. Yeah, the same time there was the idea of
8  doing some business development for WLS.
9       Q. To put it a little differently, as of
10  January 20, 2004, WLS was not an ICANN-accredited
11  registrar and, therefore, had no ability to register
12  domain name names with any registries, is that
13  correct?
14       A. That's correct.
15       Q. And the relationship with Pool.com was to
16  provide some domain registration services?
17       A. No. The relationship with Pool.com was to
18  market whatever the assets of Dodora --
19       Q. Well, if you could look at Paragraph 2, this
20  identifies WLS as registrar, correct?
21       A. That's correct.
22       MR. BAKER: What are we looking at?
23       MR. HECKER: Paragraph 2 of Exhibit 8.
24       MR. BAKER: Okay.

7 (Pages 226 to 229)

Ronald Garraud

Page 230

1    Q. And in Paragraph 2 it states that "Registrar
2  agrees to provide domain registration services to
3  Pool on behalf of Pool's customers."
4        Do you see that?
5    A. Yes.
6    Q. As of January 20, 2004, was WLS Registrar,
7  Inc. contractually entitled to provide domain
8  registration services to Pool on behalf of Pool's
9  customers?
10   A. That's correct.
11   Q. How would WLS have provided any domain
12 registration services as of January of 2004 if it
13 was not an ICANN-accredited registrar?
14   A. They provide a service to Dodora through
15 Dodora Unified Communications, and at the same time
16 WLS was seeking for its own accreditation by ICANN.
17   Q. Did you enter into this agreement in an
18 attempt to transfer assets of Dodora away from the
19 control of the receiver?
20   A. No.
21   Q. Did you enter into this agreement in any way
22 to change the way in which Dodora received
23 compensation for any domain name registration
24 services that it provided?

Page 231

1    A. No.
2    Q. Why, as of January 20, 2004, did Dodora and
3  WLS consider it to be a good idea to have WLS enter
4  into this agreement with Pool.com?
5    A. Well, there is something behind this
6  agreement, but that was the right thing to do at
7  that time.
8    Q. What was behind this agreement?
9    A. Well, after Pool, we view it and they think
10 this is the right thing to do.
11   Q. Who is "they"?
12   A. Pool.com.
13   Q. Who did you talk to at Pool.com about
14 entering this agreement?
15   A. Len Bayles, L E N, B A Y L E S.
16   Q. And why did -- please tell me the substance
17 of your conversations or communication with Mr.
18 Bales about this Pool.com registrar partner
19 agreement between WLS and Pool.com?
20   A. After we reviewed everything to the legal
21 team, I'm assuming they examine everything that was
22 going on and then they were okay with everything.
23   Q. You provided this agreement to your legal
24 team?

Page 232

1    A. And their legal team, too.
2    Q. And my question is, first of all, who
3  approached whom?
4    A. They approached us.
5    Q. Pool.com approached you?
6    A. I approached Maggie.
7    Q. Okay. Maggie Wesh?
8    A. Yes.
9    Q. One of the stockholders of Dodora?
10   A. In WLS.
11   Q. Yes, and also one of the stockholders of WLS?
12   A. Yes.
13   Q. What did you hear from Maggie about her
14 conversation with Pool.com as to why they were
15 interested in this relationship?
16   A. Well, Maggie, after, you know, reviewing
17 everything, you know, she feel like it could be a
18 good lucrative partnership, and then she asked me to
19 start working on the implementation.
20   Q. Let me back up. Dodora could have entered
21 into the same kind of agreement with Pool.com?
22   A. That Dodora couldn't.
23   Q. Why not?
24   A. The Dodora asset was freezed in Texas.

