UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

_____
                                        )
DODORA UNIFIED COMMUNICATIONS,          )
INC.,                                   )
            Plaintiff,                  )
                                        )         Civil Action No.
        v.                              )         05-10016-NMG
                                        )
DIRECT INFORMATION PVT. LTD. and        )
ANSWERABLE, INC.,                       )
            Defendants.                 )
_____ )

**OPPOSITION TO MOTION FOR RECONSIDERATION OF ORDER GRANTING
DEFENDANT'S MOTION IN LIMINE RE:  CERTAIN CONTRACT ISSUES**

        Dodora has presented no cognizable argument why the Court should reconsider and

reverse its correct decision that Dodora may not at trial challenge the validity of the contracts

into which Directi and the receiver entered.   On that basis alone, Dodora's motion for

reconsideration should be denied.   The fact that Dodora did not timely file an opposition alone

warranted denial of the motion.   The fact that the Court allowed Dodora an opportunity to file an

opposition late was a way to give Dodora some opportunity to make a convincing argument why

the motion should not be granted.   Dodora's arguments were unpersuasive, and the Court

correctly granted Directi's motion.[1]

        The Court has copies of the contracts themselves; they are attached to Dodora's own

complaint.   Directi accurately quoted the language on which Dodora relies.   Moreover, the

_____

[1] The arguments presented in this opposition, Directi believes, ought to be unnecessary to the denial of Dodora's
motion for reconsideration.  However, Directi had prepared them to reply to most of the specific points that Dodora
had raised in its opposition to Directi's original motion in limine.  Directi submits these arguments and evidence
now in opposition to the motion for reconsideration and in further support of the original motion and  so that the
record is more complete on these issues.

deposition excerpt is from the testimony of Ronald Garraud, Dodora's principal (and only employee), which Dodora's lawyer obviously knows.  (*See* Exh. 1 hereto.)

The "document purporting to be from the Texas court" was authenticated by:  (a) Dodora's allegations concerning the same document in paragraph 24 of its complaint; (b) Dodora's inclusion of the same document as Exh. D to its complaint; (c) Mr. Garraud's deposition testimony (Exh. 1, pp. 306-08); (d) Mr. Bernstein's deposition testimony (Exh. 2, pp. 42-44);[2] (e) Dodora's failure to object to this document as listed on Directi's original and amended trial exhibit lists (both filed with Court, item 15 in each); and (f), under F.R.C.P. 36, Dodora's failure to respond or to object to Directi's request to admit number 2 that a "true and correct copy of the complaint and the docket sheet in the Compana case are attached hereto." (Exh. 3.)

The question also is not whether the quoted contract language is or is not ambiguous. The quoted language simply does not, under any interpretation, lead to the result that Dodora wants.  Dodora's major premise therefore is false.  And both Mr. Turakhia of Directi and Mr. Bernstein – the only contracting parties – have testified that the language was not intended to have the effect Dodora argues.  (Exh. 2, Bernstein pp. 33-34; Affidavit of Bhavin Turakhia in opposition to motion for preliminary injunction (filed Jan. 20, 2005) ¶8.)  Accordingly, if there is any ambiguity, all the parol evidence supports the validity of the agreements.

Dodora is so wrong in suggesting that the receiver did not ever formally seek approval of the contracts that it either has not reviewed the Texas case file or is trying to mislead the Court. Why else would Dodora have felt it was necessary to include, in the agreed order closing the

---

[2] Mr. Bernstein's deposition was taken after the filing date for motions in limine.  Directi has included relevant pages.

receivership, any reference to exactly that motion?  Mr. Bernstein did so request, as the docket

sheet and his testimony make clear:

> A.    "Ron started complaining that the contracts were not valid because of the
> subject–to provisions.  And so I felt like if he was going to make an issue
> of it I'd go to court and get the contracts confirmed.  There wasn't any
> problem with it.
>
> Q.    Did the court actually decide that motion ever on a substantive basis as
> you say?
>
> A.    No, it never came up."  (Bernstein (Exh. 2) p. 35, *see also,* docket sheet,
> contained in Exh. 3.)

The contracts are valid on their face and have been affirmed by the only parties to the

contract in sworn testimony.  It is Dodora's burden to prove they are invalid.  Dodora simply

failed to do so and cannot do so.  The very order that Dodora's lawyers drafted, and to which

Dodora agreed, makes clear that the Texas court did not decide the contracts were invalid or

beyond the receiver's authority.

In fact, the Texas court entered an order, in January 2004, appointing Mr. Bernstein the

receiver "with the power and authority to take possession of all non-exempt property, real and

personal, of Defendant [Dodora], including, but not limited to:  . . . (6) all cash; . . . (8) causes of

action or choses of action; (9) contract rights, whether present or future; and (10) accounts

receivable; and that all such property shall be held in custia legis of said receiver as of the date of

this Order."  (Exh. 4, p. 2.)   That order also expressly provided Mr. Bernstein with the

"following rights, authority and powers with respect to the Defendant's property; . . . (9) the

right, power, and authority to hire any person or company necessary to accomplish any right or

power under this Order."  (*Id.* p. 3.  *See  also,* Bernstein (Exh. 2) pp. 11-13.)

The Texas Court subsequently specifically found that Mr. Bernstein "is vested with

possession and control of Dodora's log-in credentials under its Registry-Registrar Agreement

with VeriSign." (Exh. 5.  *See also,* Bernstein (Exh. 2) pp. 20-22.)  Mr. Bernstein then provided those credentials to Directi, after they signed the agreements.  (Bernstein (Exh. 2) p. 34.)   There is no basis to assume anything other than that if the court had decided the motion that Mr. Bernstein brought (which, according to the docket sheet, Dodora never even opposed), it would have approved the contracts.

It is impossible to read an order expressly ***approving*** "all actions" of the receiver "in all respects" as somehow not approving his actions in hiring Directi.  Any ambiguity in this order, and it is hard to see how there could be any with that all-encompassing language, must be construed against Dodora, not Directi.  Dodora helped draft and expressly agreed to the order; Directi had nothing whatsoever to do with it.  The fact that the Texas court did not substantively address the receiver's motion regarding the contracts is both indisputable and quite easily explained:  it was not necessary, as the word "moot" makes clear.  (Bernstein (Exh. 2) pp. 45-46.)  That is quite different, though, than deciding substantively that the contracts should not be approved.

It would indeed be inequitable to invalidate two contracts under which Directi performed services for six months, based on the wording of an order that Dodora drafted and agreed to, but with respect to which Directi had no opportunity to object.  Quite frankly, Dodora was trying, in December 2004, to orchestrate the false and misleading arguments it raises now against Directi, by convincing the receiver, after threats of a lawsuit against him, to agree to this language.  Whether under quantum merit, equitable or other principles, Dodora's position would work a grave injustice on Directi.

Respectfully submitted,

DIRECT INFORMATION PVT. LTD.,

4

By its attorneys,

s/Dustin F. Hecker

_____
Dustin F. Hecker, Esq., BBO# 549171
Nancy J. Puleo, Esq., BBO 648457
POSTERNAK BLANKSTEIN & LUND LLP
The Prudential Tower
800 Boylston Street
Boston, MA  02199
(617-973-6100)

Dated: June 5, 2005

## CERTIFICATE OF SERVICE

I, Dustin F. Hecker, hereby certify that on this 5th day of June, 2005, I caused a copy of the foregoing to be served pursuant to the Court's cm/ecf system and by electronic mail, to: David Baker, Esq., 105 Union Wharf, Boston, Massachusetts 02109.

s/Dustin F. Hecker

_____
Dustin F. Hecker

Dodora Unified
vs.
Direct Information, et al.