Page 233

1    Q. As of January of 2004, the receiver had
2  already been appointed?
3    A. That's correct.
4    Q. You knew the receiver had been appointed by a
5  court to take control of whatever assets of Dodora
6  he could find, correct?
7    A. That's correct.
8    Q. One of the assets of Dodora was its
9  connections to the various registries and log-in
10 credentials --
11   A. That's correct.
12   Q. -- that Dodora entered into an agreement with
13 WLS by which it agreed to allow WLS to use its
14 log-in credentials and connections to the
15 registries, correct?
16   A. Correct.
17   Q. And WLS entered into this agreement with
18 Pool.com in about January 20, 2004 --
19   A. That's correct.
20   Q. -- correct?
21        The result of it would be any monies
22 that would be generated from Dodora's batch pool
23 connections would flow through WLS, correct?
24   A. That's correct.

8 (Pages 230 to 233)

Ronald Garraud

Page 234

1    Q. And that would have the effect, at least
2    initially, of potentially keeping that money away
3    from the receiver, is that correct?
4    A. If it is how you see it, that's correct.
5    Q. That's the way it would have worked, correct?
6    A. That's probably correct.
7    Q. Did WLS actually ever receive any money from
8    Pool.com as a result of this agreement?
9    A. Yes.
10   Q. How much?
11   A. Whatever it generated every month.
12   Q. Are there any records that reflect how much
13   was generated each month?
14   A. Yes, there is records.
15   Q. And have you produced those records?
16   A. Yes, we produced them.
17   Q. If we look at the bank records for 2004 and
18   see payments from Pool.com, does that actually
19   reflect money that was received by WLS under the
20   agreement with Pool.com?
21   A. That's correct.
22   Q. Even though it may appear on a bank record
23   for Dodora or financial statement for Dodora --
24   A. That's correct.

Page 235

1    Q. -- it was your position that that actually
2    was WLS's money?
3    A. That's correct.
4    Q. Okay. Did Dodora receive directly from
5    Pool.com any money at all after WLS entered into
6    this agreement with Pool.com?
7    A. No.
8    Q. Okay. Has Dodora received any money directly
9    from Pool.com at any point since January, 2004?
10   A. No.
11   Q. Has Dodora directly received money from
12   Snapnames.com --
13   A. No.
14   Q. -- since January of 2004?
15   A. No.
16   Q. If you could look again at Paragraph 2 of the
17   Pool.com registrar partner agreement --
18   A. Right.
19   Q. -- there is a sentence about four lines down
20   that begins, "Registrar will give Pool exclusive and
21   continual access to 100 percent of the connections
22   allocated to registrar by each registry for
23   registering deleted domains and will not, during
24   the term of this agreement, use such registry

Page 236

1    connections in any way to compete (alone or with
2    any third party) with Pool in the business of
3    registering deleted domains."
4    Q. Did I read that correctly?
5    A. I think you did.
6    Q. You understood when you signed this agreement
7    WLS could not enter into only one similar -- could
8    not enter into an agreement with a business other
9    than Pool.com to do substantially what it was going
10   to do with Pool.com, correct?
11   A. That's correct.
12   Q. It couldn't enter into a similar agreement
13   with Snapnames.com while this agreement with
14   Pool.com was in effect, correct?
15   A. That's correct.
16   Q. I will put that aside for the time being and
17   may or may not want to come back to it if I have
18   time to look at these documents today.
19       How many different sets of lawyers
20   represented you in connection with the Compana case?
21   A. Two team of lawyers:  One in Massachusetts --
22   a team in Massachusetts and one in Texas.
23   Q. How many different firms in Massachusetts
24   have you used in connection with the receivership or

Page 237

1    the Compana litigation?
2    A. Two firms.  Two or three.  I don't know.
3    Q. How about down in Texas; how many different
4    firms did you use down there?
5    A. In Texas, two.
6    Q. And what firms are those?
7    A. There is Randy Shaffer, S H A F F E R, and I
8    forgot the other one.  The other one was working
9    under -- for Newman, Newman & Newman.
10       MR. BAKER:  N E W M A N.
11       MR. HECKER:  Okay.  We will mark the
12   next exhibit, which is a letter from Mr. Bernstein
13   to Mr. Torakhia dated June 28, 2004 with
14   attachments.
15       (Marked, Exhibit 9, letter from Mr.
16   Bernstein to Mr. Torakhia, 6/28/04, with
17   attachments.)
18   Q. Before we get to that, let me ask a couple of
19   more questions about WLS, if I could.  Who are WLS's
20   customers currently?
21   A. I would probably say Pool.com.
22   Q. You still have this contractual relationship
23   with Pool.com?
24   A. Right.