Deposition of Ronald Garraud

Volume II

April 14, 2005
pp 205-329

**Jones Reporting**
COMPANY

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Exh. 1

Ronald Garraud

Page 306

1   involved?
2       A. Do they have any business to be there?
3           MR. BAKER: Just --
4       A. Probably no.
5           MR. BAKER: Don't be argumentative.
6   Answer yes or no if you can.
7           THE WITNESS: No.
8       Q. They were not involved.
9           MR. HECKER: Mark this as the next
10  exhibit, an agreed order closing receivership.
11          (Marked, Exhibit 21, agreed order
12  closing receivership.)
13          MR. HECKER: Exhibit 22 is an agreed
14  order of dismissal; Exhibit 23 is a release of
15  judgment lien; and Exhibit 24 is an agreed order of
16  dismissal.
17          (Marked, Exhibit 22, agreed order of
18  dismissal.)
19          (Marked, Exhibit 23, release of judgment
20  lien.)
21          (Marked, Exhibit 24, agreed order of
22  dismissal.)
23      Q. And tell me whether or not you recognize
24  these documents as documents that were prepared in

Page 307

1   connection with the settlement with Compana and Mr.
2   Bernstein.
3       A. Yes. I mean, that's what followed this, you
4   know, proposed settlement. They go and, you know,
5   rewrite it to language and then they propose it to
6   the court to sign.
7       Q. And so for a period of almost two weeks
8   Mr. Bernstein, your lawyers, and Compana's lawyers
9   were drafting documents which were going to be filed
10  in court to resolve the litigation in receivership?
11      A. Yes.
12      Q. And these constitute at least some of the
13  documents that were filed in court, correct?
14      A. Yeah. That's the one there.
15      Q. And these are documents your lawyers were
16  involved in drafting, right?
17      A. That's correct.
18      Q. Did you review them before they were filed in
19  court?
20      A. No, I don't think I reviewed them.
21      Q. But Dodora's lawyers were, in fact,
22  authorized to negotiate these and submit them to the
23  court, correct?
24      A. Yes, because we got the actual -- if I

Page 308

1   remember, yes, they discussed -- Randy and Nick
2   discussed the language of the order.
3       Q. You had lawyers in Massachusetts, being
4   Todd & Weld, and lawyers in Texas, being Mr. Shaffer
5   and his firm?
6       A. Working together.
7       Q. They were working together to prepare these
8   documents for you?
9       A. Yes.
10      Q. Look at whatever the exhibit is that is the
11  agreed order closing receivership. Is that 21?
12      A. Yes.
13      Q. Look at the third paragraph, which reads,
14  "Ordered: That all actions taken by the receiver
15  during the pendency of the receivership are approved
16  in all respects."
17      A. Yes.
18      Q. Is that language that your lawyers were
19  authorized to agree to on your behalf?
20      A. Yes.
21      Q. And Mr. Shaffer, the attorney for Dodora, did
22  sign this document, correct?
23      A. That's correct.
24      Q. And the second paragraph reads, "Ordered:

Page 309

1   That the receiver's motion to approve contracts is
2   hereby denied as moot."
3       A. That's correct.
4       Q. Is that, in fact, the same language that
5   appeared in Exhibit 20, the settlement agreement
6   that was signed at the mediation?
7       A. Yup, that's correct.
8       Q. And again, your lawyers were authorized to
9   agree to that language in the agreed order closing
10  receivership?
11      A. That's correct. We asked them to put that
12  in.
13      Q. What do you understand the word "moot" means?
14      A. That means there was never a legal -- I know
15  what "moot" means. They will never have legal final
16  decision.
17      Q. Do you know that the word "moot" means, in
18  essence, academic?
19      A. Yes, I do.
20      Q. Just quickly, if you could take a look at
21  maybe the last two, the two different forms of
22  agreed order of dismissal.
23      A. Right.
24      Q. One of them, the one-page document contains

1    UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
2         EASTERN DIVISION

3    _____)
                                     )
     DODORA UNIFIED COMMUNICATIONS,  )
4    INC.,                           )
               Plaintiff,            )
5                                    )  Civil Action No.
         v.                          )  05-10016-NMG
6                                    )
     DIRECT INFORMATION PVT.LTD.,    )
7    LOGICBOXES, WEBHOSTING INFO,    )
     TRANSECUTE (I) PVT.LTD.,        )
8    RESELLERS, INC., AND            )
     ANSWERABLE, INC., COLLECTIVELY  )
9    d/b/a "DIRECTI.COM"             )
               Defendants.           )
10   _____)

11

12              ***********************
                  ORAL DEPOSITION OF
13                  MIKE BERNSTEIN
                    MAY 26, 2005
14              ***********************
                     **DUPLICATE**
15                   **ORIGINAL**

16

17       ORAL of MIKE BERNSTEIN, produced as a witness at

18   the instance of the Defendants, and duly sworn, was

19   taken in the above-styled and numbered cause on the

20   26th of May, 2005, from 4:17 p.m. to 5:35 p.m., before

21   Donna L. Collins, CSR in and for the State of Texas,

22   reported by machine shorthand, at the offices of The

23   Blenden Law Firm, 2217 Harwood Road, Hurst, Texas,

24   pursuant to the Federal Rules of Civil Procedure and

25   the provisions stated on the record.

Exh. 2

*Mike Bernstein - 05/26/2005*

```
 1   through MB 0007.  If you did not get those documents in

 2   a Federal Express package, I'd like -- these are the

 3   documents that you produced and, hopefully, you have a

 4   copy of them.

 5       A.   What's the date on the letter?

 6       Q.   February 2, 2004, is the letter from you to

 7   Dodora enclosing a copy of the order appointing you

 8   corporate receiver.

 9            MR. BLENDEN:  I'm not seeing it in the

10   Federal Express package.

11            THE WITNESS:  Here's what I faxed over.

12       A.   Okay, February 2nd letter to Mr. Garraud and

13   Dodora?

14       Q.   Correct.

15       A.   Okay.

16       Q.   That needs to be marked as the first exhibit.

17            (Exhibit 1 marked.)

18            MR. BLENDEN:  Okay, it's been marked.

19            MR. HECKER:  Okay.

20       Q.   Mr. Bernstein, I'd like you to take a look at

21   what's been marked Exhibit 1, February 2, 2004, letter

22   from you to Dodora with an attached order.

23       A.   Yes, sir.

24       Q.   That is your signature on that letter, I take

25   it?
```

04:28PM — 5
04:29PM — 10
04:30PM — 20
04:30PM — 25

1    A.    Yes.

2    Q.    And this is a letter you sent to Mr.

3    Garraud -- that's G-A-R-R-A-U-D -- of Dodora?

4    A.    Yes.  The letter says Dodora Garraud.  I

04:30PM  5    believe there was an initial -- a little bit of

6    confusion as to what the respondent's name was.  So the

7    top of that letter is addressed to Dodora Garraud.

8    Q.    But you understood Mr. Garraud was the

9    principal or president of Dodora; is that correct?

04:31PM  10    A.    Correct.  And he's named as the respondent in

11    the order appointing receiver.

12    Q.    Okay.  And in the order that you attached, the

13    order that the Texas court entered appointing you

14    receiver?

04:31PM  15    A.    Yes.

16    Q.    And is it the order which generally lays out

17    your authorization to act as a receiver?

18    A.    That's correct.

19    Q.    Were you, as you understood it, under this

04:31PM  20    order entitled to obtain or try to find and levy on

21    assets of Dodora?

22    A.    Yes.

23    Q.    Did you understand you had, under this order,

24    and the powers given you as the receiver the authority

04:31PM  25    to enter into agreements which would assist you in your

*Mike Bernstein - 05/26/2005*

1    activities as a receiver?