9 (Pages 234 to 237)

Ronald Garraud

Page 322

1    A. That's pretty much what I can think of at
2  this point.
3    Q. What are the financial damages that Dodora
4  has been caused allegedly by any actions of Directi?
5    A. Well, the financial damage is clear. I mean,
6  pretty much all the assets that Dodora were supposed
7  to acquire between June, 2004 to December 2004 was
8  pretty much redirected to Directi.
9    Q. How much money is Dodora claiming in this
10  litigation from Directi?
11    A. Well, the book would say we lost pretty much
12  close to a quarter of a million dollars, but other
13  than that, there is more like time that -- not even
14  accountable for time we spent to fix things, time we
15  spent because of other issues that we experiment to
16  have the process of bringing the registrar back on.
17  We never put a number on that, but if you look at
18  the bulk number, I mean, that's pretty much what we
19  can claim at this point.
20    Q. How do you calculate that $250,000?
21    A. Well, we look at basically, you know --
22  without knowing how much money Directi is making
23  between June, 2004 and June -- to December of 2004,
24  so we come to some projection, look at the Dodora

Page 323

1  financial situation before June of 2004 and the
2  financial situation after December of 2004. So
3  basically if everything was stable and no
4  interference whatsoever, this is what we expect
5  basically to make at the end of the year, but that
6  wasn't becoming a reality because of the
7  interference by Directi. So it's still unknown how
8  much money that was generated by Directi between
9  June, 2004 to December of 2004.
10    Q. I guess what I'm trying to get at is the
11  $250,000 that you just testified to, is that an
12  amount that you believe Directi actually earned as a
13  result of managing Dodora's assets or is that an
14  amount that you believe Dodora would have earned but
15  for the actions of the receiver and Directi and
16  anybody else?
17    A. Yeah. It's goodwill. Goodwill.
18    Q. So which is it? Is this money that Directi
19  earned or that Dodora would have earned had it been
20  able to operate the business itself?
21    A. That's what Dodora probably earned, but again
22  I don't know how much Directi earned between June of
23  2004, unless Bhavin is willing to open up his bank
24  account so we can see.

Page 324

1    Q. You would agree that the receiver took the
2  actions which resulted in Dodora's losing the
3  ability to access VeriSign and ICANN registries,
4  correct?
5    A. I don't know.
6    Q. The receiver was the one who obtained access
7  to those credentials?
8    A. That's correct.
9    Q. That was as a result of the actions that the
10  receiver took under authority of the order
11  appointing him in the Texas case, correct?
12    A. That's correct.
13    Q. And Directi acted, as far as you know, under
14  contract to Mr. Bernstein, correct?
15    A. I will say correct assuming the court
16  approved it.
17    MR. BAKER: Are we concluded? It's
18  12:20.
19    MR. HECKER: I understand. I just don't
20  want to be cut off. I appreciate your concern.
21    MR. BAKER: If you want to submit
22  written interrogatories later on --
23    MR. HECKER: Why don't we do this: You
24  have to go. It's conceivable there are additional

Page 325

1  documents we will get. I will suspend the
2  deposition and may or may not talk to you about
3  continuing it either over the phone or for a short
4  period of time some other time.
5    MR. BAKER: Okay.
6    MR. HECKER: We can't get anything else
7  done today with you. We will suspend.
8    (Whereupon the deposition was adjourned
9  at 12:25 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