2         A.    That's correct.  Under this order I get all of

3    the defendant's contract rights and all its rights to

4    all of its nonexempt assets.  Being it's a corporation

04:32PM  5    it would have no nonexempt assets.  So all its assets

6    would come into the receivership.

7         Q.    Okay.  So you understood under this order you

8    had the ability to, in essence, step into Dodora's

9    shoes with respect to contract rights Dodora actually

04:32PM  10   possessed; is that correct?

11        A.    Yes.  And rights to handle its property.

12        Q.    Okay.  And, in addition, did you understand

13   you had the authority to enter into agreements with

14   third parties that might be necessary to assist you in

04:32PM  15   collecting assets of Dodora to satisfy the judgment in

16   favor of Compana?

17        A.    Yes, sir.  Item 9 at the bottom of the second

18   page of the order gives the receiver the right, power,

19   and authority to hire any person or company necessary

04:32PM  20   to accomplish any right or power under this order.

21        Q.    Okay.  In January or February of 2004, I take

22   it you did make some attempt to attach a bank account

23   or bank accounts of Dodora, correct?

24        A.    Yes.  We served a levy on Citizens Bank in

04:33PM  25   Lynn, Massachusetts.

1    fine.  We don't see anything here.

2         A.    Just give me a second.  I'm sorry to hold you

3    up.

4         Q.    That's okay.  We'll move on.

04:43PM  5         A.    Hold on.  I found it.  I guess I did do it on

6    January 28th.  I apologize.

7         Q.    That's okay.  No problem.

8              Did you subsequently request an order

9    from the court that more specifically addressed your

04:44PM 10    right to obtain Dodora's log-in credentials, in other

11    words, agreements with either ICANN or VeriSign?

12         A.    Yes.  We ended up getting an order -- a kind

13    of order to compel.

14         Q.    And why was it that you found it necessary to

04:44PM 15    obtain that order from the Texas court?

16         A.    I wasn't getting any real response from ICANN,

17    and I don't think VeriSign was going to do anything

18    without an order.  Either way, it seemed like the thing

19    to do to get one.  And then once we served that on

04:44PM 20    VeriSign, then they did turn over the log-in

21    credentials to me.

22         Q.    Okay.

23              MR. HECKER:  And if I could ask the court

24    reporter to please mark as the next exhibit, I believe

04:44PM 25    Number 2, one of the documents that Mr. Bernstein

1  produced.  It's a March 19, 2004, letter from him to

2  VeriSign attaching a two-page order from the Texas

3  court.

4           (Exhibit 2 marked.)

04:45PM  5      A.    Dusty, this is a four-page document, March

6  19th to VeriSign marked as Exhibit 2.  VeriSign and

7  Chris Sheridan, two-page letter and a two-page order.

8      Q.    That's correct.

9               And Exhibit 2 letter you sent to

04:46PM  10  VeriSign, Mr. Bernstein?

11      A.    Yes.

12      Q.    And it attaches an order from Judge Greenberg

13  dated March 19, 2004?

14      A.    Yes.

04:46PM  15      Q.    And is this the order that you referenced a

16  minute ago requiring VeriSign and ICANN to comply with

17  your request to turn over Dodora's log-in credentials?

18      A.    Yes.

19      Q.    And, in fact, you quote from that order in the

04:46PM  20  first page of that exhibit, don't you?

21      A.    Yes.

22      Q.    What happened with respect to Dodora's log-in

23  credentials after you sent this letter to VeriSign?

24      A.    I didn't get the credentials right away.

04:46PM  25  There was some back and forth between me and VeriSign.

1    But eventually they changed Dodora's log-ins and gave

2    me new ones.  And that had the effect of pretty much

3    bringing Dodora's Internet traffic to a stop.

4         Q.   How did you know that?

04:47PM  5         A.   Well, I knew that it would.  And I imagine Ron

6    started calling me.

7         Q.   Okay.  Is this the case that you started

8    having some conversations with Mr. Garraud after you

9    succeeded in having VeriSign change the log-in

04:47PM 10    credentials such that Dodora could no longer log in to

11    the VeriSign system?

12         A.   I think that's right.

13         Q.   And did he describe to you at all the effects

14    that that was having or he expected would have on his

04:47PM 15    business?

16         A.   Yes, but really that's not much different than

17    any creditor seizing the money of the bank or the

18    constable going out and grabbing the assets.  It's

19    going to have an effect on the business, but that's

04:48PM 20    part of the nature of the beast.

21         Q.   Right.  Once you obtained control over

22    Dodora's log-in credentials to VeriSign, what did you

23    do to try to use that control to generate revenues to

24    satisfy the default judgment in favor of Compana?

04:48PM 25         A.   We -- I had been negotiating with a company

1     Q.   And did you understand that it was -- let me

2   back up for a second.  Did you request that these

3   contracts be subject to court approval in any way?

4     A.   Yes, I did.

05:03PM  5     Q.   Why was that?

6     A.   Well, two reasons.  One, Directi was insisting

7   on a venue clause in India, and we tried to negotiate

8   that out but they wouldn't do it.  And, two, as

9   knowledgeable as Directi sounded and they really did

05:04PM 10   impress me, but as knowledgeable as they sounded, you

11   know, to be truthful, I didn't know them.  So I felt

12   like I needed to retain some sort of control should

13   something go wrong, should Directi not perform as

14   they're supposed to perform.  So I made it subject to

05:04PM 15   the court's approval, meaning if I didn't like what was

16   going on after the fact, I could go back to the court,

17   ask for approval.  And if the court didn't approve it,

18   then we'd be out of the contract.

19     Q.   And, to your knowledge, that was acceptable to

05:04PM 20   Directi; is that correct?

21     A.   Yes.

22     Q.   Did you have any understanding, at the time

23   you entered into this agreement, that court approval

24   was necessary before the contract literally could come

05:04PM 25   into effect in any way?

*Mike Bernstein - 05/26/2005*

34

1      A.    No.    That's not accurate.    I had every right

2   to enter into the contracts.    Just like a receiver has

3   the right to call up a locksmith and say, hey, come

4   lock the warehouse where the property is without having

05:05PM   5   to go to court first and saying do I have permission to

6   hire a locksmith.    It's in the order.    And I believe I

7   read that out earlier.    I have the power to contract

8   with whoever I need to do whatever I need to do to do

9   my duties under the order.

05:05PM   10      Q.    Did Directi begin performing services under

11   those agreements at some point after June 15, 2004?

12      A.    Yes, they started doing the technical work on

13   their end.    And it was a couple days before everything

14   was up and running, but yes.

05:05PM   15      Q.    To your knowledge, did Directi undertake any

16   activities with respect to Dodora's domain name

17   business or batch pool connections before the contracts

18   were actually executed?

19      A.    No.    They wouldn't have been able to until I

05:05PM   20   sent them the passwords.

21      Q.    And when was it that you sent them the

22   passwords?

23      A.    It would have been shortly after the

24   agreements were signed.

05:06PM   25      Q.    Did you, at any point, request or make a

*Mike Bernstein - 05/26/2005*

1    motion to the court that informally approved the

2    contracts?

3        A.    Yes, I think it was second half of the summer.

4        Q.    And why was it that you decided to do that?

05:06PM    5        A.    Ron -- I believe that Ron started complaining

6    that the contracts were not valid because of the

7    subject-to provisions.  And so I felt like if he was

8    going to make an issue of it I'd go to the court and

9    get the contracts confirmed.  There wasn't any problem

05:06PM    10    with it.

11        Q.    Did the court actually decide that motion ever

12    on a substantive basis as you say?

13        A.    No, it never came up.

14        Q.    Backing up just a little bit, did you ever --

05:07PM    15    have you ever heard of a business called WLS Registry

16    or Registrar?