# NEWMAN & NEWMAN
ATTORNEYS AT LAW, LLP

505 Fifth Avenue South
Suite 610
Seattle, Washington
98104

phone 206.274.2800
fax 206.274.2801

www.newmanlaw.com
info@newmanlaw.com

**SENT VIA U.S. MAIL, E-MAIL, AND FAX TO (703) 450-7326**

June 1, 2004

Andrea T. Vavonese, Esq.
VeriSign, Inc.
21355 Ridgetop Circle
Dulles, VA 20166

> **Re:** **Dodora Unified Communications, Inc.**

Dear Andrea:

Dodora Unified Communications, Inc. ("Dodora") engaged us to represent its interests relating to a putative judgment issued against it in favor of Compana, LLC.

Dodora is an ICANN accredited registrar and a party to VeriSign's Registry-Registrar Agreement. Pursuant to that agreement, Dodora has the right to login credentials to access the .com and .net registries. However, VeriSign has denied Dodora access to the registries. Our client is advised that VeriSign has changed Dodora's login credentials and given control over them to Michael S. Bernstein, a purported receiver working on behalf of Compana, LLC.

The putative judgment against Dodora was issued pursuant to a default. Dodora was never served process in that underlying action, and in fact has never seen a copy of the complaint or ostensible judgment in that case. The default was improper, and the judgment is invalid. Consequently, Dodora will appear in the County Court at Law Number Five of Dallas, Texas and move to set aside the default order and judgment.

Currently, Dodora is the registrar for a large number of domain names and corresponding customers who are unable to update DNS or contacts, renew domain names, or register new names. Some Dodora customers were pending DNS changes at the time VeriSign rejected Dodora's communications with the registries. Those customers now are without DNS servers and therefore do not have the ability to propagate web sites, receive email, or perform any other function requiring a nameserver. Customers cannot renew domain names, and thus risk losing them. Several customers have contacted Dodora to express concern, and some

1294-0002

*Andrea T. Vavonese, Esq.*
*June 1, 2004*
*Page 2 of 2*

customers have threatened lawsuits against Dodora. Dodora has already lost, and until connection to the registries is restored will continue to lose, substantial goodwill and revenue. Even worse, some of Dodora's customers have received threats by *their* customers of lawsuits relating to service outages arising from the DNS issues just discussed.

VeriSign should not have transferred Dodora's login credentials to Mr. Bernstein. Accordingly, we request that VeriSign deny Mr. Bernstein access to Dodora's login credentials, and issue new login credentials to Dodora forthwith.

If VeriSign complies with our request by 5:00 p.m. EDT, Wednesday, June 2, 2004, Dodora will waive and release all claims against VeriSign relating to damages it suffered during the time it could not access the registries.

Needless to say, we would be extremely grateful if VeriSign would act on this request immediately.

Please contact me with any questions. My email address is dn@newmanlaw.com and my direct dial telephone number is (206) 274-2828.

Thank you very much for your prompt assistance with this matter.


Very Truly Yours,

NEWMAN & NEWMAN,
ATTORNEYS AT LAW, LLP


Derek A. Newman

cc:     Dodora Unified Communications, Inc.
        Jeffrey Cash, Esq.
        Daniel E. Halloran, Esq.
        Michael S. Bernstein

*Garrand*
EXHIBIT NO. 5
4-12-05

FILED

**CAUSE NO. 03-3182-E**                    2004 JUN -3  AM 11: 22

COMPANA, LLC                    §        IN THE COUNTY COURT HOUR AW
    Plaintiff,                 §        CYNTHIA
                                §        COUNTY CLERK
                                §        DALLAS COUNTY
v.                              §
                                §        AT LAW NO. 5
DODORA UNIFIED COMMUNICATIONS, INC.  §
    Defendant.                  §        DALLAS COUNTY, TEXAS