17        A.    Yes.  I believe that's another Dodora company

18    or another of Ron Garraud's companies.

19        Q.    Did a company ever -- did you ever do anything

05:07PM    20    with respect to that company in connection with the

21    receivership?

22        A.    Ron had mentioned that that company -- that

23    the website to that company was being controlled by

24    Directi, and I communicated with Directi and told them

05:07PM    25    that -- you know, that that wasn't part of the

1    A.    Yes.

2    Q.    And Exhibit 19, the copy I have is not

3    executed, but it is a fully typewritten document with

4    no handwriting on it; is that correct?

05:16PM    5    A.    Yes.

6    Q.    And is it your best belief that Exhibit 19 was

7    eventually signed by Dodora, Compana, and yourself?

8    A.    Yes.

9    Q.    Now, as a result of the settlement, was the

05:17PM    10    receivership closed up and the case terminated?

11    A.    Yes.

12    Q.    Were there documents that had to be prepared

13    to be filed in court to accomplish that?

14    A.    There was an order discharging -- an agreed

05:17PM    15    order closing receivership.  There was an agreed order

16    of dismissal and I believe a release of judgment lien.

17    Q.    Okay.  If you could take a look at, I guess,

18    four different documents that were marked in Mr.

19    Garraud's deposition as Exhibits 21, 22, 23, and 24 and

05:17PM    20    tell me when you have those in front of you?

21    A.    Yes.

22    Q.    Well, first of all, can you identify these as

23    documents which were prepared in connection with the

24    dismissal of the case or cases involving the

05:17PM    25    receivership in Texas?

*Mike Bernstein - 05/26/2005*

1      A.    Before we do that, it looks like 22 and 24 may

2  be the same thing.

3      Q.    No, I actually had that question.

4      A.    22 looks like it has the signature pages, the

05:18PM  5  agreed signature pages on it.  And 24 looks like it's

6  simply the page with the judge's signature.

.7      Q.    There's a different case number between 22 and

8  24; is that correct?

9      A.    Oh, yes, that's correct.

05:18PM  10     Q.    And is it -- wasn't it the case that Dodora

11  commenced a related litigation in the Texas courts in

12  an effort to overturn the default judgment at some

13  point?

14     A.    That is correct.

05:18PM  15     Q.    Okay.  Then with that sort of caveat, do you

16  recognize these documents which were filed in

17  connection with the dismissal of the two cases that

18  deal with the Compana and Dodora litigation in Texas?

19     A.    Yes.

05:19PM  20     Q.    Were these documents that, to your

21  understanding, were circulated among the lawyers for

22  Compana and Dodora as well as you?

23     A.    Yes.

24     Q.    And if you could take a look at Exhibit 21.

05:19PM  25  And it says Agreed Order Closing Receivership.  Do you

1    see that?

2        A.    Yes.

3        Q.    To your knowledge, is this a document that

4    Dodora's lawyers assisted in drafting and signed off

05:19PM    5    on?

6        A.    Yes.

7        Q.    In fact, is there a signature for a Randal

8    Shaffer attorney for Dodora Unified Communications on

9    Exhibit 21?

05:19PM   10        A.    Yes.

11        Q.    Did you understand Mr. Shaffer to be the

12    attorney for Dodora?

13        A.    Yes.

14        Q.    And as far as you know this document -- this

05:19PM   15    Agreed Order Enclosing Receivership was, in fact, filed

16    in the Texas courts?

17        A.    Yes.

18        Q.    And do you recognize the signature of the

19    judge presiding in the case?

05:20PM   20        A.    That looks like his stamp.

21        Q.    And what is his name?

22        A.    Mark Greenberg.

23        Q.    Okay.  I'd just quickly go over -- I'd like to

24    quickly go over a couple of points in this order.  I'd

05:20PM   25    like to read the first paragraph, and just tell me

1    please if I've read it correctly.  "It is ordered that

2    this receivership be and the same hereby is terminated;

3    and that the receiver be, and he is released and

4    discharged from all obligations under his bond and

05:20PM  5    under this receivership."  Did I read that correctly?

6        A.    Yes, sir.

7        Q.    So is it fair to say that this is, you know, a

8    reflection that the case in Texas is over and your

9    duties as receiver were officially discharged?

05:20PM  10       A.    Correct.

11       Q.    Okay.  The next portion of this order

12   reads "Ordered that the Receiver's Motion to Approve

13   Contracts is hereby denied as moot."  Did I read that

14   correctly?

05:20PM  15       A.    Yes.

16       Q.    What did you understand the words "denied as

17   moot" to mean?

18       A.    It means there was no sense -- there was no

19   reason for the judge to hear it.  It didn't need to be

05:21PM  20   heard.

21       Q.    Why was it that it did not need to be heard?

22       A.    Because we had a settlement.

23       Q.    Okay.  And, as a result, there was no

24   particular reason for the court to have to decide one

05:21PM  25   way or the other whether the contract should be

1  approved; is that correct?

2      A.   Right.  I had filed the motion.  So the motion

3  was what we call a live pleading.  It was there in the

4  court waiting to be dealt with.  And so we had to deal

05:21PM  5  with it and it didn't need to be dealt with anymore.

6      Q.   The next sentence says "Ordered that all" --

7  I'm sorry -- "Ordered that all actions taken by the

8  receiver during the pendency of the receivership are

9  approved in all respects."  Do you see that?

05:21PM  10      A.   Yes.

11      Q.   Did you consider your entering into the

12  agreements with Directi to be actions that you had

13  taken during the pendency of the receivership?

14      A.   Certainly.

05:22PM  15      Q.   And this is language that Dodora's lawyers

16  agreed to, correct?

17      A.   Yes.

18      Q.   And the date of this order is December 13; is

19  that correct?

05:22PM  20      A.   2004.

21      Q.   Had you informed Mr. Turakhia before December

22  13 that a settlement either was in the works or had

23  occurred?

24      A.   As soon as we had the settlement, I sent him

05:22PM  25  an e-mail, I believe.  And I think that I had let him



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

|  |  |
|---|---|
| DODORA UNIFIED COMMUNICATIONS, INC., <br>      Plaintiff, <br><br>    v. <br><br> DIRECT INFORMATION PVT. LTD., LOGICBOXES, WEBHOSTING. INFO., TRANSECUTE (I) PVT. LTD., RESELLERSRS, INC., AND ANSWERABLE, INC., COLLECTIVELY d/b/a "DIRECTI.COM" <br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
05-10016-NMG

## REQUEST FOR ADMISSIONS

  Pursuant to Fed. R. Civ. Pro. 36, the defendant, Direct Information Pvt. Ltd. ("Directi"), requests that the plaintiff, Dodora Unified Communications, Inc. ("Dodora"), admit the truth of the following matters within thirty days (30) of service of these requests.

## DEFINITIONS

  The following definitions apply to these requests for admissions.

1.  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

2.  The terms "plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

3.  The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

ID # 429733v01/14386-2/ 04.29.2005



4. The term "Dodora" shall mean the plaintiff, Dodora Unified Communications, Inc., and any division, unit, subsidiary, affiliate or parent corporation thereof or predecessor or successor thereto, and all of its employees, representatives and agents.

5. The term "Directi" shall refer to the defendant, Direct Information PVT., Ltd., and any division, unit, subsidiary, affiliate or parent corporation thereof or predecessor or successor thereto, and all of its employees, representatives and agents.

REQUESTS

Request to Admit No. 1

Prior to March 2003, Dodora had a business relationship with Compana, LLC.

Request to Admit No. 2

In March 2003, Compana commenced a lawsuit in the Texas state courts against Dodora. A true and correct copy of the complaint and the docket sheet in the Compana case are attached hereto.