### DEFENDANT'S MOTION FOR TEMPORARY RESTRAINING ORDER

Dodora Unified Communications, Inc. ("Corporate Defendant" or "Dodora")
requests that the Court enter an order for the following:  (i) temporarily abating
enforcement of the Court's January 9, 2004 Order Appointing Receiver and restraining
Michael S. Bernstein, the Receiver appointed by the Court on January 9, 2004, from
*further action on behalf of Corporate Defendant; and (ii) temporarily abating enforcement*
of the Court's March 19, 2004 Order granting Receiver's Motion to Require Parties to
Comply with Receivership Order.  In support of this motion, Dodora would respectfully
show the Court the following:

### I. Factual and Procedural Background

**A. *Dodora is an Internet Registrar.***

Dodora is an ICANN accredited Internet "registrar".[1]  Dodora and all Internet
registrars are in the business of selling domain name registrations to consumers.[2]  A
consumer who registers a domain name is called a "registrant".  Domain names can only
be registered through an ICANN accredited registrar (or its authorized reseller).[3]  Each

---

[1] *See* Affidavit at § 7.
[2] *Id.*
[3] *Id.*


TRUE AND CORRECT
... OF ORIGINAL
... N DALLAS
COUNTY CLERK'S OFFICE

registrar maintains registrant contact information and other information that relates to a domain name for its customers. If a domain name registrant would like to point its *domain name to a certain web page, for example, it must contact its registrar to specify* the information necessary for the Internet "registry" to route the domain name traffic to the particular web page.

### B. VeriSign is an Internet Registry.

VeriSign is the Internet registry for all <.com> and <.net> domain names. <.com> and <.net> are each "top-level" domains. A "registry" is the organization responsible for maintaining the authoritative database of all domain name registrations in a particular top-level domain space. There can be only one registry for each top-level domain. *Otherwise, there would be conflicts on the Internet (e.g., one registry could* point a domain name to one website, and another registry may point the same domain name to a different website; and traffic to one website or the other would depend upon which registry is accessed by a particular Internet user).

### C. Interaction between Registrars (Dodora) and the Registry (VeriSign).

Each registrar acts as an interface between its registrants and the registry operator, registering, renewing, transferring, and deleting domain names on behalf of consumers by issuing the appropriate commands to the registry. From a sales standpoint, a registry sells domain names to registrars on a wholesale basis. Registrars, in turn, sell those domain names to registrants on a retail basis. Sometimes, registrars empower "resellers" who are simply sales agents that sell domain names to their customers on behalf of the registrar.

Registrars access the registry database via login credentials, which are essentially a username and password. The registrar must enter, and the registry will verify, the



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE 2

credentials each time the registrar makes a request to the registry.  Consequently, the

registrar login credentials must be verified whenever a registrant (*i.e.*, consumer) wishes

to register a domain name, renew a domain name registration, change information

relating to the domain name (such as where e-mail for the domain name should be

received), or perform several other functions relating to the domain name.

### D. Federal Mandate Controls the Accreditation of Registrars.

ICANN is a not-for-profit California corporation appointed by the United States

government to oversee the Internet domain name system.  Pursuant to government

contracts, ICANN is the only party in the world with the power to accredit registrars.

VeriSign is bound by agreements with ICANN and the United States government to

provide registry services only to ICANN accredited registrars.  Similarly, ICANN is

bound by contract and instruction from the United States government to only recognize

registrars who meet certain technical and other criteria.  Registrar accreditation is not

transferable under any circumstances.  Accordingly, a registrar cannot sell its

accreditation, and a sale of its assets cannot and would not under any circumstances

include its accreditation.

### E. Dodora's Property Rights are Suffering Irreparable Harm.

Dodora is the owner of certain property and rights that are threatened with

irreparable injury by the conduct of the Plaintiff Compana, LLC ("Compana" or

"Plaintiff"), and more specifically the receiver appointed by this Court on January 9,

2004, Michael S. Bernstein ("Receiver").[4]  In particular, Dodora is qualified with ICANN

and VeriSign to register domain names, and did so through a Registry-Registrar

---

[4] *Id.* at § 6.