Request to Admit No. 3

Dodora's business address, as of March 2003, was the home of Mr. Ron Garraud. Compana delivered a copy of the summonses and complaint to an individual at Mr. Garraud's home. That happened before June 4, 2003.

Request to Admit No. 4

Dodora did not take any action in the Texas court concerning the litigation until some point in January 2004.

Request to Admit No. 5

The Texas court appointed Michael Bernstein as a receiver for Compana in January 2004. Dodora, through Mr. Garraud, was aware of his appointment shortly after it occurred.

Request to Admit No. 6

Dodora, through Mr. Garraud, understood that the receiver had been appointed to attempt to find assets to use to satisfy the $100,000 default judgment that had been entered against Dodora. The receiver, by early June 2004, had changed Dodora's log-in credentials with VeriSign and other top level domain registries. Mr. Bernstein's actions deprived Dodora of the ability to manage its domain name registrar business.

2

Request to Admit No. 7

Dodora attempted to stop the receiver's actions through a temporary restraining order action filed in the Texas state courts in early June 2004. The Texas court denied Dodora's request for a temporary restraining order on June 4, 2004.

Request to Admit No. 8

Mr. Bernstein entered into two agreements with Directi on June 15, 2004. Directi managed Dodora's domain name registration business from shortly after entering into the agreements with Mr. Bernstein to early December 2004, when Dodora, Compana and Mr. Bernstein reached a settlement.

Request to Admit No. 9

Acting on behalf of and under contract to Mr. Bernstein, Directi arranged with Pool.com to monitize Dodora's batch pool connections.

Request to Admit No. 10

Dodora and Directi are "registrars" of domain names. Every registrar registers domain names by connecting to a "registry" for different "top level domains," or "TLDs."

Request to Admit No. 11

The TLDs are required to report, to the Internet Corporation for Assigned Names ("ICANN"), on a periodic basis, the number of domain names that are registered through each accredited registrar. ICANN publishes reports, available on its website, showing the sum total of domain names under management of a registrar for particular periods. Registrars such as Dodora are required to provide information about the number of domain names registered through them in such a way that ICANN can assemble the information about total domain name registrations.

Request to Admit No. 12

According to the information available publicly from ICANN, in or about June 2004, Dodora had no more than about 18,000 domain names under management. According to publicly available information from ICANN, as of June 2004, Dodora did not have as many as 60,000 domain names under management.

Request to Admit No. 13

Between June 15, 2004 and December 13, 2004, Directi never had information about or access to more than approximately 18,250 domain names registered to Dodora. In December 2004, Dodora reacquired all contacts with the customers for and management over 11,746 of those

3

domain names. Directi subsequently transmitted to Dodora information about all other domain names managed by Directi under contract with Mr. Bernstein from about June 15, 2004 to early December 2004.

Request to Admit No. 14

Customers for about 1850 domain names managed by Directi pursuant to Directi's agreements with Mr. Bernstein allowed their domain names to expire. Customers for approximately 2906 domain names managed by Directi pursuant to its agreements with Mr. Bernstein transferred their names to registrars other than Directi. If a customer chooses to take its business elsewhere at any time, a registrar is prevented from blocking them from doing so.

Request to Admit No. 15

Customers for no more than about 1786 domain names registered through Dodora transferred their domain name registrations to Directi during the period June 15, 2004 through mid December 2004.

Request to Admit No. 16

Dodora charged its customers about $6.69 per domain name per year. Of that amount, Dodora was required to pay to VeriSign a fee of $6.00 per domain name. Dodora also was required to pay to ICANN a fee of $.25 per domain name per year. Dodora's gross profit, per domain name registered through it, was about $.45 per domain name per year.

Request to Admit No. 17

For the period between June 15, 2004 and December 1, 2004, Pool.com transferred $4,924.03 to Mr. Bernstein and $43,517.33 to Directi with respect to the Dodora batch pool connections. Directi received, in or about January 2005, an additional $3,115.64 from Pool.com. Pool.com's payments during the period from June 15, 2004 to early December 2004, with respect to the Dodora batch pool connections, totaled $51,557.00. Of this amount, Directi retained $12,130.25, after a payment of $2,566.42 it made to Dodora in or about January 2005 after receipt of a payment from Pool.com in January, 2005.

Request to Admit No. 18

Mr. Bernstein, the receiver in Texas, or VeriSign, received the balance of the money paid by Pool.com with respect to the Dodora batch pool connections.

DIRECT INFORMATION PVT. LTD.,

By its attorneys,

4

Dustin F. Hecker, Esq., BBO# 549171
Nancy J. Puleo, Esq., BBO 648457
POSTERNAK BLANKSTEIN & LUND LLP
The Prudential Tower
800 Boylston Street
Boston, MA 02199
(617-973-6100)

Dated: April 25, 2005

## CERTIFICATE OF SERVICE

I, Dustin F. Hecker, hereby certify that on this 25 day of April, 2005, I caused a copy of the foregoing to be served by ~~mail,~~ hand to: David Baker, Esq., 105 Union Wharf, Boston, Massachusetts 02109.

Dustin F. Hecker

5



CAUSE NO. 03-31820-E

| | | |
|---|---|---|
| COMPANA, L.L.C., | § | IN THE COUNTY COURT |
| **Plaintiff,** | § | |
| | § | |
| v. | § | AT LAW NO. __5__ |
| | § | |
| DODORA UNIFIED | § | |
| COMMINICATIONS, INC., | § | |
| **Defendant.** | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

COMES NOW Compana, L.L.C., Plaintiff, and files this *Original Petition* complaining of Dodora Unified Communications, Inc., Defendant, and in support hereof would respectfully show the Court:

### I.

### DISCOVERY CONTROL PLAN

1. Discovery is to be conducted under Level II of TEX. R. CIV. P. 190.

### II.

### PARTIES

2. Plaintiff is a Nevada limited liability company.

3. Defendant is a foreign corporation doing business in Texas and does not maintain a place of regular business in this State. Further, Defendant does not maintain an agent for service of process in this State. Service may be had upon Defendant by serving the Texas Secretary of State pursuant to TEX. CIV. PRAC. & REM. CODE § 17.044.

## III.

## JURISDICTION AND VENUE

4.  This court has subject matter jurisdiction over this cause because the amount in controversy in this case exceeds the minimum jurisdictional limits of this court. Venue is proper in Dallas County pursuant to TEX. CIV. PRAC. & REM. CODE §15.0002, and pursuant to the terms of the contract.

## IV.

## FACTUAL BACKGROUND

5.  Plaintiff is in the business of utilizing proprietary software developed for registering internet domain names immediately upon their expiration of registration and re-release into a pool of general availability. The names registered are known as "newly deleted domain names". Defendant is an ICANN accredited registrar, meaning it has the right to acquire top level domain names (.com, .net, and .org) and resell them to the general public.

6.  On November 12, 2002, Plaintiff and Defendant entered into a domain name registration agreement for newly deleted domain names. The agreement set forth the following points:

    a.  Defendant agreed to provide Plaintiff access to its network to install Plaintiff's software and submit domain lists;

    b.  The agreement specifically prohibited Defendant from inhibiting Plaintiff's access to execute Plaintiff's software, upload domain lists, and update "whois" information;

    c.  The agreement specifically prohibited Defendant from letting a third party use programming or scripted means to register newly deleted domain names;

    d.  All software and scripts of Plaintiff remained the exclusive property of Plaintiff and were designated as Plaintiff's proprietary information; and

c.     Plaintiff agreed to deposit funds with Defendant from which $35 was to be deducted for each name registered with Defendant.