MOTION FOR TEMPORARY RESTRAINING ORDER



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE
Page 3

Agreement.[5]  Acting on behalf of the Plaintiff to collect damages purportedly owed by way of a default judgment entered against Dodora, the Receiver asked for and received *an order from this Court directing ICANN and VeriSign to change Dodora's login credentials and reassign new credentials that were then forwarded to Receiver.*[6]  The Receiver's actions have stymied Dodora's business operations, effectively eliminating Dodora's ability to conduct business and generate revenue thereby.[7]

### F. The Default Judgment Entered Against Dodora was Improper.

Through the recent actions of the Receiver, Dodora is now aware that a default judgment has been entered against Dodora by this Court.  Dodora was not served with original service of process of the underlying petition.[8]  Nor was Dodora served with citation or notice of the entry of default judgment.[9]  *It was not until the Receiver* attempted to seize assets of Dodora in Massachusetts that Dodora learned of the default judgment.[10]  Having not received the petition, Dodora is not in a position to respond to the merits of the claims asserted at this time, but would like its constitutional right to be heard and will move separately to set aside the default judgment.[11]

### II.  Argument and Authorities

### A.    Dodora's Property is Suffering Irreparable Harm.

The Plaintiff, through the Receiver, is causing irreparable harm to Dodora's property and rights by effectuating a change of Dodora's login credentials with VeriSign

---

[5] *Id.* at § 7.
[6] *Id.* at § 8.
[7] *Id.* at § 9.
[8] *Id.* at § 4.
[9] *Id.*
[10] *Id.* at § 5.
[11] *Id.* at § 4.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

and ICANN.[12]  These actions shackled Dodora's business operations and commenced a

serious negative chain of events regarding the financial condition of Dodora and its

ability to generate income.[13]  Moreover, the daily loss of accessibility to customer

accounts and daily harm to Dodora's business reputation is irreplaceable.[14]  Dodora's

business could effectively disappear as a result of the Receiver's actions and may not be

rehabilitated by Dodora if this course of action is allowed to continue.[15]

Currently, Dodora is the registrar for a large number of domain names and

corresponding customers who are unable to update domain name information or contacts,

renew domain names, or register new names.[16]  Some Dodora customers were pending

domain name information changes at the time VeriSign rejected Dodora's login

credentials.[17]  Those customers now are without domain name services and therefore do

not have the ability to propagate web sites, receive email, or perform any other function

relating to the domain name.  Registrants cannot renew domain names, and thus risk

losing them.  Several customers have contacted Dodora to express concern, and some

customers have threatened lawsuits against Dodora.

**B.**    ***Dodora is Suffering and Will Continue to Suffer Imminent and Immediate Harm.***

The actions taken by Receiver, specifically changing the login credentials with

VeriSign, has had an immediate harmful effect on Dodora's business.[18]  Dodora cannot

register any new customers, cannot service its existing customers, and cannot offer

---

[12] *Id.* at § 8.
[13] *Id.* at § 9.
[14] *Id.*
[15] *Id.*
[16] *Id.* at § 10.
[17] *Id.*
[18] *Id.* at § 8.


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

services to third-party resellers.[19]  As a result, Dodora has lost the ability to generate income and will not regain the ability to generate income unless the Court grants this Motion.[20]

Dodora has already lost, and until connection to the VeriSign registry is restored will continue to lose, substantial goodwill and revenue.[21]  Even worse, some of Dodora's customers (*i.e.*, registrants) have received threats by *their* customers of lawsuits relating to service outages arising from the issues discussed herein.[22]  Dodora has authorized several resellers who have built businesses around their ability to offer domain name services through Dodora.  The harm inflicted on those resellers is unquantifiable and ongoing.  Effectively, those resellers are out of business.[23]

### C.    Receiver's Action are Without Right or Entitlement.

The Receiver's conduct is completely without right or entitlement in that the Receiver is acting to secure assets to satisfy a defective default judgment.  Dodora was not properly served with citation of process for Plaintiff's Original Petition in this case.[24]  Nor was Dodora served with notice of a Motion to Enter Default Judgment or the Default Judgment Order.[25] Dodora would like its constitutional right to be heard regarding the claims asserted against it in this case.[26]

---

[19] *Id*. at § 10.
[20] *Id*. at §9.
[21] *Id*.
[22] *Id*. at 10.
[23] *Id*.
[24] *Id*. at § 4.
[25] *Id*.
[26] *Id*.


TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

### D. Receiver's Actions are Having the Exact Opposite Effect of What Receiver Wants to Occur.

Among other things, receivers serve the purpose of collecting judgments. Here, Dodora generates all of its revenue from domain name registrations. Currently, because it cannot communicate with the registry, Dodora cannot perform domain name registration services and cannot generate any revenue whatsoever.[27] A more practical means by which to collect on the judgment would be to intercept payments to Dodora arising out of domain name registration services. But, due to VeriSign's compliance with the order, no revenue is flowing for the Receiver to intercept.

Apparently, the Receiver thinks he can sell Dodora's accreditation as an asset and satisfy the judgment with the funds received from the sale. But ICANN would never recognize such a transaction because doing so would jeopardize its contractual relationship with the United States government. Consequently, the Receiver has not secured an asset that can be liquidated; rather, he has cut off the only means by which he could collect a judgment from Dodora. Receiver's actions are having the direct opposite effect of his stated purpose of seizing control of Dodora's login credentials to generate funds.

### E. Dodora Has No Adequate Remedy at Law for the Injuries Caused by Receiver.

Dodora has no adequate remedy at law for the injuries just described. The injuries and losses are continuing. The property and rights involved are unique and irreplaceable, so that it will be impossible to accurately measure, in monetary terms, the damages caused by the Receiver's conduct. The injuries are also having effects on a

---

[27] Id. at 8.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

number of innocent third parties that have contractual relationships with Dodora and with Dodora's resellers.

### III.    Temporary Injunction

For the reasons stated in this pleading, Dodora requests that, after a hearing on this matter, this Court temporarily enjoin the Receiver from seizing access to Dodora's login credentials and otherwise interfacing with Dodora's relationships with VeriSign and ICANN.

### IV.    Permanent Injunction

For the reasons stated in this pleading, Dodora requests that, after trial, this Court permanently enjoin the Receiver from seizing access to Dodora's login credentials and otherwise interfacing with Dodora's relationships with VeriSign and ICAAN.

### V.    Ex Parte Temporary Injunctive Relief is Appropriate

It is essential that the Court immediately and temporarily restrain the Receiver from continuing with the conduct described in this Motion.  It is essential that the Court act *immediately, prior to notice on the Plaintiff and Receiver and a hearing on the matter,* because there is no damage to the Receiver, and in fact, granting the relief requested will actually preserve the assets of Dodora.  Moreover, to the best of Dodora's counsel's knowledge, the case at bar is not subject to transfer to another jurisdiction.  And Dodora is willing to post a bond in this matter.



TRUE AND CORRECT COPY OF ORIGINAL FILED IN DALLAS COUNTY CLERK'S OFFICE

WHEREFORE, Defendant requests that:

1.    A temporary restraining order be issued without notice to Plaintiff or Receiver, restraining Plaintiff, Receiver, its agents, servants, and employees, from directly or indirectly (i) requiring VeriSign or ICANN to recognize Receiver's signature as controlling authority with regard to Dodora's Registry Registrar Agreement and Dodora's log-in credentials; (ii) requiring VeriSign and ICANN to direct all communications to Dodora through Receiver; (iii) requiring ICANN and VeriSign to produce all written, faxed, and electronic communication with Dodora and all contracts and changes in contracts between any party and Dodora, regardless of Date, to Receiver; (iv) attempting to negotiate the accounts of Dodora with ICANN and VeriSign; (v) taking any further action with regard to the assets of Dodora; and (vi) an order requiring VeriSign to return login credentials to Dodora and to correspond and negotiate directly with VeriSign.