7.     Immediately following the execution of the agreement Plaintiff deposited sufficient funds for Defendant to commence performance. Immediately upon acquiring Plaintiff's software, Defendant knowingly and willfully cut off all access of Plaintiff to Defendant's system. Shortly thereafter, Defendant repudiated its agreement with Plaintiff in conscious disregard of Plaintiff's rights under the agreement. Although demand for performance has been made, Defendant failed and refused to perform or otherwise abide by the contract. As a result, Plaintiff has been damaged.

## V.
## BREACH OF WARRANTY

8.     Plaintiff incorporates the preceding paragraphs by reference herein.

9.     The language set forth in the agreement, as well as the actions of Plaintiff surrounding the creation of the agreement, create an express warranty that Defendant would allow Plaintiff to run its software, and would refrain from registering newly deleted domain names during the term of its agreement. Plaintiff requests the court assess damages in an amount to be determined by the trier of fact.

## VI.
## DECEPTIVE TRADE PRACTICES

10.     Plaintiff incorporates the preceding paragraphs by reference herein.

11.     Plaintiff was a consumer looking to purchase goods and services from Defendants. Defendant took advantage of Plaintiff in an unconscionable manner. Defendant has knowingly committed

---

actionable conduct under the DTPA, in violation of Plaintiff's rights, and Plaintiff seeks treble damages as provided by the Deceptive Trade Practices Act.

## VII.

### CONVERSION

12. Plaintiff incorporates the preceding paragraphs by reference herein.

13. Defendant has wrongfully exercised dominion and control over Plaintiff's software, which was contractually stipulated as proprietary intellectual property, in a manner inconsistent with Plaintiff's rights. Plaintiff has incurred damages resulting from Defendant's conversion, for which it seeks judgment in an amount to be determined by the trier of fact at trial.

## VIII.

### INJUNCTIVE RELIEF

14. Plaintiff incorporates the preceding paragraphs by reference.

15. Plaintiff is the owner of property or rights and business interests threatened with irreparable injury by the conduct of Defendant. Plaintiff's inability to newly deleted domain names, and the utilization of his software by competitors, will manifestly impact the market share in this emerging market with considerable revenue potential in the upcoming years. The injuries and losses are continuing and Plaintiff has no adequate remedy at law for the injuries just described.

16. In order to preserve the status quo and the property and rights of Plaintiff during the pendency of this action, Defendant should be cited to appear and show cause why it should not be temporarily enjoined, during the pendency of this action, from registering, or allowing to by registered, newly deleted domain names.

---

PLAINTIFF'S ORIGINAL PETITION        PAGE 4

17.   Jeff Baron's affidavit that proves the allegations in the application for injunctive relief are attached as Exhibit A and incorporated by reference herein.

## IX.

### SPECIFIC PERFORMANCE

18.   Plaintiff incorporates the preceding paragraphs by reference.

19.   Monetary damages for the violation of plaintiff's rights under the contract would be an inadequate remedy because of the nature of this recently emerging commercial enterprise. The only  adequate remedy for the violation of the Plaintiff's rights would be to compel Defendant to specifically perform the agreement between it and Plaintiff. Plaintiff has performed all terms, covenants, and conditions  under the contract so far as the conduct of Defendant has permitted. Plaintiff has always been, and now is, ready, willing, and able to commence registration of newly deleted domain names utilizing its software, and following the sixth registration, to prepay for estimated registrations to take place in the upcoming month, and plaintiff hereby offers to comply with and perform every requirement imposed on her by the agreement.

20.   Plaintiff requests the court order Defendant to specifically perform its obligations as set forth in the agreement made the basis of this suit.

## X.

### BREACH OF CONTRACT

21.   Plaintiff incorporates the preceding paragraphs by reference herein.

22.   In the alternative, if such be necessary, Plaintiff pleads paragraph 11 of the contract, wherein Plaintiff is entitled to recover $100,000.00 as liquidated damages.

23.   Defendant has failed and refused to provide Plaintiff access to their software. Defendant

has inhibited Plaintiff's ability to execute their software. Defendant has allowed third parties to use programming and scripted means to register newly deleted domain names. Defendant has begun registering newly deleted domain names. All of these acts and omissions violate their contractual obligations, and each constitute a material breach. The harm caused by Defendant's breach of the agreement as described herein was difficult if not impossible, at the time the contract was executed to ascertain or estimate. Businesses devoted to the internet exist in an ever changing and dynamic environment in which success is made or lost on inspiration and timing. As a result, the liquidated damages provision was agreed to to bring certainty to this issue. Defendant has failed or refused to perform its obligations and at a minimum Plaintiff is entitled to attorney's fees, expenses, court costs, and $100,000.00 in liquidated damages. invested

## XI.

## DECLARATORY JUDGMENT

24. Plaintiff incorporates the preceding paragraphs by reference.

25. There exist uncertainty and insecurity with respect to rights, status, and other legal relations. Plaintiff is equitably entitled to a speedy and effective method to determine the rights of parties in this controversy. The Declaratory Judgments Act provides that a party interested under a written contract may have the court determine any question of construction or validity arising under the instrument and obtain a declaration of rights, status, or other legal relations under it.

26. Plaintiff petitions the Court pursuant to the Declaratory Judgments Act, Chapter 37 of the Texas Civil Practice and Remedies Code, for construction of the contract made the basis

of this suit and a declaration Defendant it is sufficiently ambiguous as to be unenforceable and it is within the courts discretion to do so.

## XII.

### ATTORNEY'S FEES

27.    Plaintiff incorporates the preceding paragraphs by reference herein.

28.    Plaintiff has retained the firm of Jackson & Collins to represent it in this action and has agreed to pay the firm reasonable and necessary attorney's fees. Recovery of attorney's fees is provided for under the contract made the basis of this suit, as well as under the Deceptive Trade Practices Act and Declaratory Judgments Act.

### PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer and that, upon final trial of this case, Plaintiff recover from Defendant:

A.   Judgment for trebled damages resulting from Defendant's breach of warranty, unconscionable action, and conversion;

B.   An order enjoining and restraining Defendant during the pendency of this action from registering any newly deleted domain names, as well as selling, transferring, or disposing of Plaintiff's proprietary software or trade secrets;

C.   An order requiring Defendant to specifically perform its contractual obligations to Plaintiff;

D.   Liquidated damages in the amount of $100,000.00;

E.   A clarification of the contract made the basis of this suit be issued as a declaratory judgment;

F.   Attorney's fees, expenses, and court costs;

G.   Pre and post judgment interest at the highest rates allowed by law; and

H. Such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

BY:

Thomas P. Jackson
State Bar No. 10496600
Robert J Collins
State Bar No. 04618050
JACKSON & COLLINS
12655 North Central, Suite 812
Dallas, TX 75206
(972) 387 0007    (phone)
(972) 387 8707    (fax)

**ATTORNEYS FOR PLAINTIFF**

**ORDERS**

DATE.

6/03 Default Judgment
(m/o copies 6/10/03)                    103 0278-0279

NOTICE OF DEFAULT JUDGMENT MAILED

1/9/04 - m for receiver ex parte Granted
                                        106 0316 - 0319

3/19/04 m to require parties

6/4/04 to cooperate w/ receiver    107/1142-1143
       TRO denied

9-15-04 Order Granting Motion to
       Withdraw By Defendants Counsel
                                        110, 1250

10/22/04 bill review - no service on d, hearing
        did not go forward

10/26/04 - Mr. Blenden agrees to appear
       for company - - $8000 approved
       for receiver - preliminary hearing
       on bill of review set for 12/3/04 +
       trial on merits for 12/13/04

10/29/04 Mediation Order        111, 759

10/29/04 Order Approving 2nd Amended
       Receiver's 1st Interim Application
       for Authority to disburse funds
       and approval of Receiver's fees
                                        111, 760-761

2/13/04 Agreed Order of Dismissal
                                        112, 241-242

12/13/04 Agreed Order closing
       Receivership        112, 240

*John Michael Ami*

# JUDGE'S DOCKET.    COUNTY COURT AT LAW NO 5

on: TRO                Filing: 03-21-03        No. 03-03182-E

PARTIES
COMPANA LLC

*MARK BLENDEN* ATTORNEYS *0-4863*
JACKSON THOMAS P-    JURY FEE PAID
LAW OFFICE OF THOMAS P JACKSON
12655 NORTH CENTRIAL EXPW #812
DALLAS            TX 75243
972 387 0007  10496600

VS.
DODORA UNFIED COMMUNICATI

*Randal C. Shaffer 18085800*

5/28/03 Certificate of Last Known Address
6/4/03 Affidavit of Thomas P. Jackson

1/9/04 Motion for Receivership-Ex part

1/13/04 Oath of receiver
3/3/04 Receiver's Motion to Require Parties
to Comply with Receivership Order

8-26-04 Receiver's 1st Interim
Application for Authority to disburs
funds and Approval of Receivers f

9-9-04 motion to withdraw
by Defendant's Counsel.
10/20/04 and amended Receiver
1st interim application for au
thorization to disburse fund
and approval of receivers
frees

## SETTINGS

**Michael S. Bernstein**                                    Attorney and Counselor at Law, Receiver

1301 Northwest Highway Suite 204 Garland Texas 75041-5896 • (972) 271-2700 Office • (972) 271-1818 Fax

February 2, 2004

Dodora Garraud
Dodora Unified Communications, Inc.
14 Nicholson St.
Lynn MA  01905

RE:    Receivership in Cause No.  CC-03-3182-E in County Court at Law Number Five, Dallas
       County;  *Compana, LLC v. Dodora Unified Communications*

       My File No.  2148b

Dear Mr. Garraud and Dodora Unified Communications, Inc.:

I have been appointed as receiver in the above case.  Please be aware that all property of the
defendant corporation, including money in the bank accounts, is property of the receivership and
under the supervision and jurisdiction of the Court.  A copy of the receivership order is enclosed.
Please read it carefully and comply in all respects.

Please contact me immediately at 972 / 271-2700 to arrange a meeting.

Please do not ignore this letter and order, but discuss with your attorney the consequences for
failure to comply.

Please respond promptly.

Very truly yours,

Mike Bernstein, Receiver

enclosure:    Order

c:    Mark P. Blenden, Esq., via fax to 817 / 267-1992 (w/o attachment); your file No. 23028

*Exh. 4*

Δ/π EXHIBIT    1
Deponent *Bernstein*
*5-26-05*
Date_____ Rptr. *DC*
WWW.DEPOBOOK.COM





Cause No. CC-03-3182-E

COMPANA, LLC

VS.

DODORA UNIFIED COMMUNICATIONS

IN THE COUNTY COURT

AT LAW NUMBER FIVE OF

DALLAS COUNTY, T E X A S

## ORDER APPOINTING RECEIVER, CORPORATE DEFENDANT

CAME ON to be heard the Application for Turnover After Judgment of COMPANA, LLC, (herein "applicant"); whereupon, the Court, after a review of the papers herein on file, became of the opinion that a Receiver should be appointed to take possession of and sell the assets of DODORA UNIFIED COMMUNICATIONS, (herein "defendant"). Respondent refers to Dodora Garraud, an officer of DODORA UNIFIED COMMUNICATIONS.

IT IS THEREFORE, ORDERED, ADJUDGED, and DECREED by this Court that Michael Bernstein, whose address is 1215 Executive Drive West, #109, Richardson, TX 75081 (telephone: [972] 238-0777; fax [972] 238-1981), be, and he is hereby appointed Receiver in this case pursuant to the Texas Turnover Statute with the power and authority to take possession of all non-exempt property, real and personal, of Defendant, including, but not limited to: (1) all documents or records, including financial records, related to such property that is in the actual or constructive possession or control of the Defendant; (2) all financial accounts (bank accounts), certificates of deposit, money-market accounts, accounts held by any third party; (3) all securities; (4) all real property, equipment, vehicles, boats, and planes; (5) all safety deposit boxes or vaults; (6) all cash; (7) all negotiable instruments, including promissory notes, drafts, and checks; (8) causes of action or choses of action; (9) contract rights, whether present or future; and (10) accounts receivable; and that all such property shall be held in custodia legis of said receiver as of the date of this Order.

Respondent is hereby **ORDERED** to immediately turnover to the Receiver within five (5) days from Respondent's receipt of a copy of this Order the documents contained on **Exhibit "A"** attached hereto, together with all documents and financial records which may be requested by the Receiver.

mr

106 0316



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

PAGE 2

Respondent is hereby **ORDERED** to turnover to the above-named Receiver at the address stated above, within five (5) days of Respondent's receipt of a copy of this Order, all checks, cash, securities (stocks and bonds), promissory notes, documents of title, and contracts owned by or in the name of Defendant.

*Respondent is hereby* **ORDERED** *to continue* (until the Judgment in this cause is fully paid) to turnover to the Receiver at the Receiver's address all checks, cash, securities, promissory notes, documents of title, and contracts within three (3) days from Defendant's receipt and possession of such property, if, as and when Defendant becomes in receipt and possession of any such property.

The Receiver is hereby authorized to take all action necessary to gain access to all storage facilities, safety-deposit boxes, real property, and leased premises wherein any property of Defendant may be situated.

In addition to the powers of the Receiver set forth herein, the Receiver shall have the following rights, authority and powers with respect to the Defendant's property: (1) the right, authority, and power to collect all accounts receivable of Defendant; (2) the right, authority, and power to change locks to all premises at which any property is situated; (3) the right, authority, and power to open all mail directed to Defendant; (4) the right, authority, and power to endorse and cash all checks and negotiable instruments payable to Defendant; (5) the right, authority, and power to hire a real estate broker to sell any real property and mineral interest belonging to the Defendant; (6) the right, power and authority to hire any person or company to move and store the property of Defendant; (7) the right, authority, and power (but not the obligation) to insure any property belonging to the Defendant; (8) the right, power, and authority to obtain from any financial institution, bank, credit union, or savings and loan any financial records belonging to or pertaining to the Defendant; and (9) the right, power, and authority to hire any person or company necessary to accomplish any right or power under this Order.

mr

106 0317



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK S OFFICE

PAGE 3

Any Sheriff or Constable, and their deputies, are hereby directed and ordered to assist the Receiver in carrying out his duties and exercising his powers hereunder and prevent any person from interfering with the Receiver in taking control and possession of the property of Defendant. The Receiver is authorized to direct any Constable or Sheriff to seize and sell property under a Writ of Execution.

It is further, **ORDERED** that Respondent shall fully answer, within 30 days, post judgment interrogatories previously served and that Applicant have and recover of and against Defendant, Judgment in the additional sum of $750 as additional attorney fees for the presentation of this motion.

The Receiver is ordered to post bond in the amount of $100 payable to this Court and conditioned upon his faithful discharge of his duties in accordance with this Order. The Receiver's fee is taxed as costs against the Defendant. The Receiver is further ordered to take the oath of his office.

**It is further ORDERED** that the Receiver shall make no distribution to the Plaintiff without motion, notice to Defendant, and order of the court, unless Defendant signs a Rule 11 Agreement specifically allowing such distribution. The Receiver is ordered to hold all assets and funds pending either the further order of the court, to be made only with prior notice to Defendant, or Rule 11 Agreement signed by Defendant.

**SIGNED** this 9th day of January, 2004.

JUDGE PRESIDING

**APPROVED AS TO FORM:**
THE BLENDEN LAW FIRM

BY: _____
MARK P. BLENDEN
State Bar No. 02486300
PLAINTIFF'S ATTORNEY

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing instrument was forwarded by certified mail to respondent on January 9, 2004.


106 0318

_____
MARK P. BLENDEN

TRUE AND CORRECT
COPY OF ORIGINAL

23028FD
ds

Mark P. Blenden · David W. Roth
Metro (817) 318-7000 · FAX (817) 2
Toll Free (888) 799-3000 · FAX (888) 99-4000

E-mail: mark@b          nlawfirm.com
www.blende.          firm.com

THE BLENDEN LAW FIRM
P. O. B.      0326 · Dallas, Texas 75356-0326
2217 Ha      od Road · Bedford, Texas · 76021-3607

## EXHIBIT A TO RECEIVERSHIP ORDER
## DOCUMENTS TO BE TURNED OVER TO RECEIVER

Any and all records, as hereinafter described, relative to the period of 1992 through and including the present, concerning affairs of defendant

1.  canceled checks;
2.  bank statements;
3.  pass books;
4.  all other bank account records;
5.  federal income tax returns;
6.  state franchise tax returns;
7.  life insurance policies'
8.  original and duplicate of all motor vehicle Certificates of Title;
9.  stock certificates;
10. bonds;
11. stock broker confirmation slips of trades and monthly statements;
12. copies of all financial statements given to any bank or any other person, firm or corporation;
13. promissory notes;
14. bills of sale;
15. real property deeds and deeds of trust;
16. business journals, ledger accounts payable and receivable files;
17. pledges and security agreements and copies of financial    statements;
18. copies of state sales tax reports;
19. stock record book and minutes of the corporation;
20. any other record or document evidencing any ownership to real or personal property or to any debt owed or money had;
21. all personal property returns filed with any taxing authority, including but not limited to the Dallas Central Appraisal District;
22. all documents listing or summarizing property owned by defendant.

ds
23028
mr



TRUE AND CORRECT
COPY OF ORIGINAL
FILED IN DALLAS
COUNTY CLERK'S OFFICE

**Michael S. Bernstein, P.C.**                                                      Attorney at Law, Receiver

1301 Northwest Highway Suite 204 Garland Texas 75041-5896 • (972) 271-2700 Office • (972) 271-1818 Fax

March 19, 2004

Verisign, Inc.                              via fax to 703 / 450-7582
ATTN: Legal DEPARTMENT                      and via overnight delivery
21355 Ridgetop Circle
Dulles VA 20166                             faxing  10 pages, including this page.


Chris Sheridan                             via fax to  703 / 421-5828
Manager, Customer Support
Verisign
21355 Ridgetop Circle
Dulles VA 20166

RE:    Registrar DODORA UNIFIED COMMUNICATIONS, INC.

       Receivership in Cause No.  CC-03-3182-E in County Court at Law Number Five, Dallas
       County;  *Compana, LLC v. Dodora Unified Communications*

       Our File No.  2148b



Dear Mr. Sheridan and Verisign, Inc.

I am the duly appointed, qualified and acting receiver for the assets and contract rights of Dodora
Unified Comunications, Inc., hereinafter referred to as "Dodora".  A certified copy of the Order
Appointing Receiver, Corporate Defendant was mailed to Verisign on January 28, 2004.
Another copy is enclosed, via fax and overnight delivery.

As receiver, I hold and control all of Dodora's property and property rights, including their rights
under contracts with Verisign and Dodora's log-in credentials.  (See, generally, Order Appointing
Receiver, Corporate Defendant, also page 1, item 9 of the Order.)

Therefore, as holder of Dodora's contract rights and other property rights, I hereby take
possession and control of their rights, contracts and licenses with Verisign.  Enclosed via fax and
overnight delivery is a certified copy of the Court's Order Requiring Compliance With
Receivership Order.  The Order Requiring Compliance directs Verisign to recognize the
receiver's signature as controlling authority:

   **"The court finds that Receiver Michael S. Bernstein is vested with possession and
   control of Dodora's log-in credentials under its Registry-Registrar Agreement with
   Verisign.  VeriSign and ICANN are ordered to recognize Receiver's signature as
   controlling authority with regard to Dodora's Registry Registrar Agreement and
   Dodora's log-in credentials".**  (Order Requiring Compliance, page 2, top, emphasis
   added.)

*Exh. 5*

VeriSign Levy
March 19, 2004
Page 2.

Therefore, please IMMEDIATELY change Dodora's log in credentials and fax new log-in credentials to me at 972 / 271-1818 or via Email to msbpc@earthlink.net.

The receivership was effective as of the date of the Order Appointing Receiver, January 9, 2004. If Dodora has purported to transfer or assign its agreement with VeriSign to another entity, such a transfer is ineffective. Dodora would have had no power or authority to make such a transfer or assignment. If this has occurred, the new entity's log-in credentials should be changed immediately.

Please call me at your first opportunity to confirm the changed credentials and discuss any questions you may have.

Very truly yours,

Michael S. Bernstein, Receiver

P.S. Please note that the address and phone numbers listed for the receiver in the Order Appointing Receiver have changed. Please use the current contact information, as shown on this letter.)

c:      The Blenden Law Firm, # 23028      (via fax, w/o attachments)

Cause No. CC-03-3182-E

| COMPANA, LLC | § | IN THE COUNTY COURT |
|---|---|---|
| | § | |
| VS. | § | AT LAW NUMBER FIVE OF |
| | § | |
| DODORA UNIFIED COMMUNICATIONS | § | DALLAS COUNTY, T E X A S |

## ORDER REQUIRING COMPLIANCE WITH RECEIVERSHIP ORDER

The court has reviewed Receiver's Motion to Require Parties to Comply With Receivership

Order. After reviewing the affidavit of Michael S. Bernstein, the file, and considering the

argument of counsel, the court finds that the motion should be granted. It is therefore

ORDERED THAT Dodora Unified Communications (hereafter referred to as Dodora), the

judgment debtor, direct all further communication with Internet Corporation for Assigned Names

and Number (hereafter ICANN), and VeriSign, Inc.(hereafter VeriSign) through Receiver,

Michael S. Bernstein, via email to msbpc@earthlink.net and faxed to 972-271-1818. It is further

ORDERED THAT Dodora comply, in all respects, with this court's Order Appointing Receiver

of January 9, 2004. Dodora is prohibited from transferring assets, including contract rights, to

third parties without written approval of Receiver Michael S. Bernstein.

The Receiver is authorized and directed to sell Dodora's property at a private sale, including

without limitation, Dodora's ICANN Accreditation, its customer list and all rights pertaining

thereto, and its log-in credentials with VeriSign and ICANN, subject to final approval of this

court.



The court finds that Receiver Michael S. Bernstein is vested with possession and control of

Dodora's log-in credentials under its Registry-Registrar Agreement with VeriSign.  VeriSign and

ICANN are ordered to recognize Receiver's signature as controlling authority with regard to

Dodora's Registry Registrar Agreement and Dodora's log-in credentials.

VeriSign and ICANN are directed to forward all future communication to Dodora through

Receiver Michael S. Bernstein at 1301 Northwest Hwy., #204, Garland, TX 75041, telephone

972-271-2700, fax 972-271-1818, email msbpc@earthlink.net.  ICANN and VeriSign are further

ordered to provide Michael S. Bernstein with a copy of all written, faxed, and electronic

communication with Dodora dated after January 1, 2003; and all contracts and changes to

contracts between any party and Dodora, regardless of date.  ICANN and VeriSign are directed

to negotiate with Michael S. Bernstein, only, as a representative of Dodora.

IT IS SO ORDERED.

Signed March 19, 2004.

_____
Judge Presiding

23028