2.    A temporary injunction be issued, after a hearing on this matter, enjoining Plaintiff, Receiver, its agents, servants, and employees, from directly or indirectly making claims on Dodora's assets.

3.    A permanent injunction be issued, on final trial of this cause, enjoining Plaintiff, Receiver, its agents, servants, and employees, from directly or indirectly making claims on Dodora's assets.

4.    Costs of suit, including reasonable attorneys' fees; and

5.    Such other and further relief to which Defendant may be justly entitled.



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

Respectfully submitted by:

Darin M. Klemchuk
State Bar No. 24002418
J. Jeffrey Cash
State Bar No. 24001851
Patrick W. Powers
State Bar No. 24013351

CASH KLEMCHUK ROACH POWERS LLP
7502 Greenville Ave.
Suite 500
Dallas, TX 75231

214/890-9246 (telephone)
214/550-2671 (facsimile)

ATTORNEYS FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served on counsel of record as follows on this 3rd day of June, 2004:

Michael Bernstein
1301 Northwest Hwy., #204
Garland, Texas 75041
Receiver

Mark P. Blenden
PO Box 560326
Dallas, Texas 75356
Attorney for Receiver

Via Certified Mail, Return Receipt Requested

J. Jeffrey Cash



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE
Page 10

MOTION FOR TEMPORARY RESTRAINING ORDER

## CERTIFICATE OF CONFERENCE

Due to the emergency nature of the relief requested herein, counsel for Movant has not had an opportunity to schedule a conference to resolve the dispute, and believes that counsel for Receiver would oppose the relief sought herein. Counsel has attempted to discuss this matter via telephone conference with opposing counsel.

J. Jeffrey Cash



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

FROM :                          FAX NO. :                    Jun 15 2003 07:53AM  P1

### AFFIDAVIT OF RON GARRAUD

STATE OF MASSACHUSETTS

COUNTY OF

On this day, before me the undersigned authority, personally appeared RONALD
GARRAUD, known to me to be the person whose name is signed to this affidavit and
who, by me being first duly sworn did depose and say:

1. I am over twenty-one years of age, am of sound mind, and duly qualified to
   testify as to the matters contained herein. I make Affidavit upon my own
   personal knowledge and the facts hereinafter are true, correct, and complete.

2. *This Affidavit is being offered in support of Defendant's Motion for Temporary
   Restraining Order.*

3. I am the Chief Executive Officer of Dodora Unified Communications, Inc.
   ("Dodora"), the movant with respect to the above-referenced motion.

4. Dodora has not received service of an original petition or a default judgment in
   the matter of Compana, LLC vs. Dodora Unified Communications, nor has
   Dodora had an opportunity to be heard with respect to the claims asserted in
   the lawsuit.

5. I recently have been made aware of the fact that a default judgment has been
   entered against Dodora in a Texas county court of law and that a receiver has

transferable and have no value to any one other than Dodora.

TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

been appointed with respect to such judgment.

6. I am now aware that a receiver is attempting to exercise control of certain assets and contractual rights of Dodora, specifically the log-in credentials under Dodora's Registrar Accreditation Agreement with ICANN and VeriSign.

7. Dodora is in the business of acting as a registrar of internet domain names.

8. As a result of an order issued by the County Court of Law, Number 5, in Dallas, Texas (the "Order"), VeriSign has denied Dodora access to its log-in credentials.

9. Enforcement of the Order has effectively ceased the operations of Dodora and is causing Dodora to lose customers and other business. The harm caused by this enforcement is irreparable and unquantifiable in that it is adversely affecting Dodora's relationship and reputation with its customers.

10. Dodora's customers and third-party resellers are also denied access to their accounts as a result of the receiver's actions and are suffering unquantifiable harm as a result of the Order.

11. Irrespective of the receiver's stated intent, the log-in credentials are not transferable and have no value to any one other than Dodora.


TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE